# 2014-1215, 1216

In The

# United States Court Of Appeals
## For The Federal Circuit

## LIFE TECHNOLOGIES CORPORATION,

*Appellant,*

v.

## ILLUMINA, INC.,

*Cross-Appellant.*

Appeal from the Decision of the Patent Trial and Appeal Board of the
United States Patent and Trademark Office, Reversing the Patent Examiner's Rejection of
Claims 10-30, Presented in Re-Examination Application 95/001,292 in the Inter Partes
Re-Examination of U.S. Patent No. 6,654,505.

———————————

## BRIEF OF APPELLANT

———————————

Kevin R. Casey, Esquire
Brian A. Cocca, Esquire
Michelle C. Orloski, Esquire
STRADLEY RONON STEVENS
  & YOUNG, LLP
Great Valley Corporate Center
30 Valley Stream Parkway
Malvern, PA  19355
(610) 640-5800

*Counsel for Appellant*

*GibsonMoore Appellate Services, LLC*
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

# CERTIFICATE OF INTEREST

Counsel for Appellant, Life Technologies Corporation, certifies the following:

1. The full name of every party or amicus represented by me is:

   Life Technologies Corporation

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Life Technologies Corporation

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Life Technologies Corporation is a wholly owned subsidiary of Thermo Fisher Scientific Inc., a publicly traded company.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

   Kevin R. Casey, Esquire
   Brian A. Cocca, Esquire (Federal Circuit admission pending)
   Michelle C. Orloski, Esquire (Federal Circuit admission pending)
   Kevin W. Goldstein, Esquire (no longer with the firm)
   Stradley Ronon Stevens & Young, LLP
   Great Valley Corporate Center
   30 Valley Stream Parkway
   Malvern, PA 19355

   Ashita A. Doshi, Esquire (in-house counsel)
   Life Technologies Corporation

   Joseph Lucci, Esquire
   Woodcock Washburn LLP n/k/a Baker & Hostetler LLP

   David J. Ball, Jr., Esquire
   Paul, Weiss, Rifkind, Wharton & Garrison LLP

i

Date: March 10, 2014

/s/ *Kevin R. Casey*
_____
Signature of counsel

 Kevin R. Casey
_____
Printed name of counsel

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTEREST ......................................................................i

TABLE OF CONTENTS............................................................................ iii

TABLE OF AUTHORITIES .........................................................................v

STATEMENT OF RELATED CASES ..........................................................1

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES...................................................................2

STATEMENT OF THE CASE .......................................................................3

A.    The Priority Claim .............................................................................4

B.    The USPTO Proceedings ...................................................................8

SUMMARY OF THE ARGUMENT ...........................................................14

ARGUMENT ...............................................................................................18

      1.    The PTAB Failed to Construe the "Key Feature" of the Claims ........19

      2.    The PTAB Erred in Determining that the "Correlating" Step in
          Each of Claims 10-30 of the '505 Patent Finds Written
          Description Support in the '445 Patent ...............................................22

          a)    The Applicable Legal Precedent...............................................23
          b)    Overview of the Differences Between the '505 Patent
              Claims and the '445 Patent Sequencing Process .....................26
          c)    Detailed Description of the '445 Patent's Process of
              Sequencing ................................................................................30
          d)    Contrast Between the '505 Patent Claims and the
              Sequencing Process of the '445 Patent .....................................38

      3.    The PTAB Erred in Determining that the Gelles Declaration
          Evidences Inherent Written Description Support for the
          "Correlating" Step. ............................................................................42

      4.    The PTAB Erred in According Weight to the Conclusory Gelles
          Declaration ........................................................................................48

5.      The PTAB Erred in Considering the Gelles Declaration
        Because Illumina Did Not Show Good and Sufficient Reasons
        Why this Evidence Was Necessary and Not Presented Earlier,
        in Contravention of 37 C.F.R. § 1.116(e). .........................................52

6.      The PTAB Erred in Determining that claims 10-30 of the '505
        patent Are Entitled to a Priority Date earlier than May 22, 1998
        and, Therefore, Erred in Determining that Brenner Does Not
        Anticipate Claims 10-30 Under 35 U.S.C. § 102(b)...........................54

CONCLUSION & RELIEF SOUGHT ....................................................................55

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Ariad Pharm., Inc. v. Eli Lilly and Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................................23

*Atlantic Research Marketing Systems, Inc. v. Troy*,
  659 F.3d 1345 (Fed. Cir. 2011) ...............................................20, 21

*Binstead v. Littmann*,
  242 F.2d 766 (CCPA 1957) ......................................................25

*In re Brandstadter*,
  484 F.2d 1395 (CCPA 1973) .....................................................26

*In re Buchner*,
  929 F.2d 660 (Fed. Cir. 1991) ..................................................26

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005) .................................................23

*Continental Can Co. USA v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) .................................................24

*In re Cortright*,
  165 F.3d 1353 (Fed. Cir. 1999) .................................................25

*Cybor Corp. v. FAS Technologies, Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) (en banc) ......................................22

*In re Daniels*,
  144 F.3d 1452 (Fed. Cir. 1998) .................................................23

*In re Draeger*,
  150 F.2d 572 (CCPA 1945). .....................................................25

*Eiselstein v. Frank*,
  52 F.3d 1035 (Fed. Cir. 1995) ..................................................23

*In re Enhanced Security Research, LLC*,
  739 F.3d 1347 (Fed. Cir. 2014) ......................................................18

*Hansgirg v. Kemmer*,
  102 F.2d 212 (CCPA 1939) ............................................................25

*In re Hiniker Co.*,
  150 F.3d 1362 (Fed. Cir. 1998) ......................................................21

*Hyatt v. Boone*,
  146 F.3d 1348 (Fed. Cir. 1998) ......................................................25

*Koito Mfg. Co. Ltd. v. Turn-Key-Tech, LLC*,
  381 F.3d 1142 (Fed. Cir. 2004) ......................................................26

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*,
  590 F.3d 1448 (Fed. Cir. 1998) ................................................. 20-21

*Langer v. Kaufman*,
  465 F.2d 915 (CCPA 1972) ............................................................25

*Life Technologies Corp. v. Illumina*,
  No. 1:09-cv-00706-RK (D. Del. Sept. 21, 2009) ................................1

*Life Technologies Corp. v. Illumina*,
  No. 3:11-cv-00703-BTM-DHBJAH (S.D. Cal.) ................................1

*Lighting Ballast Control LLC v. Philips Electronics North America Corp.*,
  --- F.3d ---, 2014 WL 667499 (Fed. Cir. 2014) (en banc)..................22

*Lockwood v. Am. Airlines*,
  107 F.3d 1565 (Fed. Cir. 2008) ......................................................23

*In re Oelrich*,
  666 F.2d 578 (CCPA 1981) ............................................................25

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................21

*Rapoport v. Dement*,
  254 F.3d 1053 (Fed. Cir. 2001) ......................................................21

vi

*Reiffin v. Microsoft Corp.*,
   214 F.3d 1342 (Fed. Cir. 2000) ........................................................54

*Retractable Techs. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) ........................................................21

*In re Smyth*,
   189 F.2d 982 (CCPA 1951) ...............................................................26

*Tempo Lighting, Inc. v. Tivoli, LLC*,
   --- F.3d ----, 2014 WL 503128 (Fed. Cir. 2014) ..............................18

*Therma-Tru Corp. v. Peachtree Doors Inc.*,
   44 F.3d 988 (Fed. Cir. 1995) ............................................................23

*Tronzo v. Biomet, Inc.*,
   156 F.3d 1154 (Fed. Cir. 1998) ........................................................24

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ...................................................23, 24

## STATUTES

5 U.S.C. § 706(2)(A) ..............................................................................54

28 U.S.C. § 1295(a)(4)(A) ..................................................................1, 18

35 U.S.C. § 6(b) .......................................................................................1

35 U.S.C. § 102(b) ..........................................................................*passim*

35 U.S.C. § 103(a) ...................................................................................8

35 U.S.C. § 112 ...............................................................................*passim*

35 U.S.C. § 120..........................................................................7, 23, 54

35 U.S.C. § 134 .......................................................................................1

35 U.S.C. § 315 .......................................................................................1

vii

## RULES

37 C.F.R. § 1.78(a)(3) ..............................................................8

37 C.F.R. § 1.116(e) ...............................................3, 43, 52, 53

37 C.F.R. § 1.132 ....................................................................10

## STATEMENT OF RELATED CASES

A.    No appeal in or from the same proceeding before the United States Patent and Trademark Office Patent Trial and Appeal Board was previously before this or any other appellate court.

B.    U.S. Patent No. 6,654,505 was the subject of litigation in *Life Technologies Corp. v. Illumina*, No. 1:09-cv-00706-RK (D. Del. Sept. 21, 2009). The Delaware District Court ordered the transfer of the litigation to the Southern District of California, where the case is designated 3:11-cv-00703-BTM-DHBJAH.

## JURISDICTIONAL STATEMENT

Life Technologies Corporation (Life Technologies) appeals the decision of the Patent Trial and Appeal Board (PTAB) of the United States Patent and Trademark Office (USPTO), reversing the patent Examiner's rejection of claims 10-30, presented in re-examination application 95/001,292 in the inter partes re-examination of U.S. Patent No. 6,654,505. The PTAB had jurisdiction to review the adverse decisions of the patent Examiner under 35 U.S.C. §§ 6(b), 134, and 315.

The Court of Appeals for the Federal Circuit has jurisdiction over the present appeal under 28 U.S.C. § 1295(a)(4)(A). The judgment of the PTAB from which this appeal was lodged is final.

1

The PTAB issued a Decision on Appeal on November 29, 2012.  Illumina, as patent owner, requested rehearing of this PTAB Decision.  The PTAB issued a Decision on Rehearing on September 20, 2013.  Life Technologies filed its Petition for Review with this Court on November 19, 2013.  Illumina filed its Cross Petition for Review/Notice of Cross Appeal on December 2, 2013.

## STATEMENT OF THE ISSUES

1.      Whether the PTAB erred in failing to construe (at all, and at least properly) each of the four limitations recited in the "correlating" step in each of claims 10-30 of the '505 patent, thereby failing to perform the first step required of the proper written description analysis: claim construction.

2.      Whether the PTAB erred in its determination that the "correlating" step in each of claims 10-30 of the '505 patent finds written description support under 35 U.S.C. § 112, first paragraph, in priority document U.S. Patent No. 6,013,445 (the '445 patent), when the PTAB made no findings with respect to whether the '445 patent discloses all elements of this step.

3.      Whether the PTAB erred in relying upon the Gelles Declaration as persuasive evidence that the "correlating" step in each of claims 10-30 is inherently disclosed in the specification of the '445 patent sufficiently to satisfy the written description requirement under 35 U.S.C. § 112, first paragraph.

2

4.      Whether the PTAB erred in according weight to the Gelles Declaration, despite the PTAB's own assessment that the Gelles Declaration was "admittedly sparse," because the Gelles Declaration was conclusory.

5.      Whether the PTAB erred in considering the Gelles Declaration because Illumina did not show good and sufficient reasons why this evidence was necessary and not presented earlier, in contravention of 37 C.F.R. § 1.116(e).

6.      Whether the PTAB erred in its determination that claims 10-30 of the '505 patent are entitled to a priority date earlier than May 22, 1998, and, therefore, erred in determining that Brenner does not anticipate claims 10-30 under 35 U.S.C. § 102(b).

## STATEMENT OF THE CASE

The underlying dispute between the parties in this case arises from the inter partes re-examination of U.S. Patent No. 6,654,505 (the '505 patent) before the USPTO.  Illumina, Inc. (Illumina) filed the application that matured into the '505 patent as a divisional of a U.S. national phase application filed first as a PCT international application on May 22, 1998.  Life Technologies filed a request for inter partes re-examination of the '505 patent on December 31, 2009, and the USPTO granted this request.  (A77.)

## A.    The Priority Claim

During the re-examination, nearly nine years after filing the application that matured into the '505 patent, and nearly seven years after the '505 patent issued, Illumina amended the priority claim of the '505 patent to include a series of continuation-in-part applications dating back to October 13, 1994.  The original priority claim in the '505 patent stated:

> This application is a divisional of U.S. patent application Ser. No. 09/424,028, filed Nov. 16, 1999 now U.S. Pat. No. 6,406,848, which is a 371 of PCT/US98/11224, filed May 22, 1998, which is a C-I-P of U.S. patent application Ser. No. 08/862,610, filed May 23, 1997 now abandoned, all of which are incorporated in their entirety herein by reference.

(A61, col. 1 lines 4-9.)  The amended (and current) priority claim for the '505 patent states:

> This application is a divisional of U.S. Application Ser. No. 09/424,028, filed November 16, 1999, now U.S. Patent No. 6,406,848, which is a National Stage of International Application No. PCT/US98/11224 filed on May 22, 1998, and a continuation-in-part of U.S. Application Ser. No. 08/946,138, filed October 7, 1997, now U.S. Patent No. 6,013,445, which are both continuations-in-part of U.S. Application Ser. No. 08/862,610, filed May 23, 1997, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/689,587, filed August 12, 1996, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which is a continuation-in-part of U.S. Application Ser. No. 08/358,810, filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a continuation-in-part of U.S. Application Ser. No. 08/322,348, filed October 13, 1994, now abandoned.  This application is also a continuation-in-part of U.S. Application Ser. No. 09/090,809, filed June 4, 1998, now U.S. Patent No. 6,280,935, which is a divisional of U.S. Application Ser. No.

4

08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which
is a continuation-in-part of U.S. Application Ser. No. 08/358,810,
filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a
continuation-in-part of U.S. Application Ser. No. 08/322,348, filed
October 13, 1994, now abandoned.  The entire disclosures of U.S.
Application Ser. No. 09/424,028, International Application No.
PCT/US98/11224, U.S. Application Ser. No. 08/862,610, and U.S.
Application Ser. No. 08/358,810 are incorporated herein by reference.

(Cert. of Correction at A75.)  Illumina petitioned the USPTO Director to accept the

amended priority claim as unintentionally delayed, (A410-13), and the Director

eventually granted this petition and effectuated a change in priority.  (A473-78.)

The following chart (Chart 1) illustrates the amended priority claim (solid boxes

correspond to the original priority documents of the '505 patent, and dashed boxes

correspond to new priority documents added in the revised priority claim):

CHART 1



The left-hand side of Chart 1 reflects a priority claim broken by the

abandonment of the '610 application on March 11, 1998, before the next

application in the chain (PCT/US98/11224) was filed on May 22, 1998. Illumina has dropped reliance on that priority claim. (A6.) Thus, only the priority claim reflected in the right-hand side of Chart 1 (i.e., '505 patent to '028 application to '445 patent to '719 patent to '097 patent) is at issue. Central to this issue are two patents and one patent publication: the '505 patent, U.S. Patent No. 6,013,445 (the '445 patent), and WO 96/12014 (Brenner).

In unrelated filings, Illumina applied for a reissue of the '445 patent to revise its priority claim to mirror the new priority claim of the '505 patent. The original priority claim of the '445 patent did not reference U.S. Patents No. 5,846,719 or No. 5,604,097 or Application No. 08/322,348 (abandoned) in common with the amended priority claim of the '505 patent. Reissue of the '445 patent was granted as RE43,097. Absent this reissue-implemented priority claim revision, the '505 patent could not obtain the benefit of the October 13, 1994 filing date. 35 U.S.C. § 120.

Illumina revised the priority claims of the '505 and '445 patents in an attempt to antedate certain prior art references cited by the Examiner as the basis for anticipation and obviousness rejections raised during the re-examination of the '505 patent. One such reference, Brenner, published on April 25, 1996.

## B.    The USPTO Proceedings

Life Technologies requested inter partes re-examination of the '505 patent, raising a substantial new question of patentability of original claims 1-6 in view of various prior art references.  The USPTO granted the inter partes re-examination request, (A77), and, on March 23, 2010, issued a non-final Office Action rejecting claims 1-6 of the '505 patent as either anticipated under 35 U.S.C. § 102(b) by, or as rendered obvious under 35 U.S.C. § 103(a) over, sixteen different prior art references.  (A84-85.)

Illumina filed a response to the Office Action, adding new claims 7-30 and amending the priority claim of the '505 patent to include a series of continuation-in-part applications dating back to October 13, 1994.  (A320-68.)  To effectuate the priority claim revision, Illumina separately filed a petition with the USPTO Director to accept an unintentional delay for a claim for priority under 37 C.F.R. § 1.78(a)(3).  (A410-13.)  Based on the new priority claim, Illumina argued that the Examiner based most of the rejections on references that did not constitute prior art in light of the new priority date, but conceded that some of the rejections were based on references available before the new priority date.  (*Id.*)

Life Technologies filed comments on Illumina's amendment and response, which challenged the propriety of the attempted priority claim revision.  (A425-28.)  Life Technologies also proposed that the Examiner should reject new claims

8

10-30 under 35 U.S.C. § 102(b) as anticipated by International Publication No. WO 96/12014 (Brenner), which published on April 25, 1996, and as failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112, first paragraph. (A453-71.)

On June 30, 2010, the USPTO Director granted Illumina's petition for unintentional delay in claiming the benefit of priority to earlier applications, effectively permitting the new chain of priority dating back to October 13, 1994. (A473-78.) In view of this decision, Life Technologies filed supplemental comments challenging whether claims 1-30 could benefit from the earlier priority date because the claimed subject matter lacked written description support in the specification of several of the priority applications. (A485-98.)

The Examiner issued an Action Closing Prosecution (ACP) on September 20, 2010, which maintained most of the original rejections, and issued a new rejection of claims 7-30 as anticipated by Brenner under 35 U.S.C. § 102(b). (A697-704.) The Examiner determined that, despite Illumina's attempt to re-write history through the priority claim alterations in the '505 and '445 patents, the claims under re-examination did "not enjoy support in any of the parent patent applications prior to the filing date of PCT/US98/11224, which is May 22, 1998." (A540.) Specifically, the Examiner found that the claimed subject matter lacked

9

written description support in the '445 patent. (A541.) Therefore, claims 7-30 had priority only to May 22, 1998, the filing date of the PCT application.

In response to the ACP, Illumina argued that the claimed subject matter was part of each new priority document. Illumina submitted a Declaration under 37 C.F.R. § 1.132 of Dr. Jeffrey Gelles (Gelles Declaration) to support its position. Notably, Illumina did not provide any explanation as to why the Gelles Declaration was necessary, or why it could not have submitted this Declaration before the ACP. (A711-12.) The Gelles Declaration offered various conclusions as to why the newly added priority documents provided written description support for the claimed subject matter. (A764-806.)

Because Illumina recognized that the specifications of the '505 and '445 patents were dramatically different, particularly with respect to the correlating step that is the subject of this appeal, Illumina relied on the Gelles Declaration to justify its position that the specification of the '445 patent nevertheless supported the subject matter of the '505 patent claims. With reference to working Example 1 of the '445 patent, Dr. Gelles testified that the correlating step constituted an inherent feature of the '445 patent specification. (A767-68.) The Gelles Declaration concluded, based on an explanation which the PTAB later characterized as "admittedly sparse," that the specification of the '445 patent supports the '505

10

patent claims.  (*Id.*)  Life Technologies challenged the Gelles Declaration both as untimely and as legally and factually insufficient.  (A822-27; A1128-31.)

The Examiner issued a Right of Appeal Notice (RAN) on February 18, 2011.  (A78.)  The Examiner maintained that claims 1-30 "do not enjoy support in the parent patent applications prior to the filing date of PCT/US98/11224, which is May 22, 1998."  (A860.)  The Examiner determined that support for the full scope of the claims "is not found in any of the [priority] patent disclosures."  (A862.)  In addition, the Examiner found the Gelles Declaration insufficient to bridge the gaps, remarking that the "Gelles Declaration is not persuasive because it is limited to opinion and it lacks factual support for the opinions that are set forth therein." (A863.)  Ultimately, the Examiner concluded that the "[p]atent owner has failed to demonstrate [the] priority . . . needed to antedate and subsequently remove Brenner as prior art."  (A1002.)  Therefore, the Examiner maintained the rejections of claims 10-30 as anticipated by Brenner.  (*Id.*)

Illumina and Life Technologies timely submitted their respective briefs in response to the RAN.  (A78.)  The PTAB held an oral hearing on July 25, 2012 to discuss specifics of the issues on appeal.  (A1227.)

The PTAB issued its Decision on Appeal (DoA) on November 29, 2012. (A78.)  The PTAB considered the questions of (i) whether the '445 patent provides written description support for the subject matter claimed in the '505 patent, (A9-

11

10), and, accordingly, (ii) whether Brenner anticipates claims 10-30. (A33-39.) The PTAB separated the claims into two groups, claims 1-9 and claims 10-30, and issued twenty-two findings of fact with respect to support for the claimed subject matter in the priority documents. (A10-14.)

The substantive analysis of claims 10-30 centered around whether the '445 patent described the claimed step of "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images." (A16-23.) To answer this question, the PTAB focused on claim 10 as representative of all of the claims. (A17.)

As a starting point, the PTAB noted that there "is no express disclosure in the '445 Patent that an image is taken after each ligation cycle and that the optical signals from each image are correlated for each microparticle as required by the claim." (A18.) Recognizing this deficiency, the PTAB assessed paragraphs 28 and 29 of the Gelles Declaration, which characterized working Example 1 and corresponding Fig. 4 of the '445 patent as inherently describing the correlating step. (A18-22.)

Acknowledging that the Gelles Declaration "is admittedly sparse," the PTAB nevertheless found this evidence "logical" and "entirely consistent and supported by the written description of the '445 patent." (A19-20.) In view of the testimony in the Gelles Declaration, the PTAB determined that "four different

12

images from each successive ligation would have been correlated to pinpoint the same microparticle in each [image] in order to determine the sequence of the polynucleotide attached to the microparticle." (A20.) The PTAB viewed the testimony in the Gelles Declaration as suggesting "that the inventor's [sic] necessarily accomplished the [correlating] step in assembling the sequence of Figure 4." (*Id.*)

Although Life Technologies had challenged the Gelles Declaration as failing to suggest or prove that the missing claim step (and, hence, the specific limitations recited in that step) was necessarily present in the priority documents, the PTAB did not agree with Life Technologies. The PTAB addressed this challenge by explaining that "the optical signals generated at each microparticle must be correlated. Dr. Gelles testified to this fact, and based on our independent findings on the '445 Patent, we find no reason to doubt it." (A22.) Based on these findings, the PTAB found "that the written description of the '445 Patent conveys to one of ordinary skill in the art that the inventors had possession of the claimed step." (A22.) On the question of priority, the PTAB held that "the Examiner erred in denying claims 10-30 benefit of the '445 . . . Patent[]." (A23.)

The PTAB next addressed the question of whether claims 10-30 were anticipated by Brenner. (A33-34.) Because the prior art value of Brenner as an anticipatory reference was undisputed, this question directly tied into the issue of

13

priority, for which the PTAB "determined that claims 10-30 are entitled to the priority date of December 19, 1994." (A39.) Brenner had published on April 25, 1996. Thus, the PTAB held that "Brenner is not prior art and we are compelled to reverse the rejection." (*Id.*)

Illumina filed a Request for Rehearing of the Decision on Appeal on December 31, 2012, (A78), requesting that the PTAB reconsider the PTAB's affirmance of certain rejections of claims 2-6 as inconsistent with the PTAB's rejection of the Examiner's claim construction underlying the rejections. (A1273-75.) The PTAB issued its Decision on Rehearing on September 20, 2013 (Appeal 2012-007309). (A78.) In this Decision, the PTAB denied the Request on the ground that Illumina's rationale appeared to be based on new arguments not made in Illumina's brief, and did not identify a point misapprehended or overlooked by the PTAB in rendering its Decision on Appeal. (A48.)

## SUMMARY OF THE ARGUMENT

This PTAB conscientiously tackled its job in this inter partes re-examination of the '505 patent. Substantial evidence supports many of the PTAB's factual findings, and the PTAB made many correct legal determinations. Specifically, for example, the PTAB correctly found that claims 1-9 of the '505 patent are broader than the written description in the '445 patent and correctly concluded that the Examiner had properly determined that claims 1-9 are not in compliance with the

14

written description requirement.  Illumina will likely challenge that finding and

determination on cross-appeal.

With respect to Life Technologies' appeal, the Examiner determined that

claims 10-30 of the '505 patent were also not entitled to the priority date of the

'445 patent because the '445 patent did not describe the claimed subject matter in

compliance with 35 U.S.C. § 112, first paragraph.  The Examiner was again

correct.  In this portion of the re-examination, however, and despite again making a

number of correct factual findings and legal conclusions, the PTAB erred.

At issue is whether the '445 patent provides written description support for

the correlating step recited in claims 10-30 of the '505 patent.  The claims recite a

sequence of processing steps which include what the PTAB termed a "correlating

step."  (A16.)  In turn, the correlating step constitutes a combination of four

limitations: (1) correlating (2) the optical signals generated (3) at each

microparticle (4) with its corresponding image in each of the plurality of the digital

images.  (*Id.*)

The PTAB's analysis of the issue began with an error because it failed

expressly to interpret the claimed correlating step.  And, to the extent the PTAB

implicitly interpreted that step, the PTAB failed to consider each of the four

limitations recited in combination by that step.  Specifically, the PTAB failed to

accord the four highlighted claim limitations their ordinary meaning in

15

combination. Had the PTAB carefully parsed and interpreted each of the four
limitations recited in combination in claims 10-30, the PTAB might well have
avoided the misunderstanding of those limitations that characterized the
subsequent steps of its written description analysis. De novo review by this Court
of those limitations will undoubtedly correct the PTAB's misunderstanding.

In the next step of its analysis, the PTAB correctly found no express
disclosure of the correlating step in the '445 patent. (A20.) The PTAB erred,
however, by finding inherent disclosure of the correlating step in the '445 patent –
without making any findings with respect to whether the '445 patent inherently
conveys the full scope of this correlating step, including the four limitations in
combination. (A20-22.) Thus, substantial evidence does not support the PTAB's
findings of inherent disclosure.

In the sequencing method disclosed by the '445 patent, each microparticle
does not generate a fluorescent (optical) signal in each digital image. Further,
because only a fraction of the microparticles actually generates a fluorescent signal
in a particular digital image, and because that fraction changes with each digital
image, it is impossible to correlate the optical signal generated at each
microparticle with its corresponding image in each of the plurality of digital
images. The PTAB failed to consider the correlating limitation of the "correlating
step" of the '505 patent claims in combination with the other three related

16

limitations (correlating for signals generated at each microparticle in each digital image). The PTAB erred in considering the overall correlating step without relation to the specific limitations required to carry out the correlating step.

Illumina filed a declaration by Dr. Jeffrey Gelles, after the Examiner issued an action closing prosecution, belatedly attempting to buttress its position. The PTAB correctly characterized the declaration as "admittedly sparse." (A19.) Nevertheless, the PTAB deferred to the Gelles Declaration as establishing that the correlating step was inherent in the disclosure of the '445 patent. (A19-22.) The PTAB's reliance on the Gelles Declaration as evidencing inherent correlation is flawed because, procedurally, the Gelles Declaration was untimely filed without justification as to why the late filing was necessary and, substantively, is both irrelevant and conclusory.

The Gelles Declaration (a) lacks any independent factual support, (b) is directed to something other than the actual claim language, and (c) does not reach the high standard for demonstrating inherency. The Gelles Declaration does not evidence that the entire correlating step of claims 10-30 is necessarily present in the '445 patent or that a person having ordinary skill in the art would necessarily conclude from the information provided in the '445 patent that each of the four limitations recited in the correlating step occurs. Because the PTAB nevertheless

17

considered the Gelles Declaration as persuasive evidence, the PTAB erred in this regard.

Illumina does not contest the fact that the prior art reference of WO 96/12014 (Brenner) anticipates claims 10-30 of the '505 patent if those claims are not entitled to the priority date of the '445 patent. Therefore, the Examiner correctly concluded that Brenner anticipates claims 10-30. The PTAB erred in concluding to the contrary.

## ARGUMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) to review appeals from the PTAB in a patent re-examination, and reviews PTAB legal determinations de novo and factual findings for substantial evidence. *In re Enhanced Security Research, LLC*, 739 F.3d 1347, 1351 (Fed. Cir. 2014); *see also Tempo Lighting, Inc. v. Tivoli, LLC*, --- F.3d ----, 2014 WL 503128 at *3 (Fed. Cir. 2014) (applying the stated standard of review and affirming the Board's "broadest reasonable interpretation" of the disputed claim terms during inter partes reexamination).

During re-examination of the '505 patent, Illumina presented new claims 10-30, which the Examiner rejected as anticipated by WO 96/12014 to Brenner. (A548-704.) Illumina never contested whether Brenner substantively anticipates claims 10-30. *See, e.g.*, A1123 at n.3; *see also* A1240-41 at 14:16-15:7. Instead,

18

Illumina attempted to antedate Brenner by revising the priority claim of the '505

patent to garner priority earlier than the publication of Brenner. (A410-13.)

### 1. The PTAB Failed to Construe the "Key Feature" of the Claims

Claim 10 is representative of claims 10-30 for purposes of this appeal.

Claim 10 recites:

> 10. A device-readable medium comprising:
>
> a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for:
>
> rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;
>
> converting each of a plurality of optical signals into respective data representative of the nucleotides; and
>
> processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of the digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of DNA fragments.

(A322-23.)

Claims 10-30 of the '505 patent relate to a device readable medium

comprising a program of instructions for a device to determine a sequence of

nucleotides. Each of the claims recite that the instructions require rendering a

plurality of digital images of an array of microparticles throughout a sequence of

processing steps based on optical signals generated at the microparticles, and then "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of the digital images." (A322-28.) The '505 patent designates this latter step a "key feature of the invention." (A50, at Abstract.) This key claim step constitutes a combination of four limitations: (1) <u>correlating</u> (2) the optical signals generated (3) at <u>each</u> microparticle (4) with its corresponding image in <u>each</u> of the plurality of the digital images. (A322-23 (emphasis added).)

Relevant to this appeal, the central question becomes whether the documents to which the '505 patent newly claims priority and, in particular, the '445 patent, provide written description support for these four limitations as recited <u>in combination</u> in each of claims 10-30. As the discussion below reveals, the '445 patent does not provide the requisite written description support for all four limitations in combination.

In its Decision on Appeal, the PTAB ultimately determined that the '445 patent conveys possession of the correlating step. (A17.) The PTAB erred, however, because it never performed the first step required of the proper analysis: claim construction. "[C]laim construction is inherent in any written description analysis." *Atlantic Research Marketing Systems, Inc. v. Troy*, 659 F.3d 1345, 1354 (Fed. Cir. 2011); *see also Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating*

20

*Co.*, 590 F.3d 1448, 1454-56 (Fed. Cir. 1998) ("A [decisionmaker] must base its analysis of written description . . . on proper claim construction."). In fact, with respect to patentability, "the name of the game is the claim." *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). Thus, the "first step of a patentability" analysis mandates that the PTAB must start by interpreting any relevant terms in the patent claims. *Rapoport v. Dement*, 254 F.3d 1053, 1058 (Fed. Cir. 2001). The PTAB's error is especially troubling because the parties expressly raised the issue of claim interpretation before the PTAB. (*See* A1041; A1133.)

"To ascertain the scope and meaning of the asserted claims, [courts] look to the words of the claims themselves, the specification, the prosecution history, and any relevant extrinsic evidence." *Atlantic Research Marketing Systems*, 659 F.3d at 1354 (quoting *Retractable Techs. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303 (Fed. Cir. 2011) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315–17 (Fed. Cir. 2005) (en banc)). Had the PTAB carefully parsed and interpreted each of the four limitations recited in combination in claims 10-30, the PTAB might well have avoided the misunderstanding of those limitations that characterized the subsequent steps of its written description analysis.

But the PTAB did not expressly interpret the claimed correlating step. And, to the extent the PTAB implicitly interpreted that step, the PTAB misconstrued the claim limitations. Specifically, the PTAB failed to accord the highlighted claim

21

limitations, (1) <u>correlating</u> (2) the optical signals generated (3) at <u>each</u> microparticle (4) with its corresponding image in <u>each</u> of the plurality of the digital images, their ordinary meaning in combination. This error of claim construction presents an issue of law subject to de novo review on appeal. *See*, *e.g.*, *Lighting Ballast Control LLC v. Philips Electronics North America Corp.*, --- F.3d ---, 2014 WL 667499 at *1 (Fed. Cir. 2014) (en banc) (concluding as a matter of stare decisis that the rule in *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc), that claim construction is an issue of law subject to *de novo* review on appeal will be retained).

### 2. The PTAB Erred in Determining that the "Correlating" Step in Each of Claims 10-30 of the '505 Patent Finds Written Description Support in the '445 Patent

In the next step of its analysis, the PTAB erred because it made no findings with respect to whether the '445 patent conveys the full scope of this correlating step, including the four limitations in combination. In particular, the PTAB failed to establish whether the correlating step includes <u>each</u> microparticle in <u>each</u> digital image, and whether the correlation uses optical signals that are generated at <u>each</u> microparticle (as opposed to using the absence of optical signals). The PTAB did not consider whether the '445 patent conveys possession of the combination of four limitations in the correlating step as claimed. Therefore, the PTAB erred in its determination that the '445 patent conveys possession of the correlating step of

22

claims 10-30.  As a result, the PTAB also erred in its determination that the '505 patent antedates Brenner such that Brenner does not anticipate claims 10-30.

### a)    The Applicable Legal Precedent

"Entitlement to priority under § 120 is a matter of law, and receives plenary review on appeal."  *In re Daniels*, 144 F.3d 1452, 1456 (Fed. Cir. 1998).  "[T]o gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112."  *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1571 (Fed. Cir. 2008).  "Compliance with the 'written description' requirement is a question of fact . . . ."  *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995).  An invention claimed in a CIP application is entitled to the benefit of the filing date of a parent application when the parent satisfies the written description requirement of 35 U.S.C. § 112.  *Therma-Tru Corp. v. Peachtree Doors Inc.,* 44 F.3d 988, 992 (Fed. Cir. 1995).

"The 'written description' requirement implements the principle that a patent must describe the technology that is sought to be patented . . . ."  *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).  The written description "must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'"  *Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555,

23

1563 (Fed. Cir. 1991)).  The test for sufficiency of the written description "is

whether the disclosure of the application relied upon reasonably conveys to those

skilled in the art that the inventor had possession of the claimed subject matter as

of the filing date."  *Id*. (citations omitted).

The '445 patent does not comply with the written description requirement of

Section 112 such that the revised priority chain of the '505 patent breaks beyond

May 22, 1998.  *See* 35 U.S.C. § 112.  The specification of the '445 patent does not

reasonably convey possession of a device readable medium comprising a program

of instructions for <u>correlating</u> optical signals generated at <u>each</u> microparticle with

its corresponding image in <u>each</u> of a plurality of digital images, as claims 10-30

require.  The PTAB found that the '445 patent does not expressly describe this

step, and Illumina does not contest this finding.  (A18.)  Thus, the inquiry becomes

whether the '445 patent inherently describes all four limitations of this step in

combination.  The answer is no.

"In order for a disclosure to be inherent . . . , the missing descriptive matter

must necessarily be present in the parent application's specification such that one

skilled in the art would recognize such a disclosure."  *Tronzo v. Biomet, Inc*., 156

F.3d 1154, 1159 (Fed. Cir. 1998) (citing *Continental Can Co. USA v. Monsanto

Co*., 948 F.2d 1264, 1268 (Fed. Cir. 1991).  The burden is on the patent owner,

Illumina, to "show[] that one of ordinary skill would necessarily conclude from the

information expressly disclosed by the written description that the [missing step] occurs." *In re Cortright*, 165 F.3d 1353, 1360 (Fed. Cir. 1999). *See also Hyatt v. Boone,* 146 F.3d 1348, 1354-55 (Fed. Cir. 1998) ("the written description must include all of the limitations . . . or the applicant must show that any absent text is necessarily comprehended in the description provided and would have been so understood at the time the patent application was filed."); *Cf. Langer v. Kaufman*, 465 F.2d 915, 918 (CCPA 1972) ("To prove inherency, the burden is on [the patent owner] to show that the '*necessary and only reasonable* construction to be given the disclosure by one skilled in the art is one which will lend clear support to . . . [this] positive limitation in the interference count.'") (quoting *Binstead v. Littmann*, 242 F.2d 766, 770 (CCPA 1957) (emphasis in original)).

"Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981) (quoting *Hansgirg v. Kemmer*, 102 F.2d 212, 214 (CCPA 1939)). "Inherency does not mean that a thing might be done, or that it might happen . . . one out of twenty odd times; but it must be disclosed, if inherency is claimed, that the thing will necessarily happen." *In re Draeger*, 150 F.2d 572, 574 (CCPA 1945).

"[Section] 112 requires that, unless the information is well known in the art, the application itself must contain this information; it is not sufficient to provide it

only through an expert's declaration. *In re Smyth*, 189 F.2d 982, 990 90 USPQ 106, 112, 38 CCPA 1130 (1951). Moreover, an expert's opinion on the ultimate legal issue must be supported by something more than a conclusory statement." *In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991). "[A]ffidavits fail in their purpose [when] they recite conclusions and few facts to buttress said conclusions." *In re Brandstadter*, 484 F.2d 1395, 1406 (CCPA 1973). *Cf. Koito Mfg. Co. Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("General and conclusory testimony . . . does not suffice as substantial evidence of invalidity.").

      b)    **Overview of the Differences Between the '505 Patent Claims and the '445 Patent Sequencing Process**

"Sequencing" is a process of determining the exact order of the four types of nucleotides (abbreviated A, C, G, and T) which constitute individual building blocks linked together in a nucleic acid polymer. The order in which the nucleotides are linked together constitutes the nucleic acid sequence. The claims of the '505 patent and the nucleic acid sequencing process of the '445 patent both involve obtaining and comparing "digital images" (i.e., photographs) of a bead array taken during the sequencing process. Beads in the array generate fluorescence, which is photographed.

      Claims 10-30 of the '505 patent are all directed to software for determining a nucleic acid sequence by correlating fluorescent "optical signals generated at each microparticle with its corresponding image [of the fluorescent microparticle] in

26

each of a plurality of digital" photographs of the bead array. (A322-28.) To paraphrase, the '505 claims recite that during the sequencing process, a series of photographs ("plurality of digital images") are taken of the bead array, and each bead in the bead array emits fluorescent "optical signals" that create a "corresponding image" of each bead in each photograph of the array.

The sequencing process of the '445 patent determines, in parallel, the sequence (i.e., identity and order) of nucleotides in different nucleic acid templates attached to different beads that are spread out in a planar "array" on a flat surface. *See, e.g.*, A380 and A399 highlighting Feature 510 of Fig. 5. The templates are sequenced by repeated cycles of three main steps: ligation, identification, and cleavage. One such cycle of ligation, identification, and cleavage provides the sequence of a four-nucleotide segment of each template on each bead (the four-nucleotide sequence information for each template is called a "word").

In the sequencing process of the '445 patent, a single cycle of ligation, identification, and cleavage involves taking a series of sixteen separate photographs of the bead array during the identification step. The combined package of sixteen photographs taken together allows the user to elucidate a "word" (i.e., sequence information of a four-nucleotide segment) from each template on each bead in the array.

27

None of these sixteen photographs of the array contains a fluorescent image of each bead in the array, because only some, but not all, beads emit a fluorescent signal when any one photograph is taken. (Beads that do not emit fluorescence do not produce a "corresponding" fluorescent bead image in the photograph.) The '445 patent explicitly acknowledges that the identification step involves determining the "presence or absence of" a fluorescent signal from individual beads in each photograph of the array. *See, e.g.*, A397 at col. 33, lines 55-58 ("The presence or absence of fluorescent signal after washing indicates the presence or absence of a particular nucleotide at a particular location."); *see also* A398 at col. 36, lines 34-36 ("[T]he mixture is washed . . . and the presence or absence of a fluorescent signal is measured.").) The '445 patent unequivocally teaches that some beads do not emit a fluorescent signal and, thus, do not produce a "corresponding [bead] image" in the photograph of the array.

The sequencing process described in the '445 patent does not correlate fluorescent bead images in the manner recited by the '505 claims. Rather, according to the sequencing process of the '445 patent, only some, but not all, beads emit fluorescent optical signals at any one time. And the beads that do or do not emit fluorescent optical signals change from photograph to photograph. Therefore, any individual photograph of the bead array does not have a "corresponding image" of each bead in the array as required by the claims of the

28

'505 patent because some beads do not emit fluorescent "optical signals" and cannot generate a "corresponding [bead] image" in the photograph. And because the sequencing process of the '445 patent lacks a "corresponding" image for <u>each</u> and every bead, the process does not and cannot include the step of correlating <u>each</u> bead image in <u>each</u> photograph of the bead array as the '505 claims require.

Both Illumina and the PTAB relied on the Gelles Declaration to support the position that the '445 patent inherently discloses the correlating step of the '505 patent claims. *See* A1036; A18-22. In particular, Dr. Gelles testified that Example 2 of the '445 patent "includes assembling separate four-nucleotide sequences" [i.e., "words"] from a given bead during successive sequencing cycles into a longer base pair sequence and that assembling two successive four-nucleotide "words" together would require correlating both "words" with the bead from which both "words" were generated. (A1073 at ¶ 28.) Dr. Gelles did not go so far, however, as to actually opine about whether the '445 patent's process of obtaining each "word" from a given bead and, subsequently, assembling different "words" from that bead together, necessarily involves correlating fluorescence of "<u>each</u> bead with its corresponding [bead] image in <u>each</u> of a plurality of digital" photographs of the array, which is what the claims of the '505 patent actually require. In fact, the sequencing process of the '445 patent does not perform such correlation for the reasons provided above.

29

c) **Detailed Description of the '445 Patent's Process of Sequencing**

A detailed description of the '445 patent's sequencing process is provided for reference. The process involves sequential hybridizing/ligating to, identification of, and removal of encoded adapters and labeled complementary tags from a nucleic acid. Using this process, nucleic acids are sequenced in increments of four-nucleotide segments. The four types of nucleotides (abbreviated A, C, G, and T) constitute individual building blocks that are linked together to form a nucleic acid. The order in which the nucleotides are linked together constitutes the nucleic acid sequence.

Example 1 and Example 2 of the '445 patent are representative of the encoded adapter sequencing process described in the '445 patent. Illumina and the PTAB referred to the Gelles Declaration which relied on Example 2 as supporting the correlating step. Example 2 explicitly incorporates the sequencing technique described in Example 1. These two Examples formed an integral part of the PTAB's analysis. (A18-22.)

In these Examples, the templates on the beads are first cleaved to generate a single-stranded overhang of four nucleotides. (A376, Fig. 2 of the '445 patent.) The exact identity and order of the nucleotides in the four-nucleotide overhang is determined by applying a mixture of <u>sixteen</u> different sets of adaptors to the beads. Each adaptor set is designed to bind (hybridize) and get linked ("ligated") to all

overhangs having one of the four possible nucleotides (A, C, G, or T) at a given nucleotide position, and thus each type of encoded adaptor binds to about *one-fourth* of all beads.

In particular, the sixteen sets of adapters correspond to all sixteen possible variations in the four-nucleotide overhang:

| ANNN | NANN | NNAN | NNNA |
|------|------|------|------|
| CNNN | NCNN | NNCN | NNNC |
| GNNN | NGNN | NNGN | NNNG |
| TNNN | NTNN | NNTN | NNNT |

Each of the sixteen adaptor sets also bears a unique identifying "tag" sequence. After attachment to matching beads, the adaptors are identified by binding fluorescent probes, called "tag complements," to the tag sequences of the adaptors. Fluorescence by a bead after a particular tag complement is applied indicates that the bead bears the matching adaptor, which in turn indicates that the template on the bead contains the nucleotide sequence which that particular adaptor matches. An adaptor (and its corresponding tag complement) binds to all templates having one particular type of nucleotide. Because there are four possible types of nucleotides (A, C, G, or T) at any position, each adaptor set (and thus each tag complement) only binds to about <u>one-fourth</u> of all beads.

The sixteen adaptor sets are shown on the next page, with a corresponding template and tag complement also shown for the bottom-most adaptor set.

31

## Sixteen encoded adaptor sets

```
5'-pANNNTACAGCTGCATCCCttggcgctgagg
        pATGCACGCGTAGGG-5'

5'-pNANNTACAGCTGCATCCCtgggcctgtaag
        pATGCACGCGTAGGG-5'

5'-pCNNNTACAGCTGCATCCCttgacgggtctc
        pATGCACGCGTAGGG-5'

5'-pNCNNTACAGCTGCATCCCtgcccgcacagt
        pATGCACGCGTAGGG-5'

5'-pGNNNTACAGCTGCATCCCttcgcctcggac
        pATGCACGCGTAGGG-5'

5'-pNGNNTACAGCTGCATCCCtgatccgctagc
        pATGCACGCGTAGGG-5'

5'-pTNNNTACAGCTGCATCCCttccgaacccgc
        pATGCACGCGTAGGG-5'

5'-pNTNNTACAGCTGCATCCCtgaggggggatag
        pATGCACGCGTAGGG-5'

5'-pNNANTACAGCTGCATCCCttcccgctacac
        pATGCACGCGTAGGG-5'

5'-pNNNATACAGCTGCATCCCtgactccccgag
        pATGCACGCGTAGGG-5'

5'-pNNCNTACAGCTGCATCCCtgtgttgcgcgg
        pATGCACGCGTAGGG-5'

5'-pNNNCTACAGCTGCATCCCtctacagcagcg
        pATGCACGCGTAGGG-5'

5'-pNNGNTACAGCTGCATCCCtgtcgcgtcgtt
        pATGCACGCGTAGGG-5'

5'-pNNNGTACAGCTGCATCCCtcggagcaacct
        pATGCACGCGTAGGG-5'

5'-pNNNTNTACAGCTGCATCCCtggtgaccgtag
        pATGCACGCGTAGGG-5'

5'-pNNNTTACAGCTGCATCCCtccctgtcgga
        pATGCACGCGTAGGG-5'
```

The single-stranded portions of four nucleotides on the left side will bind to all templates with a matching overhang; one set of matching templates is shown for the bottom-most adaptor

Tag sequences are shown in lower-case; each tag sequence is unique to each adaptor set

Labelled Tag Complement (underlined)

```
NNNNNNNNN
NNNNNNNNNNNNNNNNA          aggggacagcct
```

☆

32

Importantly, in a single step of identification each of the sixteen tag complements is applied and removed separately, and sixteen different photographs of the array are taken during application of each tag complement. Each photograph reveals the "presence or absence of a fluorescent" bead image for each bead in the array, indicating whether that particular tag complement bound to the bead or not. (A398 at col. 36, lines 34-37.) Because a fluorescent tag complement should only bind to about one-fourth of all beads, about three-fourths of the beads do not produce a corresponding fluorescent bead image in any one photograph.

The following Table summarizes the sequencing process as disclosed in the specification of the '445 patent in the first (left) column. The second column identifies the limitation of claim 10 of the '505 patent corresponding to the process step. The third column summarizes the sequencing process as disclosed in Example 1 of the '445 patent. Finally, the fourth (right) column highlights the lack of support for the claim limitation in the '445 patent.

33

| Sequencing Process According to the Specification of the '445 Patent | Claim Limitation (Claim 10 as Representative) | Example 1 of the '445 Patent | Lack of Support for the Claim Limitation in the '445 Patent |
|---|---|---|---|
| (1) Target nucleic acid (NA1 and NA2) of unknown sequence affixed to microparticle (MP1 and MP2); All microparticles assembled into an array.<br><br>(MP1—NA1)<br>(MP2—NA2) | N/A | "a segment of plasmid pGEM7Z is amplified and attached to glass beads" col. 33, lines 42-44. | |
| (2) Hybridize (bind) and ligate (link) encoded adapter (EA1 and EA2) to each target nucleic acid via complementarity (match).<br><br>(MP1—NA1—EA1)<br>(MP2—NA2—EA2) | N/A | "Ligation of the adapters to the target polynucleotide" col. 36, line 8 | |
| (3a) Hybridize (bind) fluorescently labeled tag complement (TC1) to sub-set of encoded adapters via complementarity (match).<br><br>(MP1—NA1—EA1—TC1)<br>(MP2—NA2—EA2) | N/A | "Separately, each of the labelled tag complements is applied to the polynucleotide-bead mixture under conditions which permit the formation of perfectly matched duplexes." col. 36, lines 30-32. | |

| | | | |
|---|---|---|---|
| (3b) Wash unbound tag complement from mismatched encoded adapters. | N/A | "after which the mixture is washed under stringent conditions" col. 36, lines 34-35. | |
| (4) Expose hybridized tag complement to light to excite the fluorescence(*).<br><br>(MP1—NA1—EA1—TC1*)<br>(MP2—NA2—EA2)<br><br>-MP1 produces signal via TC1<br>-MP2 produces no signal | Optical signals generated at the microparticles | "and the presence or absence of a fluorescent signal is measured." col. 36, lines 35-36. | Microparticle 1, but not microparticle 2, has a tag complement attached. Only microparticle 1 will generate an optical signal (the fluorescence). Microparticle 2 will not generate an optical signal. |
| (5) Take picture of the array. | Rendering a plurality of digital images of the planar array of the microparticles | | |
| (6) Remove tag complement.<br><br>(MP1—NA1—EA1)<br>(MP2—NA2—EA2) | N/A | "Tag complements are … washed … for 10 minutes at 55° C." col. 36, lines 36-40. | |

| | | | |
|---|---|---|---|
| (7) Repeat steps (3a) through (6) with new tag complements (TC2, etc.) until all tag complements cycled through:<br><br>3a. Hybridize (bind) fluorescently labeled tag complement (TC2) to sub-set of encoded adapters via complementarity (match).<br><br>(MP1-NA1-EA1)<br>(MP2-NA2-EA2-TC2*)<br><br>3b. Wash unbound tag complement from mismatched encoded adapters.<br><br>4. Expose hybridized tag complement to light to excite the fluorescence(*).<br><br>(MP1—NA1—EA1)<br>(MP2—NA2—EA2—TC2*)<br><br>-MP1 produces no signal<br>-MP2 produces signal via TC2<br><br>5. Take picture of the array.<br><br>6. Remove tag complement.<br><br>(MP1—NA1—EA1)<br>(MP2—NA2—EA2) | Correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images | | Microparticle 2, but not microparticle 1, has a tag complement attached. Only microparticle 2 will generate an optical signal (the fluorescence). Microparticle 1 will not generate an optical signal. <u>Thus, each microparticle does not generate an optical signal.</u><br><br>Each digital image in the plurality will show some microparticles generating an optical signal and other microparticles not generating an optical signal. <u>Thus, each digital image does not have a corresponding image of microparticles with generated optical signals.</u><br><br>Cannot correlate absence of signal with absence of signal. <u>Thus, cannot correlate each microparticle in each digital image.</u> |

| | | | |
|---|---|---|---|
| (8) Cleave (remove) encoded adapter from target nucleic acid. | N/A | "After the four nucleotides are identified … the encoded adapters are cleaved from the polynucleotides" col. 36, lines 41-43. | |
| (9) Repeat steps (2) through (8) until complete target nucleic acid sequence determined. | To generate a sequence of data representative of a sequence of nucleotides | "After an initial ligation and identification, the cycle of ligation, identification, and cleavage is repeated three times to give the sequence of the 16 terminal nucleotides of the target polynucleotide." col. 36, lines 43-47. | |

### d) Contrast Between the '505 Patent Claims and the Sequencing Process of the '445 Patent

As explained above, each photograph of the bead array will show a small fraction (i.e., ¼) of microparticles generating a fluorescent signal (the presence), and a much larger fraction (i.e., ¾) of microparticles not generating any signal (the absence). Only the microparticles that emit a fluorescent signal generate a "corresponding image" in the photograph of the array. And because tag complements are removed between successive probing steps, the fraction of microparticles generating a fluorescent signal will necessarily differ among each successive digital image.

Several issues arise from the operation of the encoded adapter sequencing process described in the '445 patent vis-à-vis claims 10-30 of the '505 patent. First, in the '445 patent, each microparticle does not generate a fluorescent (optical) signal in each digital image. Second, because only a fraction of the microparticles actually generate a fluorescent signal in a particular digital image, and because that fraction changes with each digital image, it is impossible to correlate the optical signal generated at each microparticle with its corresponding image in each of the plurality of digital images. Third, it is mathematically impossible to correlate a negative (signal absence) with a negative (signal

absence).  Yet, despite these issues, the PTAB determined that the '445 patent supports the correlating step of claims 10-30.

The PTAB made this determination, in error, because it considered only whether correlating occurs with respect to assembly of a nucleic acid sequence from four nucleotide portions, and not whether correlating at each sub-step for generating a four nucleotide portion of a nucleic acid sequence occurs according to claims 10-30.  The PTAB failed to consider the correlating limitation in combination with the other three related limitations (correlating for signals generated at each microparticle in each digital image).  In short, the PTAB did not roll up its proverbial sleeves and dig into whether the '445 patent discloses more than just "correlating," and specifically whether the '445 patent inherently discloses each of the limitations recited in the correlating step of the '505 claims (i.e., the full scope of the claims).

The PTAB incorrectly considered only how a nucleotide sequence is assembled from each four nucleotide word, and failed to consider that sixteen steps and digital images are required to establish the sequence of a given four nucleotide word.  In each of these sixteen steps, each microparticle does not generate a signal, making correlation of a microparticle with itself in each digital image impossible: only ¼ of the sixteen digital images would show an optical signal generated at a given microparticle.

39

With reference to the Gelles Declaration, the deficiencies of which are discussed in more detail below, the PTAB observed that the '445 patent (1) assembles "data from three different tag complements successively collected at the same microparticle," and (2) creates "an electronic image of the fluorescence." (A19.)  In this respect, the PTAB noted that "each tag is successively removed during the process" such that the "electronic image would necessarily be taken at each cycle prior to the tag removal." (*Id.*)  Based on this analysis, and bolstered by the Gelles Declaration, the PTAB concluded that to "determine the sequence of a polynucleotide on the same microparticle of a bead array when multiple cycles of ligation and identification are carried out, the optical signals generated at each microparticle must be correlated." (A22.)  But the PTAB's analysis looks at the wrong level of correlation – the PTAB considered whether correlation is required, generally, to assemble four nucleotide words into the nucleic acid sequence, but should have considered the details of whether and how correlation is required to determine the four nucleotide word in the first place.  The claims require the latter, not just the former.

In its analysis, the PTAB acknowledged the <u>successive</u> ligation, imaging, and removal of tag complements.  (A14; A17.)  The PTAB failed to appreciate, however, that this very successive processing means that each electronic image of the fluorescence taken at a given cycle will necessarily differ from the electronic

images of the fluorescence taken in the other cycles. This is because each tag complement only interacts with a fraction (i.e., ¼) of the microparticles in a particular cycle, then the tag complement is removed and the bead array is then probed with a different tag complement that interacts with a different fraction of the microparticles in the next cycle. The removal of the tag complement removes the fluorescence it generated (the microparticles formerly complexed with the tag complement go dark), and the replacement of the tag complement moves the fluorescence to different microparticles. Accordingly, in any particular image, each microparticle does not generate a fluorescent (optical) signal and, therefore, each microparticle cannot be correlated with its corresponding image in each of the plurality of images.

The PTAB erred in considering the overall correlating step without relation to the specific limitations required to carry out the correlating step. Although the PTAB made fourteen independent findings of fact with respect to the disclosure of the '445 patent, (A10-13), the PTAB made no such findings with respect to whether and how (1) each microparticle (2) generates an optical signal in (3) each digital image of the array of microparticles such that "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" necessarily occurs when sequencing as taught by the '445 patent. In fact, the PTAB could not make such findings because, as explained

41

above, each microparticle does not generate an optical signal in each digital image of the array of microparticles. Moreover, none of the fourteen findings of fact specifically address the correlating step.

This Court should correct the PTAB's analytical error and consider all four of the limitations recited, in combination, in the correlating step of claims 10-30 of the '505 patent. Such consideration leads to the inescapable fact that the specification of the '445 patent fails to convey possession of the correlating step of claims 10-30 to a person having ordinary skill in the art. Consequently, the Court must reverse the PTAB's finding to the contrary.

### 3. The PTAB Erred in Determining that the Gelles Declaration Evidences Inherent Written Description Support for the "Correlating" Step.

As a starting point for its analysis, the PTAB determined that there "is no express disclosure in the '445 Patent that an image is taken after each ligation cycle and that the optical signals from each image are correlated for each microparticle as required by the claim." (A18.) The PTAB further determined that "there is no explicit description of the correlating step." (A20.) Thus, the PTAB considered whether the '445 patent had implicit or inherent support for this claim step. (A20-21.) In its consideration, the PTAB deferred to the Gelles Declaration as establishing that correlating was inherent in the disclosure of the '445 patent. The PTAB found "no reason to doubt" the Gelles Declaration as evidencing such

42

correlation, and concluded that "[t]o determine the sequence of a polynucleotide on the same microparticle of a bead array . . . the optical signals generated at each microparticle must be correlated."  (A22.)

The PTAB's reliance on the Gelles Declaration as evidencing inherent correlation is flawed because the Gelles Declaration is a red herring.  On one hand, the Gelles Declaration answers the wrong question.  The Gelles Declaration answers whether correlating is required to assemble four nucleotide words into a larger nucleic acid sequence.  The correct question is whether correlating optical signals generated at all microparticles among corresponding images in each of a plurality of photographs is required to determine the sequence of each of the four nucleotide words.  On the other hand, the Gelles Declaration should have been discounted as irrelevant, as conclusory, and as untimely filed without justification as to why the late filing was necessary and could not have been submitted earlier according to 37 C.F.R. § 1.116(e).

With reference to working Examples 1 and 2, the Gelles Declaration opens by characterizing the '445 patent as describing a system for image acquisition and nucleic acid sequencing based on successive ligation, identification, and cleavage steps, with electronic images taken of the microparticle array during each identification (i.e., tag complement) step.  (A767 at ¶¶ 20-27.)  The Gelles Declaration then devotes two paragraphs, 28 and 29, to answering the question of

43

whether the '445 patent inherently includes the correlating step of claims 10-30.

Paragraph 28 states:

> Thus, I understand that the analysis performed by the workstation of the '445 patent includes assembling separate four-nucleotide sequences identified during each cycle into a longer base pair sequence in the order in the nucleotides are attached to a microparticle (col. 38, lines 61-65 and Fig. 4). Assembling a longer sequence from four nucleotide "words" as shown in Figure 4 of the '445 patent would require correlating each of the separate "words" with the microparticle.

(A768.) Thus, Dr. Gelles first explains that he understands "that the analysis performed by the workstation of the '445 patent includes assembling separate four-nucleotide sequences . . . into a longer base pair sequence . . . ." (*Id.*) Without any supporting analysis, Dr. Gelles then concludes: "Assembling a longer sequence from four-nucleotide 'words' as shown in Figure 4 of the '445 patent would require correlating each of the separate 'words' with the microparticle." (*Id.*)

This conclusion is unavailing because it answers the wrong question. Claims 10-30 of the '505 patent do not require that nucleotide "words" be correlated with the microparticle. The claims require that each microparticle, via optical signals generated at each microparticle, be correlated with its corresponding image in each of the plurality of digital images of the microparticle array. Dr. Gelles opined about why Figure 4 would have required correlating nucleotides with microparticles, but not why Figure 4 would have required that each

44

microparticle generates an optical signal or would have required correlating each microparticle with itself in each digital image of the microparticle array as the claims require. Dr. Gelles did not consider the sixteen steps and digital images required to generate each nucleotide "word"; did not explain how only one quarter of the microparticles would generate fluorescence in each of the sixteen digital images; and did not explain how, because only a fraction of the microparticles generates an optical signal, correlation of each microparticle with its corresponding image in each digital image cannot occur. Thus, even if paragraph 28 correctly characterized Figure 4 as requiring correlating of nucleotide "words" with the microparticles, it still does not evidence why one of ordinary skill would necessarily conclude from Figure 4 that "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" occurs.

Paragraph 29 similarly fails to support Illumina's written description position. Paragraph 29 states:

> The disclosure of the '445 patent describes a computer based system for generating images of microparticles for observing signals generated at the microparticles (fluorescence). The system records digital images containing signals from the microparticles during a sequence of processing steps. . . . The system scans the substrate, acquires an image, and associates the images obtained in successive cycles (i.e. correlates the optical signals generated at the microparticles with the corresponding signals in other steps), and

45

determines a longer nucleotide sequence by assembling smaller
sequences together.

(A768.)  In paragraph 29, Dr. Gelles first explains that the '445 patent "describes a

computer based system for generating images of microparticles for observing

signals generated at the microparticles (fluorescence)." (*Id.*)  Dr. Gelles next

explains that the "system scans the substrate, acquires an image, and associates the

images obtained in successive cycles (i.e., correlates the optical signals generated

at the microparticles with the corresponding signals in other steps), and determines

a longer nucleotide sequence by assembling smaller sequences together." (*Id.*)

Here again, Dr. Gelles makes no mention of whether the optical signals are

generated at each microparticle, or whether the optical signals generated at each

microparticle are correlated with the corresponding signals in each digital image.

It is clear that Dr. Gelles is simply explaining how he believes the system

correlates the fluorescent signals to assemble four nucleotide "words" into the

longer nucleotide sequence.  But Dr. Gelles fails to account for the correlation of

each microparticle in each digital image among the sixteen digital images taken

during the establishment of the four nucleotide word.  Thus, even if paragraph 29

correctly characterized the basic steps of image acquisition and nucleotide

sequencing at work in the system of the '445 patent, it still does not explain why

one of ordinary skill would necessarily conclude that "correlating the optical

46

signals generated at each microparticle with its corresponding image in each of the plurality of digital images" occurs as part of these steps.

At most, the Gelles Declaration suggests that the '445 patent inherently discloses correlating optical signals generated from fluorescently labeled nucleotides in order to assemble a larger nucleic acid sequence from four nucleotide words. The Gelles Declaration does not suggest, however, that the '445 patent inherently discloses correlating optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images when generating the sequence of each four nucleotide word. The Gelles Declaration does not evidence that the entire correlating step of claims 10-30 is necessarily present the '445 patent or that a person having ordinary skill in the art would necessarily conclude from the information provided in the '445 patent that each of the four limitations recited in the correlating step occurs.

With respect to the question of whether the '445 patent inherently discloses correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images, the Gelles Declaration is irrelevant. The Gelles Declaration does not answer this question. Because the PTAB nevertheless considered the Gelles Declaration as persuasive evidence, the PTAB erred in this regard. Therefore, this Court should reverse the

PTAB's finding that the Gelles Declaration evidences that the '445 patent conveys

possession of the correlating step on this basis.

**4.    The PTAB Erred in According Weight to the Conclusory Gelles Declaration**

In addition to answering the wrong question, the Gelles Declaration is also

fatally defective as merely conclusory.  The Gelles Declaration simply recites what

Dr. Gelles believes the relevant sections of the '445 patent ought to convey, but

provides no material support, outside of Dr. Gelles's opinion, as to why the '445

patent inherently describes the correlating step.  *See* A19 (recognizing the only

"factual basis" for Dr. Gelles's opinion is the disclosure of the '445 patent).  Yet,

despite the obvious conclusory and self-serving nature of the Gelles Declaration,

and despite the fact that it (a) lacked any independent factual support, (b) was

directed to something other than the actual claim language, and (c) did not reach

the high standard for demonstrating inherency, the PTAB found "no reason to

doubt it."  (A22.)  There were plenty of reasons to doubt it.

In the first place, Dr. Gelles offers no foundation explaining why he knows

how the '445 patent system operates.  The Gelles Declaration does not suggest that

Dr. Gelles has ever sequenced nucleic acids according to the methods described in

the '445 patent, or that Dr. Gelles has ever followed the sequencing protocol

outlined in working Example 1 of the '445 patent (which describes Figure 4) or in

48

working Example 2 of the '445 patent, or that Dr. Gelles has ever used a system that sequences nucleic acids according to such a protocol, or that Dr. Gelles has ever used one of Illumina's products, or that Dr. Gelles is otherwise familiar with such a system or product.  In fact, the Gelles Declaration does not indicate that Dr. Gelles has any experience with nucleic acid sequencing, indicating only that Dr. Gelles has used microscopy.  (A764-65 at ¶¶ 3-4.)

With respect to paragraph 28, Dr. Gelles offers no explanation as to why correlating four nucleotide "words" with the microparticle, even if such occurs, necessarily includes correlating optical signals generated at each microparticle with its corresponding image in each image of the sixteen digital images.  (A768 at ¶ 28.)  Dr. Gelles does not reconcile how assembling a nucleic acid sequence, for example, as shown in Fig. 4, necessarily requires that <u>each</u> microparticle generates an optical signal in view of the requirement in the underlying protocol that "the presence <u>or absence</u> of a fluorescent signal is measured."  *See* A398 at col. 36, lines 35-36 (emphasis added).  Dr. Gelles also does not explain how microparticles that do not generate a signal may be imaged in the first place, or how the absence of a signal in a particular digital image can be correlated with the absence of a signal in another digital image.

Similarly, Dr. Gelles does not explain how, in view of the fact that the optical signal pattern changes with each digital image due to the successive

addition and removal of different fluorescently labeled tag complements, microparticles can be correlated with themselves in each of the digital images. Dr. Gelles fails to account for whether assembling a nucleic acid sequence, for example, as shown in Figure 4 of the '445 patent, could have been accomplished without each microparticle generating an optical signal and without correlating each microparticle in each digital image, and if not, why, or if assuming it can, why the '445 patent contemplates the "absence" of a fluorescent signal. Thus, Paragraph 28 of the Gelles Declaration simply does not evidence that sequencing according to the '445 patent necessarily includes the correlating step with the combination of four limitations as recited in claims 10-30.

Paragraph 29 simply restates paragraph 28, but offers no additional information with respect to the combination of four limitations that comprise the correlating step. (A768 at ¶ 29.) Dr. Gelles states that the system of the '445 patent "correlates the optical signals generated at the microparticles." (*Id.*) He does not explain, however, whether each microparticle is necessarily generating an optical signal. Dr. Gelles also states that the system "associates the images obtained in successive cycles," but does not explain whether each image includes optical signals generated at each microparticle. (*Id.*) On the flip side, paragraph 29 does not account for whether the smaller sequences can be assembled into a longer nucleotide sequence without each microparticle generating an optical signal

and without correlating each microparticle in each digital image, and if not, why, or if assuming it can, why the '445 patent contemplates the "absence" of a fluorescent signal. Like Paragraph 28, Paragraph 29 of the Gelles Declaration does not evidence that sequencing according to the '445 patent necessarily includes the correlating step with the combination of four limitations as recited in claims 10-30.

The Gelles Declaration provided Dr. Gelles's opinion on the ultimate issue. His opinion was not supported by anything other than conclusory statements, however, which themselves were not buttressed with any facts, do not reconcile inconsistencies with the specification of the '445 patent, and do not foreclose the possibility of protocol variations that do not necessitate optical signal generation at each microparticle, and do not necessitate correlation of each microparticle in each digital image. Having nevertheless considered the Gelles Declaration to be persuasive evidence, the PTAB erred in this regard. Therefore, this Court should reverse the PTAB's finding that the written description of the '445 patent conveys to one or ordinary skill in the art possession of the correlating step on this basis, too.

**5.** **The PTAB Erred in Considering the Gelles Declaration Because Illumina Did Not Show Good and Sufficient Reasons Why this Evidence Was Necessary and Not Presented Earlier, in Contravention of 37 C.F.R. § 1.116(e).**

The PTAB should have declined to consider the Gelles Declaration in the first place. This evidence was filed after an action closing prosecution without a showing of good and sufficient reasons why the evidence was necessary and not earlier presented. *See* 37 C.F.R. § 1.116(e) ("An affidavit or other evidence submitted after . . . an action closing prosecution (§ 1.949) in an inter partes reexamination filed under § 1.913 but before or on the same date of filing an appeal (§ 41.31 or § 41.61 of this title), may be admitted upon a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented."). Illumina submitted the Gelles Declaration after the Examiner had issued the action closing prosecution and before the appeal, but Illumina included no explanation or reason as to why the evidence was necessary and no explanation or reason as to why the evidence was not presented earlier. Although Life Technologies challenged the Gelles Declaration as untimely, (A817; A822), the PTAB never addressed that challenge.

Illumina submitted claims 10-30 along with the amended priority claim in response to the non-final Office Action. (A322-28.) Because Illumina amended the priority claim to antedate Brenner, Illumina knew or should have known at the

52

time it filed the amendments that it would need to establish written description support in each priority document for the subject matter of claims 10-30. Moreover, Illumina knew or should have known that the specification of the '445 patent was markedly different from the specification of the '505 patent, and did not expressly disclose the claimed correlating step such that Illumina should have filed the Gelles Declaration at the time it presented new claims 10-30 to evidence written description support. At the very least, Illumina could have prepared and filed the Gelles Declaration at the time it submitted new claims 10-30, and could have explained that the evidence was necessary to justify the claim for priority earlier than the effective date of Brenner.

In addition, the late filing and acceptance of the Gelles Declaration was prejudicial to Life Technologies. *See* A1258 at 32:15-18 (PTAB asked whether Life Technologies presented expert testimony to counter the Gelles Declaration). With prosecution effectively closed, Life Technologies simply had insufficient time to identify an independent expert, to have this expert undertake a detailed evaluation of the '445 and '505 patents, and to have this expert prepare and execute a Declaration to counter Dr. Gelles's testimony within 30 days. Rule 1.116(e) clearly contemplates this type of procedural abuse and, accordingly, sets forth a minimal burden to ensure fairness during the short windows of prosecution during inter partes reexamination. *See* 37 C.F.R. § 1.116(e).

53

The PTAB's acquiescence to the late filing of the Gelles Declaration without the requisite justifications of need and timeliness violated the rules of the USPTO. In this respect, the PTAB abused its discretion in considering the Gelles Declaration. 5 U.S.C. § 706(2)(A). Therefore, this Court should strike the Gelles Declaration from the record, and reverse the PTAB's finding that the written description of the '445 patent conveys to one of ordinary skill in the art possession of the correlating step to the extent that finding is based on the Gelles Declaration.

**6.     The PTAB Erred in Determining that claims 10-30 of the '505 patent Are Entitled to a Priority Date earlier than May 22, 1998 and, Therefore, Erred in Determining that Brenner Does Not Anticipate Claims 10-30 Under 35 U.S.C. § 102(b).**

Although 35 U.S.C. § 120 incorporates the requirements of Section 112, first paragraph, these requirements and the statutory mechanism allowing the benefit of an earlier filing date are separate provisions with distinct consequences. In accordance with Section 120, claims to subject matter in a later-filed application not supported by an ancestor application in terms of Section 112, first paragraph, are not invalidated; they simply do not receive the benefit of the earlier application's filing date and, therefore, might be invalid if intervening art exists. *See*, *e.g.*, *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000).

In this reexamination, invalidating intervening art exists. Illumina does not contest the fact that the prior art reference of WO 96/12014 (Brenner) anticipates

claims 10-30 of the '505 patent if those claims are not entitled to the priority date

of the '445 patent. Therefore, the Examiner correctly concluded that Brenner

anticipates claims 10-30. The PTAB erred in concluding to the contrary.

## CONCLUSION & RELIEF SOUGHT

The PTAB erred in failing to construe (at all, and at least properly) each of

the four limitations recited in the "correlating" step in each of claims 10-30 of the

'505 patent, thereby failing to perform the first step required of the proper written

description analysis: claim construction. Had the PTAB carefully parsed and

interpreted each of the four limitations recited in combination in claims 10-30, the

PTAB might well have avoided the misunderstanding of those limitations that

characterized the subsequent steps of its written description analysis. De novo

review by this Court of those limitations will undoubtedly correct the PTAB's

misunderstanding.

The PTAB also erred in its determination that the "correlating" step in each

of claims 10-30 of the '505 patent finds written description support under 35

U.S.C. § 112, first paragraph, in the '445 patent priority document. The PTAB

made no findings with respect to whether the '445 patent conveys the full scope of

this correlating step, including the four recited limitations of the step in

combination. Substantial evidence does not support the PTAB's finding that the

written description of the '445 patent conveys to a person having ordinary skill in

55

the art that the inventors had possession of the claimed step of "correlating optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images."

The PTAB found only that the optical signals generated at a microparticle must be correlated to determine the sequence of a polynucleotide. Regardless of whether that is true, the claims require much more: each microparticle must generate an optical signal (and not the absence of a signal), and each microparticle must be correlated in each digital image. No evidence of record indicates that the '445 patent inherently provides such a teaching, and the PTAB's findings of fact, whether or not colored by the Gelles Declaration, do not compel the ultimate finding made by the PTAB. Thus, the PTAB erred in finding that the '445 patent complies with the written description requirement for purposes of garnering priority earlier than May 22, 1998 and antedating Brenner.

The Gelles Declaration does not constitute substantial evidence supporting the PTAB's conclusion. The Gelles Declaration did not answer the question of whether the '445 patent necessarily discloses "correlating optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" required by claims 10-30. Moreover, the Gelles Declaration recites few, if any facts, and fails to provide anything more than conclusory statements that essentially say the same thing. It was unreasonable for the PTAB to find "no

reason" to doubt the Gelles Declaration, particularly in view of the multiple reasons offered above from which to question the relevancy and accuracy of that Declaration. In addition, the Gelles Declaration was filed without justification as to why it was necessary and not earlier presented, and should have been dismissed on that ground. Therefore, it was unreasonable for the PTAB to rely on the Gelles Declaration as justifying its finding that the '445 patent complies with the written description requirement for purposes of garnering priority earlier than May 22, 1998 and antedating Brenner.

Because substantial evidence does not support the PTAB's finding that the '445 patent complies with the written description requirement of 35 U.S.C. § 112, first paragraph, this Court should reverse the PTAB's reversal of the Examiner's denial of claims 10-30 the priority benefit of the '445 patent. Because the '505 patent accordingly cannot antedate Brenner, this Court should reverse the PTAB's reversal of the Examiner's rejection of claims 10-30 under 35 U.S.C. § 102(b) as anticipated by Brenner.

Respectfully submitted,

*/s/ Kevin R. Casey*
Kevin R. Casey, Esquire
Brian A. Cocca, Esquire
Michelle C. Orloski, Esquire
Stradley Ronon Stevens & Young, LLP
Great Valley Corporate Center
30 Valley Stream Parkway
Malvern, PA 19355
Telephone (610) 640-5800
Facsimile (610) 640-1965

Attorneys for Appellant,
Life Technologies Corporation

# ADDENDUM

## TABLE OF CONTENTS

PAGE

Decision on Appeal before the
Patent Trial and Appeal Board
    filed November 29, 2012 ........................................................................Add. 1

Decision on Rehearing before the
Patent and Trial Appeal Board
    filed September 20, 2013 ....................................................................Add. 43

U.S. Patent No. 6,654,505
    dated November 25, 2003 ....................................................................Add. 50

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,292 | 12/31/2009 | 6,654,505 B2 | 048522-0004 | 9037 |

22922        7590        11/29/2012

REINHART BOERNER VAN DEUREN S.C.
ATTN: LINDA KASULKE, DOCKET COORDINATOR
1000 NORTH WATER STREET
SUITE 2100
MILWAUKEE, WI 53202

| EXAMINER |
|---|
| PONNALURI, PADMASHRI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/29/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Add. 1

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

Illumina, Inc.
(Patent Owner and Appellant)

v.

Life Technologies Corporation
(Requester and Cross-Appellant)
_____

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505
Technology Center 3900
_____

Before RICHARD M. LEBOVITZ, JEFFREY B. ROBERTSON, and RAE
LYNN P. GUEST, *Administrative Patent Judges*.

LEBOVITZ, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

This is a decision on appeal in an inter partes reexamination of U.S. Patent 6,654,505 B2. The Patent Owner appeals the Examiner's decision to reject claims as anticipated and obvious, and improperly dependent. The Third Party Requester appeals the Examiner's determination not to adopt rejections of claims as obvious and failing to comply with 35 U.S.C. § 112. The Board's jurisdiction for this appeal is under 35 U.S.C. §§ 6(b), 134, and 315. We affirm and enter a new ground of rejection.

## STATEMENT OF THE CASE

The patent in dispute in this appeal is U.S. Patent No. 6,654,505 B2, issued November 25, 2003 (hereinafter, "the '505 Patent"). The Patent Owner and Real Party in Interest is Illumina, Inc. Illumina's Appeal Brief ("PO App. Br.") June 1, 2011.

A request for inter partes reexamination of the '505 Patent was filed on December 31, 2009 by a Third-Party Requester under 35 U.S.C. §§ 311-318 and 37 C.F.R. §§ 1.902-1.997. Request for Inter Partes Reexamination December 31, 2009 at 1. The Third-Party Requester is Life Technologies Corporation. Life Technologies' Respondent Brief filed July 15, 2011 ("Req. Resp. Br.") at 2.

The '505 Patent was the subject of litigation in *Life Technologies Corp. v. Illumina, Inc.*, No.1:09-cv-00706-RK (D. Del., filed September 21, 2009). The Delaware Court issued a claim construction order on December 15, 2010. On April 6, 2011, the Delaware District Court ordered the transfer of the litigation to the Southern District of California, where the case is designated 3:11-cv-00703-JAH-POR. PO App. Br. 1.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

In the present reexamination appeal, an oral hearing took place on July 25, 2012. A transcript of the oral hearing was entered into the record on August 21, 2012.

Claims 1-30 are pending and stand rejected by the Examiner. Claims 1-6 were original claims of the '505 patent. Claims 7-30 were added during the reexamination proceeding.

Illumina appeals the Examiner's adopted rejections of claims 1-30. PO App. Br. 1. Life Technologies appeals the Examiner's determination not to adopt additional proposed rejections of the claims. Life Technologies Appeal Brief ("Req, App. Br.") filed May 31, 2011 at 3.

Independent claim 1 of the '505 patent is drawn to a device-readable medium embodying a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps. The method comprises steps of rendering a plurality of images of the microparticles based on optical signals and processing the plurality of digital images. Claims 10-30 have similar steps, but are specifically drawn to a device-readable medium for determining nucleotide sequences of DNA fragments.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

REPRESENTATIVE CLAIMS

Claim 1 is an original claim and claim 10 was added during the

reexamination proceeding.

1. A device-readable medium embodying a program of
instructions for execution by said device to perform a method
of generating images of a planar array of microparticles and
tracking positions of the microparticles during a sequence of
processing steps, said program of instructions comprising
instructions for:
    rendering a plurality of digital images of the planar array
of the microparticles during the sequence of processing steps,
based on optical signals generated at the microparticles;
    and processing the plurality of digital images, wherein
said processing includes correlating the optical signals
generated at each microparticle with its corresponding image in
each of the plurality of digital images.

10. A device-readable medium comprising:
    a program of instructions for execution by the device to
perform a method of generating images of a planar array of
microparticles comprising DNA fragments and tracking
positions of the microparticles during a sequence of processing
steps for determining a sequence of nucleotides corresponding
to the DNA fragments, the program of instructions comprising
instructions for:
    rendering a plurality of digital images of the planar array
of the microparticles during the sequence of processing steps,
based on optical signals generated at the microparticles;
    converting each of a plurality of the optical signals into
respective data representative of the nucleotides; and
    processing the plurality of digital images, wherein the
processing includes correlating the optical signals generated at
each microparticle with its corresponding image in each of the
plurality of digital images to generate a sequence of data

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments.

## I. ILLUMINA APPEAL

### A. ARE CLAIMS ENTITLED TO A PRIORITY DATE EARLIER THAN MAY 22, 1998?

Illumina filed a petition on June 17, 2010 to amend the '505 Patent to make an unintentionally delayed claim for priority under 35 U.S.C. § 120. Illumina's priority claim included two different chains of priority applications, but they appear to rely on only one chain of applications in this proceeding. The chain of applications and patents that Illumina claims benefit to in the '505 Patent and argues in this appeal includes (PO App. Br. 8-12):

• US Application 09/424,028, filed November 16, 1999, now US Patent 6,406,848 (the '848 Patent). The '505 Patent is a divisional of the '848 Patent.

• PCT/US98/11224, filed May 22, 1998. The '848 Patent is the National Phase of the PCT.

• US Application 08/946,138, filed October 7, 1997, now US Patent 6,013,445 (the '445 Patent). The '848 Patent is asserted to be a continuation-part of the '445 Patent.

• US Application 08/659,453, filed June 6, 1996, now US Patent 5,846,719 (the '719 Patent). **The '445 Patent is asserted to be a continuation-in-part of the '719 Patent.**

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

• US Application 08/358,810, filed December 19, 1994, now US Patent 5,604,097 (the '097 Patent). The '719 Patent is asserted to be a continuation-in-part of the '097 Patent.

Life Technologies contends that this claim for benefit is improper because the '445 Patent did not make any direct claim of priority to the '719 Patent when it originally issued, but rather attempted a priority claim by a certificate of correction. Req. Res. Br. 11-12. Life Technologies contends that a patent owner cannot rely upon a certificate of correction to modify a priority claim. *Id.*

We do not have jurisdiction over this matter. A certificate of correction of an applicant's mistake in a patent is granted by the Director upon a showing that such mistake occurred in good faith. 35 U.S.C. § 255. On June 30, 2010, the Director granted Illumina's petition to correct the priority claim. *See* Request for Certificate of Correction in the '505 Patent, dated January 18, 2011. The Board's jurisdiction is over adverse decisions of examiners. 35 U.S.C. § 6. A decision by the Director does not fall within the Board's delegated authority to review.

With respect to the claim of benefit by the '445 Patent, we note that a reissue of the patent has been granted and published on January 10, 2012 as US RE43,097E. The reissue patent claims priority to the '719 and '097 Patents. The propriety of this priority claim is not under our jurisdiction in this proceeding to review.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Rejection

The Examiner determined that the '505 Patent was not entitled to the priority dates of the earlier filed applications because the latter did not describe the claimed subject matter in compliance with 35 U.S.C. § 112, first paragraph. Right of Appeal Notice mailed February 18, 2011 ("RAN") at 3. The Examiner found that the earlier filed parent applications "disclose planar arrays and methods of nucleic acid sequencing." *Id.* The Examiner stated that such applications did not contemplate "the presently claimed device-readable medium, methods of generating images of a planar array of microparticles, assigning pixels to the microparticles, or tracking positions of the microparticles during a sequence of processing steps." *Id* at 4. *See also* RAN, page 6, lines 11-15.

Claims 1-30 are pending. Claims 10-30 are drawn to device-readable medium for obtaining the nucleotide sequence of polynucleotides, such as DNA. However, the device-readable medium of claims 1-9 is not restricted to nucleotide sequencing methods. Therefore, we shall consider each group separately.

Principles of Law

To satisfy the written description requirement of 35 U.S.C. § 112, the inventor must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). "One shows that one is 'in possession' of the invention by describing the

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

invention, with all its claimed limitations." *Lockwood v. Am. Airlines, Inc.,*
107 F.3d 1565, 1572 (Fed. Cir. 1997).

There is no requirement that the wording in the claim be identical to
that used in the specification as long as there is sufficient disclosure to show
one of skill in the art that the inventor "invented what is claimed." *Union
Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir. 2000).
The written description "need not recite the claimed invention in *haec verba*
but [it] must do more than merely disclose that which would render the
claimed invention obvious." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558
F.3d 1368, 1377 (Fed. Cir. 2009). Thus, so long as "a person of ordinary
skill in the art would have understood the inventor to have been in
possession of the claimed invention at the time of filing, even if every
nuance of the claims is not explicitly described in the specification, then the
adequate written description requirement is met." *In re Alton*, 76 F.3d 1168,
1175 (Fed. Cir. 1996).

Issue

The issue is whether the '445, '719, and '097 Patents provide a
written description of the claimed subject matter.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

The '445 Patent

The first application to be considered is the application (08/946,138) on which the '445 Patent is based. We understand the disclosure in the application to be the same as in the '445 Patent, and all reference is to the issued '445 Patent. To begin the analysis, we set forth the following pertinent findings of facts ("FF").

FF1. The "Field of the Invention" describes the invention as relating "generally to methods for determining the nucleotide sequence of a polynucleotide, and more particularly, to a method of identifying terminal nucleotides of a polynucleotide by specific ligation of encoded adaptors." '445 Patent, col. 1, ll. 13-16.

FF2. The "Summary of the Invention" describes several different objects of the invention, each which involve DNA sequencing. '445 Patent, col. 2, ll. 15-46. For example, it is stated that "an object of our invention is to provide a DNA sequencing scheme which does not suffer the drawbacks of current base-by-base approaches." *Id.* at col. 2, ll. 16-18.

FF3. All the claims appended to Application 08/946,138, upon which the '445 Patent is based, are drawn to methods of determining a nucleotide sequence and compositions for performing the sequencing.

FF4. The '445 Patent describes a sequencing method of using adaptors which are ligated to a polynucleotide which is to be sequenced and an oligonucleotide tag which hybridizes to the adaptor and allows the identity of the adaptor to be determined. '445 Patent, Abstract.

FF5. As shown in Figure 3B of the '445 Patent, a polynucleotide is sequenced by multiples stepwise cycles of ligation and cleavage. '445

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Patent, col. 3, ll. 59-61.  In each step an adaptor is ligated to the
polynucleotide to be sequenced.  '445 Patent, col. 2, ll. 32-46.

   FF6.  A tag, complementary in sequence to the adaptor, is hybridized
to the adaptor.  '445 Patent, col. 2, ll. 42-46.

   FF7. Detection of the hybridized tag complement, e.g., by detecting a
fluorescent label on the tag complement, allows the sequence of the
polynucleotide to be deduced because the sequence of the tag complement is
known.  '445 Patent, col. 2, ll. 42-54; col. 38, ll. 50-65.

   FF8.  The adaptor is cleaved from the polynucleotide after sequence
identification of the tag, and the polynucleotide is shortened as a result.  '445
Patent, col. 6, ll. 37-46.

   FF9.  The cycle of ligation and cleavage can be repeated multiple
times in order to obtain additional sequences from the polynucleotide.  '445
Patent, col. 38, ll. 50-65.

   FF10.  The polynucleotides can be attached to microparticles and the
cycles of ligation, detection, and cleavage can be performed on
microparticles, where a device is used to detect the hybridization of the tag
complement to the adaptor. '445 Patent,  col. 38, ll. 61-65.

   FF11.  Each microparticle can be attached to only one kind of
polynucleotide.  '445 Patent, col. 24, l. 5-11.

   FF12.

        Separately, each of the labeled [sic] tag complements is
        applied to the polynucleotide-bead mixture under conditions
        which permit the formation of perfectly matched duplexes only
        between the oligonucleotide tags and their respective
        complements, after which the mixture is washed under stringent

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

> conditions, and the presence or absence of a fluorescent signal
> is measured. . . . .
>
> After the four nucleotides are identified as described
> above, the encoded adaptors are cleaved from the
> polynucleotides with Bbv I using the manufacturer's protocol.
> After an initial ligation and identification, the cycle of ligation,
> identification, and cleavage is repeated three times to give the
> sequence of the 16 terminal nucleotides of the target
> polynucleotide. FIG. 4 illustrates the relative fluorescence from
> each of the four tag complements applied to identify
> nucleotides at positions 5 through 16 (from the most distal from
> the bead to the most proximal to the bead).

'445 Patent, col. 36, ll. 30-50.


FF13.

> Three cycles of ligation, identification, and cleavage are carried
> out in flow chamber (500) to give the sequences of 12
> nucleotides at the termini of each of approximately 100,000
> cDNAs. Nucleotides of the cDNAs are identified by
> hybridizing tag complements to the encoded adaptors as
> described in Example 1. Specifically hybridized tag
> complements are detected by exciting their fluorescent labels
> with illumination beam (524) from light source (526), which
> may be a laser, mercury arc lamp, or the like. Illumination beam
> (524) passes through filter (528) and excites the fluorescent
> labels on tag complements specifically hybridized to encoded
> adaptors in flow chamber (500). Resulting fluorescence (530) is
> collected by confocal microscope (532), passes through filter
> (534), and directed to CCD camera (536), which creates an
> electronic image of the bead array for processing and analysis
> by workstation (538).

'445 Patent, col. 38, ll. 50-65.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

FF14.  Figure 4 shows the fluorescence detected at a single bead at positions 5-16 in an initial ligation followed by three successive cycles of ligation, identification, and cleavage.  '445 Patent, col. 36, ll. 47-50.

The '719 Patent

The next patent to be considered is the '719 Patent.  We make the following pertinent findings:

FF15.  The "Field of the Invention" of the '719 Patent is stated to relate "generally to methods for identifying, sorting, and/or tracking molecules, especially polynucleotides, with oligonucleotide tags, and more particularly, to a method of sorting and analyzing such tagged polynucleotides by specific hybridization of the tags to their complements." '719 Patent, col. 1, ll. 13-18.

FF16.  In the "Summary of the Invention," the inventors similarly characterize the invention as a tagging system using oligonucleotide tags, e.g., for DNA sequencing.  '719 Patent, col. 2, l. 60 to col. 3, l. 35.

FF17.

In accordance with a preferred implementation of the method, a portion of each sorted fragment is sequenced in a stepwise fashion on each of the many thousands of loaded microparticles which are fixed to a common substrate - such as a microscope slide - associated with a scanning system or an image analysis system, such as described above.

'719 Patent, col. 27, ll, 38-44.

FF18.

The loaded microparticles are then deposited on the surface of an avidinated glass slide to which and from which reagents and wash solutions can be delivered and removed. The avidinated slide with the attached microparticles is examined with a scanning fluorescent microscope . . .. The excitation beam and collected fluorescence are separated by a dichroic mirror which directs the collected fluorescence . . . to photon-counting devices . . . and digital computer, e.g. a 486-based computer. The computer generates a two dimensional map of the slide which registers the positions of the microparticles.

'719 Patent, col. 36, ll. 43-63; '097, col. 26, l. 4-24

FF19.

After cleavage with Fok I to remove the initial probe, the polynucleotides on the attached microparticles undergo 20 cycles of probe ligation, washing, detection, cleavage, and washing, in accordance with the preferred single base sequencing methodology described below. Within each detection step, the scanning system records the fluorescent emission corresponding [to] the base identified at each microparticle.

'719 Patent, col. 36, l. 64 – col. 37, l. 4; '097 patent, col. 26, ll. 25-32

The '097 Patent

The next patent to the considered is the '097 Patent. We make the following pertinent findings:

FF20. The Field and Summary of the Invention of the '097 Patent are similar to those of the '719 Patent in describing the invention as using oligonucleotide tags to sort molecules. '097 Patent, col. 1, ll. 11-15 and col. 2, l. 58 to col. 3, l. 16.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

FF21. The same methods described in the '719 Patent appear in the
'097 Patent.

FF22. "The output of the photon counters is collected by computer
304, where it can be stored, analyzed, and viewed on video 360." '097
Patent, col. 20, ll. 53-55; '719 Patent, col. 26, ll. 26-28.

Claims 1-9

Independent claim 1, and dependent claims 2-9, are drawn to a
device-readable medium "embodying a program of instructions for
execution by said device to perform a method of generating images of a
planar array of microparticles and tracking positions of the microparticles
during a sequence of processing steps." None of the claimed steps are
limited to DNA sequencing. However, the disclosure of the '445 Patent is
restricted to DNA sequencing methods. As stated in the "Field of the
Invention" and the "Summary of the Invention," the object of the methods
described in the '445 Patent is to sequence DNA. FF1 & FF2. All the
original claims appended to the application from which the '445 Patent arose
were limited to DNA sequencing. FF3. There does not appear to be any
broader disclosure in the '445 Patent. *See* FFs 4-14. As held in *Gentry
Gallery, Inc. v. Berkline Corp.,* 134 F.3d. 1473, 1479 (Fed. Cir. 1998), "[i]t
is a truism that a claim need not be limited to a preferred embodiment.
However, in a given case, the scope of the right to exclude may be limited
by a narrow disclosure." In this case, where the inventors of the '445 Patent
explicitly describe their invention as being related to DNA sequencing, we

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

find that claims 1-9 are broader than the supporting written description in the '445 Patent.

The '719 and '097 Patents have a broader disclosure than the '445 Patent in describing methods of sorting molecules using oligonucleotide tags (FF15, FF16, & FF20). However, claims 1-9 are not limited to methods of using oligonucleotide tags, e.g., to track positions of microparticles during a sequence of processing steps.

We therefore find that the Examiner properly determined that claims 1-9 are not in compliance with the written description requirement of 35 U.S.C. § 112 because they are broader than the supporting disclosure of the '719 and '097 Patents.

Claims 10-30

Claims 10-30 all involve DNA sequencing. With respect to the sequencing aspect, the claims are therefore commensurate with the scope of the written description of the '445, '719, and '097 Patents which all describe aspects of DNA sequencing.

Life Technologies contends that the '505 Patent does not comply with the written description requirement of 35 U.S.C. § 112 because the '445 Patent does not describe the claimed step of "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images." Req. Res. Br. 5. Life Technologies contends that the disclosure pointed to by Illumina at column 38, lines 50-56 of the '445 Patent bears no resemblance to the correlating step. *Id.* Life Technologies contends that Illumina has confused "obviousness with

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

enabling written description." *Id.* Claims 10, 14-17, 28 and 29 each have a correlating step. We select claim 10 as representative to address this dispute.

We do not agree with Life Technologies that the correlating step recited in claim 10 lacks an enabling written description in the '445 Patent.

At column 36, lines 47-50, the '445 patent teaches successive cycles of ligation and identification in order to determine the sequence of 16 terminal nucleotides of the polynucleotide attached to the bead. FF12. The detection of the optical signal from the fluorescence occurs for the bead array for processing and analysis. FF13. Fig. 4 shows the fluorescence detected during three successive cycles of 12 of these positions, from nucleotide 5 to nucleotide 16, at a single bead . FF12 at col. 36, ll. 47-50; FF14.

The claim requires that the optical signals for each nucleotide at a specific bead be correlated with "its corresponding image in each of the plurality of digital images." The term "correlated" is not used in the '445 Patent in this context, but the following disclosure would be understood to support it.

After describing the successive cycles of ligation and identification which reveal the sequence of the target polynucleotide, the '445 Patent describes an imaging system which enables the capture of the optical signals from the sequencing reactions. FF13. According to this passage, the fluorescent labels on a tag complement are excited and the resulting fluorescence is "collected by confocal microscope (532), passes through filter (534), and directed to CCD camera (536), which creates an electronic

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

image of the bead array for processing and analysis by workstation (538)."
FF13.

There is no express disclosure in the '445 Patent that an image is taken after each ligation cycle and that the optical signals from each image are correlated for each microparticle as required by the claim. To establish that this step is described by the '445 Patent, Illumina provided a declaration by Dr. Jeff Gelles, who was a Professor of Biochemistry and Molecular Pharmacology at Brandeis University in Waltham, Massachusetts, at the time the declaration was executed. Gelles Decl. ¶ 1. Dr. Gelles testified in his written declaration that he used "imaging technologies in [his] research, including Differential Interference Contrast Microscopy and Multi-wavelength Single Molecule Fluorescence Microscopy." Gelles Decl. ¶ 4. Based on his experience and education, we conclude that Dr. Gelles is an expert who is qualified to testify in this matter. Gelles Decl. ¶¶ 3-6.

With respect to the correlating step, Dr. Gelles testified in paragraph 28:

> 28. Thus, I understand that the analysis performed by the workstation of the '445 patent includes assembling separate four-nucleotide sequences identified during each cycle into a longer base pair sequence in the order in the nucleotides are attached to a microparticle. (col. 38, lines 61-65 and Fig. 4). Assembling a longer sequence from four-nucleotide "words" as shown in Figure 4 of the '445 patent would require correlating each of the separate "words" with the microparticle.

Dr. Gelles testified in paragraph 29 of his declaration that the computer based system for generating images of microparticles "scans the substrate, acquires an image, and associates the images obtained in

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

successive cycles (*i.e.* correlates the optical signals generated at the microparticles with the corresponding signals in other steps), and determines a longer nucleotide sequence by assembling smaller sequences together." Paragraph 30 of the Gelles Declaration lists the elements of the scanning system as shown in Figure 5 of the '445 Patent.

Life Technologies criticizes Dr. Gelles's declaration as conclusory and lacking factual support for his opinion. Req. Res. Br. 7. However, Dr. Gelles cited the disclosure of the '445 Patent that served as the basis for his opinion, and thus it is not true that his opinion is without factual basis. *See* Gelles Decl. ¶¶ 27, 28, & 30.

While Dr. Gelles's explanation is admittedly sparse, we find it difficult to ignore the disclosure in the '445 Patent of: 1) assembling data from three different tag complements successively collected at the same microparticle as shown in Figure 4 to produce a sequence of positions 5-12 of the target polynucleotide; and 2) creating an electronic image of the fluorescence. FF12-FF14. Since each tag is successively removed during the process (FF8, FF9, & FF12), the electronic image would necessarily be taken at each cycle prior to tag removal. Dr. Gelles's testimony that assembling a longer sequence from the tag complements (which he calls "words") "would require correlating each of the separate 'words' with the microparticle" is thus logical based on the fact (1) that different images would apparently be taken for each tag to produce four different images and (2) then those different images would be used to assemble the sequence shown in Figure 4 by extracting and correlating the fluorescent signal to the same microparticle.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Whether a disclosure complies with the written description requirement depends on what is actually disclosed and invented by the inventor. "Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed . . . [i]t extends only to that which is disclosed." *Lockwood*, 107 F.3d at 1571-72. When a feature is not expressly disclosed in the written description, there is a danger of reading into it what is suggested by the disclosure, rather than what was actually invented by the inventor.

In this case, testimony by Illumina's expert was that "[a]ssembling a longer sequence from four-nucleotide 'words' as shown in Figure 4 of the '445 patent would require correlating each of the separate 'words' with the microparticle." Gelles Decl. ¶ 28. As explained above, Dr. Gelles's testimony is entirely consistent and supported by the written description of the '445 Patent. In simple terms, in order to have assembled the sequence shown in Figure 4 of the '445 Patent, four different images from each successive ligation would have been correlated to pinpoint the same microparticle in each in order to determine the sequence of the polynucleotide attached to the microparticle. Dr. Gelles's testimony is not that the '445 Patent suggested the correlating step, but rather that the inventor's necessarily accomplished the step in assembling the sequence of Figure 4.

While there is no explicit description of the correlating step of claim 1, it is bedrock law that the specification need not describe the claim limitations in the identical wording as it appears in the claims, but rather only need to convey to the ordinary skilled worker the inventor invented

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

what is claimed. *Union Oil*, 208 F.3d at 997; *Alton*, 76 F.3d at 1175. Dr.

Gelles testified that the description of the '445 Patent conveyed the claim

limitation in dispute, and neither Life Technologies nor the Examiner

pointed to a deficiency in the specification, other than the absence of the

literal words, that would give reason to reject Dr. Gelles's testimony.

Life Technologies contends that Dr. Gelles misinterpreted the claim

language.

> For example, paragraph 28 of the Gelles Declaration asserts that
> the discussion in the '445 patent of manipulating "four-
> nucleotide 'words'" corresponds to "correlating each of the
> separate 'words' with the microparticle." The claims, however,
> do not refer to correlating "nucleotide words" with a
> microparticle but, rather to correlating "optical signals
> generated at each microparticle" with a "corresponding image"
> of each microparticle (*see, e.g.*, claim 1).

Req. Res. Br. 9.

We do not agree that this reflects a misinterpretation of the claim.

Dr. Gelles is merely using non-technical language to explain the claim.

Life Technologies also contends that Patent Owner "is attempting to

fill the disclosure gaps via inherency." Req. Res. Br. 10. Citing *Tronzo v.*

*Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998), Life Technologies

argues that a "party seeking to establish the inherent content of a disclosure

must establish that the missing matter is 'necessarily present' in the

disclosure such that one of ordinary skill in the art would recognize the

disclosure." *Id*. Life Technologies contends that Dr. Gelles "fails to even

suggest, much less prove, that the missing claim elements would necessarily

be present in the priority documents" and thus cannot use inherency to fill

the gaps. *Id*.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

In *Hyatt v. Boone*, 146 F.3d 1348 (Fed. Cir. 1998), the Federal Circuit considered different standards for written description when inherency was involved, including one in which the limitation said to be inherent to the disclosure must be "necessarily present" to provide written description. The court wrote:

> Hyatt argues that "reasonably conveys to the artisan" is a less rigorous and more reasonable measure of the written description requirement than the "necessary and only reasonable construction" standard that the Board applied. Precedent has used both phrases, as well as others. See, e.g., *In re Wertheim*, 646 F.2d 527, 538-39 (CCPA 1981) (the disclosure relied on must "constitute [ ] a full, clear, concise and exact description . . . of the invention claimed"). We do not view these various expressions as setting divergent standards for compliance with § 112. In all cases, the purpose of the description requirement is "to ensure that the inventor had possession, as of the filing date of the application relied on, of the specific subject matter later claimed by him." *In re Edwards*, 568 F.2d 1349, 1351-52, (CCPA 1978).

*Hyatt v. Boone*, 146 F.3d at 1354.

To determine the sequence of a polynucleotide on the same microparticle of a bead array when multiple cycles of ligation and identification are carried out, the optical signals generated at each microparticle must be correlated. Dr. Gelles testified to this fact, and based on our independent findings on the '445 Patent, we find no reason to doubt it. Accordingly, we find that the written description of the '445 Patent conveys to one of ordinary skill in the art that inventors had possession of the claimed step. For similar reasons, we find that '719 and '097 Patents describe the disputed limitations. FF15-FF22.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

In sum, we conclude that the Examiner erred in denying claims 10-30 benefit of the '445, '719, and '097 Patents.

## B. REJECTIONS OVER REFERENCES PUBLISHED
## PRIOR TO DECEMBER 19, 1994

There are three references, published prior to December 19, 1994 – the effective filing date of the '097 Patent – which are said by the Examiner to make claims 1-6 of the '505 Patent unpatentable. Because the references were all published before December 19, 1994, they are prior art to all claims of the '505 Patent, regardless of whether the claims are entitled to the priority date of the '097 patent. The three publications are as follows:

• Dow,[1] published in 1987;

• Gelles,[2] published on February 4, 1988; and

• Schmidt,[3] published November 1, 1993.

The claims stand rejected over the publications as follows:

1. Claims 1-4 under 35 U.S.C. § 102(b) as anticipated by Dow; and claim 5 and 6 under 35 U.S.C. § 103(a) as obvious in view of Dow and secondary publications;

2. Claims 1-6 under 35 U.S.C. § 102(b) as anticipated by Gelles; and

3. Claims 1-6 under 35 U.S.C. § 102(b) as anticipated by Schmidt.

---

[1] Julian A. T. Dow et al., *A simple microcomputer-based system for real-time analysis of cell behaviour*, 87 J. CELL SCI. 171, 171-182 (1987).
[2] Jeff Gelles et al., *Tracking kinesin-driven movements with nanometre-scale precision*, 331 NATURE 450, 450-453 (1988).
[3] Christine E. Schmidt et al., *Integrin-cytoskeletal interactions in migrating fibroblasts are dynamic, asymmetric, and regulated*, 123 J. CELL BIOLOGY 977, 977-991 (1993).

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

The rejections turn on two key issues. First, whether "microparticles" as recited in all the claims are reasonably interpreted to cover biological living cells. Second, whether "sequence of processing steps" requires external manipulation of the environment, or does it include changes that occur during biological processes, such as cells or particles moving on microtubules. We therefore begin with claim interpretation.

### Claim interpretation

During reexamination, as with original examination, the PTO must give claims their broadest reasonable construction consistent with the specification. *In re Am. Acad. of Sci. Tech Ctr.,* 367 F.3d 1359, 1364 (Fed. Cir. 2004).

• Microparticle

The '505 Patent contains a section titled "Microparticles" in which the inventors described microparticles that are used in its methods. Because of its importance to the claim interpretation issue, we reproduce the complete passage below:

> An important feature of the system of the invention is the use of microparticles for carrying analytes. A variety of microparticles may be employed depending on particular applications. Generally, microparticles must consist of a material compatible with the reagents and chemistry of the process steps being carried out and microparticle must be substantially mechanically rigid so that they retain their shape and size during process steps. Preferably, as used herein, the term "substantially mechanically rigid" means that microparticles neither swell nor contract by more than ten percent (as measure [sic] by diameter) in any process solvent or

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

> reagent. Preferably, microparticles are microspheres of uniform
> size, i.e. microparticles are monodisperse. More preferably, the
> diameters of spherical microparticles have a coefficient of
> variation less than five percent, and most preferably, less than
> two percent. Microparticle diameters are in the range of from
> 0.1 μm to 100 μm. Preferably, microparticle diameters range
> from 1 μm to 20 μm. Most preferably, microparticle diameters
> are in the range of 1 to 5 μm. Suitable microparticle materials
> include inorganic support materials such as glass, e.g.
> controlled-pore glass, Balltoni beads; silica, zirconia, and the
> like, e.g. Weetall, Methods in Enzymology, 44: 134-148
> (1976); and organic support materials such as highly cross-
> linked polystyrene, polyacrylate, polymethylmethacrylate,
> glycidylmethacrylate (GMA), Dynabeads (Dynal, Oslo,
> Norway), and the like, Rembaum et aI, U.S. Pat. No. 4,046,720;
> Hodge and Sherrington, editors, pages 435-456, Polymer-
> supported Reactions in Organic Synthesis (Wiley & Sons, New
> York, 1980); Andrus et al, U.S. Pat. No. 5,047,524; and the
> like.

'505 patent, col. 10, l. 40 to col. 11, l. 3.

For sequencing reactions, the '505 Patent describes CPG and

glycidylmethacrylate (GMA) beads as preferred. '505 Patent, col. 14, ll. 56-

59.

The '097 patent has the following additional pertinent disclosure:

"Solid phase supports for use with the invention may have a wide variety of

forms, including microparticles, beads, and membranes, slides, plates,

micromachined chips, and the like." '097 Patent, col. 12, 40-43.

The Examiner found that the biological cells described in the prior art

met the claimed limitation of "microparticles." Reading the above-quoted

description in the '505 Patent of microparticles, the Examiner found that

biological cells met the requirements set forth in the written description,

such as "sufficient rigidity to retain their shape and size throughout the

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

process." RAN 29. The Examiner also found biological cells to be "compatible with numerous reagents and chemistry for carrying out various processes" described in the cited prior art. *Id.* Furthermore, the disclosure that a "variety of microparticles may be employed depending on particular applications" led the Examiner to interpret the claimed microparticles as necessarily encompassing cells. *Id.*

Also referring to the above quoted passage from the '505 Patent, Life Technologies contends that the '505 Patent does not exclude biological cells as microparticles, and moreover that such passage is not limiting since it simply described the mentioned materials as suitable and preferred. Req. Res. Br. 14-15.

During patent examination, we give the terms in a claim their ordinary and customary meaning unless the Specification indicates they are to be afforded a special definition. *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997). This mode of claim interpretation also applies in reexamination proceedings. *In re Translogic Tech., Inc.*, 504 F.3d 1249 (Fed. Cir. 2007).

The issue is not whether biological cells could serve as microparticles, as the Examiner and Life Technologies appear to have understood the question, but whether the ordinary and customary meaning of microparticles would include biological cells. On that issue, there is no evidence in the record that biological cells are a type of microparticle. The passage above from the '505 Patent describes microparticles in terms of synthetic materials. The '097 Patent lists microparticle as a solid support. The fact that biological cells might serve as microparticles, and have some of their properties as both the Examiner and Life Technologies argued, is the wrong

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

question. Just because a cell can function in some circumstances as a
microparticle does not mean that a cell *is* a microparticle. It is like saying
that a ski cap is a sock because a ski cap could be worn on a foot. On this
record, we find no evidence to support the Examiner's interpretation that
biological cells are a type of a microparticle.

The rejection based on Dow involved the Examiner's determination
that biological cells are microparticles. Dow describes tracking the
movement of neutrophils, fibroblasts, and PC12 cells in an array using a
computer-based image analysis program. Dow, p. 171, "Summary"; p. 176-
177. As we have determined that cells are not microparticles as that term is
used in the claims, we reverse the anticipation rejection of claims 1-3 over
Dow and the obviousness rejection of claims 5-6 over Dow and secondary
references.


• "generating images of a planar array of microparticles and tracking
positions of the microparticles during a sequence of processing steps"

The rejections over Gelles and Schmidt involve the Examiner's
determination that the publications describe the claimed step of "generating
images of a planar array of microparticles and tracking positions of the
microparticles during a sequence of processing steps." The Examiner's
position is that "a sequence of processing steps" encompasses "biological
processes and the series of changes occurring during those biological
processes." RAN 8. Illumina contends that the Examiner's interpretation is
not reasonable when the claims are read in light of the Specification and that
this phrase would be understood by one of ordinary in the art in the light of

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

the specification to mean "manipulating the environment containing the microparticles." PO App. Br. 15.

There is no dispute about what is taught by Gelles and Schmidt. We summarize their teachings below:

• Gelles describes a "system for recording, analyzing, and determining precise positional information of microscopic plastic beads (i.e., microparticles) on a glass coverslip (i.e., a planar array) as the microparticles, driven by kinesin, attach to and move along microtubules in vitro (i.e., a sequence of processing steps; see page 450, abstract, and column 2 in its entirety, through page 451, first partial paragraph, and Fig. 2)." RAN 17.

• Schmidt describes the movement of colloidal gold particles on cells. Schmidt, p. 977. The particles are coated with anti-B1 integrin antibody. *Id.* The antibody binds to integrin on the cells, attaching the colloidal gold particles to the cell surface. *Id.* "Small gold aggregates were rapidly transported preferentially to the leading edge of the lamellipod where they resumed diffusion restricted along the edge." *Id.* The transport of the colloidal gold particles was tracked using video microscopy. *Id.* The Examiner found that the analysis of the dynamics of B1-integrin particles on the surface of migrating cells constituted "a sequence of processing steps." RAN 24.

To properly interpret the claim limitation, we must first turn to the Specification of the '505 Patent for guidance. The phrase "a sequence of processing steps" is not expressly defined nor does it appear word-for-word in the Specification. However, in the Background of the '505 Patent, the

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

inventors disclose that one of the difficulties of prior art attempts at
employing microparticles for capturing analytes was the "handling and
manipulating large numbers of microparticles." '505 Patent, col. 1, ll. 30-
41. These difficulties were said by the inventors to include "how to track
individual microparticles through *multiple steps of a process*" and "the
ability to uniformly deliver reagents to microparticles for carrying out steps
of an analytical process." *Id.* at col. 1, ll. 45-49 (emphasis added). The
inventors stated that it "would be especially desirable if such system and
apparatus permitted the tracking and analysis of multiple analytes anchored
to separate microparticles through a *sequence of several processing* and/or
analysis *steps*." *Id.* at col. 1, ll. 60-63 (emphasis added).

     In the "Summary of the Invention," it is stated that one of the objects
of the invention is "providing a system and apparatus for sequentially
delivering reagents to a population of analytes anchored to separate
microparticles." '505 Patent, col. 1, l. 65 to col. 2, l. 2. The invention is
said to achieve this object

> with an apparatus comprising a flow chamber for disposing a
> population of microparticles in a planar array; fluidic means for
> sequentially delivering processing reagents from one or more
> reagent reservoirs to the flow chamber; and detection means for
> detecting a sequence of optical signals from each of the
> microparticles of the population.

*Id.* at col. 2, ll. 20-26.

     The inventors further state in the "Summary of the Invention" that
microparticles are loaded in "in a flow chamber through which processing
reagents are sequentially delivered to the loaded microparticles from one or
more reagent reservoirs by a fluidic means." '505 Patent, col. 2, ll. 45-48.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

After delivery of the reagents, "[o]ptical signals generated by, or produced as a result of, the interaction of processing reagents and polynucleotides on the microparticles are imaged by a detection means." *Id.* at col. 2, ll. 48-50.

In sum, the problem identified in the patent's "Background" section, of manipulating microparticles through multiple steps of a process, was said to be addressed with a flow chamber that enables reagents to be delivered sequentially to the microparticles and for optical signals to be detected during the sequential delivery of the "processing reagents." The "Description of the Invention" is consistent with this identified problem and solution. For example, the flow chamber is characterized as a "key feature of the invention." '505 Patent, col. 5, ll. 23-24. Key functions of the chamber are describes as "i) holding a population of microparticles . . . during a sequence of processing steps, ii) ensuring that processing reagents can access each microparticle during each step of a process." *Id.* at col. 5, ll. 37-41. As far as the detection means, the inventors wrote that "an important feature" of it "is the ability to keep track of individual microparticles through multiple process steps and/or cycles." *Id.* at col. 8, ll. 48-50. In other words, the inventors describe the invention as a flow chamber which enables manipulative steps, particularly steps in involving delivery of processing reagents, to be performed on the microparticles.

Although claim 1 does not require that the process is performed in a flow chamber or that processing reagents are utilized, it would be departing too much from the written description to read the disputed limitation "generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps" to not require

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

that the imaging and tracking be executed during a sequence of external manipulative steps performed on the microparticles. In fact, all the process steps in the '505 Patent involve delivering fluid reagents to the microparticles. In this light, the Examiner's interpretation of "a sequence of processing steps" to encompass biological processes that occur as "a continuous action, operation, or series of changes taking place in a definite manner" is overly broad and inconsistent with the disclosure of the invention in the Specification. Claims are given their broadest reasonable interpretation as cast in the light of the invention's written description.

Life Technologies contends:

> Because there is no limiting definition of "processing steps" or "process" in the specification of the '505 patent, the Examiner interpreted these terms to have their ordinary, plain English meaning of "a systematic series of actions directed to some end" or "a continuous action, operation, or series of changes taking place in a definite manner" (RAN at 8). These ordinary meanings encompass, *inter alia*, biological processes and the series of changes occurring during those biological processes (RAN at 8; ACP at 17-18). This interpretation is consistent with the Federal Circuit's guidance that a tribunal evaluating claims on reexamination should "look to the specification to see if it provides a definition for claim terms, but otherwise apply a broad interpretation." *In re ICON Fitness*, 496 F.3d at 1379.

Req. Res. Br. 13.

Life Technologies discussion of the law is flawed. During reexamination proceedings, claims are interpreted through the lens of the patent specification. The general rule that claims are given their "broadest reasonable interpretation" is not a license to disregard meanings that claim terms would be imbued with when read in the context of the specification.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

> The Patent and Trademark Office ("PTO") determines the
> scope of claims in patent applications not solely on the basis of
> the claim language, but upon giving claims their broadest
> reasonable construction "in light of the specification as it would
> be interpreted by one of ordinary skill in the art." *In re Am.
> Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).
> Indeed, the rules of the PTO require that application claims
> must "conform to the invention as set forth in the remainder of
> the specification and the terms and phrases used in the claims
> must find clear support or antecedent basis in the description so
> that the meaning of the terms in the claims may be ascertainable
> by reference to the description." 37 C.F.R. § 1.75(d)(1).

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005).

Recently, the Board was reversed by the Federal Circuit for not
reading claims "consistent" and "in light of" of the specification. *In re
Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012). Here, the
'505 Patent makes clear the purpose of the invention was to enable
microparticles to be *handled* and *manipulated* through a sequence of several
processing steps. '505 Patent, col. 1, ll. 30-41 & 60-63. To read the claims
on a biological process where particle movement is driven by cellular
processes (Gelles and Schmidt) without a sequence of processing steps in
which microparticles are manipulated or subject to application of external
reagents, ignores the scope of the invention as described in the patent
specification. Life Technologies does not adequately support their broader
interpretation with adequate reference to the '505 Specification, a necessary
way station during claim interpretation.

Under the broadest reasonable interpretation, we conclude that a
sequence of processing steps means a sequence of external manipulating
steps performed on microparticles. Because the Examiner did not establish

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

that Gelles or Schmidt described such steps, we are compelled to reverse the anticipation rejections 2 and 3 (see supra at p. 22) of claims 1-6. Furthermore, the microspheres on Schmidt's surface are not arranged in a planar array as recited in the claims.  App. Br. 20.

## C.  REJECTIONS OVER REFERENCES PUBLISHED AFTER DECEMBER 19, 1994 BUT BEFORE MAY 28, 1998

We determined that claims 1-9 are not entitled to the benefit of the filing dates of the '445, '719, and '097 Patents.  Consequently, intervening references published between the earliest asserted filing date of December 19, 1994 and the May 28, 1998 effective filing date of the '505 Patent are prior art to claim 1-9.

The claims stand rejected over multiple publications, including the following primary references: NIH (1995), Wilson (1996), Brenner (1996), Douglas (1996), Lee (1997), and Stern (1997).

### C1.  Anticipation by Brenner

Claims 1 and 7-9 stand rejected by the Examiner under 35 U.S.C. § 102(b) as anticipated by Brenner.[4]  RAN 12-13.  The Examiner found that Brenner described all elements of claim 1, anticipating it.  RAN 16. Illumina challenged the rejection on the ground that Brenner is not a prior art reference.  PO App. Br. 18.  However, we have determined that the claims are not entitled to the priority date of December 19, 1994.  Consequently,

---

[4] WO 96/12014 (filed October 12, 1995) (published April 25, 1996).

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Brenner is prior art. We affirm the anticipation rejection of claims 1 and 7-9
over Brenner for the reasons set forth by the Examiner.

*C2. Obviousness of claims 2-6 over Brenner combined with additional*
*secondary references*

Claims 2-6 stand rejected by the Examiner as obvious under 35 U.S.C.
§ 103 in view of Brenner and additionally cited second references. RAN 12-
13. These rejections are as follows:

1. Claims 2, 3, 5, and 6 in view of Brenner and Wernet;[5]

2. Claims 2-6 in view of Brenner and Luck;[6]

3. Claims 2 and 3 in view of Brenner and Stimpson;[7]

4. Claims 2-6 in view of Brenner and Sizto;[8]

5. Claims 2-6 in view of Brenner and Douglass;[9]

6. Claim 2 in view of Brenner and DiMilla;[10]

7. Claims 2-6 in view of Brenner and Gelles;

8. Claims 2 and view of Brenner and NIH;[11] and

---

[5] Mark P. Wernet & A. Pline, *Particle displacement tracking technique and
Cramer-Rao lower bound error in centroid estimates from CCD imagery*, 15
Experiments in Fluids 295, 295-307 (1993).
[6] US 5,257,182 (filed January 29, 1991) (issued October 26, 1993).
[7] US 5,599,668 (filed September 22, 1994) (issued February 4, 1997).
[8] US 5,556,764 (filed May 2, 1994) (issued September 17, 1996).
[9] US 6,151,405 (filed March 28, 1997) (issued November 21, 2000).
[10] Paul A. DiMilla et al., *Maximal migration of human smooth muscle cells
on fibronectin and type IV collagen occurs at an intermediate attachment
strength*, 122 J. Cell Biology 729, 729-737 (1993).
[11] NIH Image Software Package Version 1.58, NIH, Bethesda, MD (1994).

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Because the same claims are rejected over multiple rejections, it is unnecessary for us to reach all the rejections to dispose of all the claims. Accordingly, we limit our discussion to Rejections 2, 4, and 7.

2. Brenner in view of Luck (claims 2-6)

The Examiner further relied upon Luck to meet the limitations in dependent claims 2-6. The Examiner found the Luck describes a "computer readable program of instructions for generating images of the cells in a planar array on a microscopic slide (a 'PAP smear') for classification of the cells as benign, premalignant or malignant." RAN 36. The Examiner found that Luck's image processing system carried out the image and pixel processing steps recited in claims 2-6. *Id*. at 37. The Examiner concluded it would have been obvious "to have used Luck's image processing system with the device-readable medium and program disclosed by Brenner in order to more efficiently track the particles within Brenner's planar array during a sequence of processing steps." *Id*. at 37.

Illumina contends "Luck does not discuss or contemplate a 'sequence of processing steps' as claimed; the microscope slide and its contents are static." PO App. Br. 22. Illumina further argues that the cellular specimens imaged by Luck do not constitute "microparticles" as that term is properly interpreted. *Id*. Illumina contends that because Luck is directed only towards processing static images of cell specimens, there would have been no motivation to combine Luck with Brenner. *Id*.

While we agree with Illumina that Luck does not teach microparticles or a sequence of processing steps, the Examiner relied upon Luck for its

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

teaching of image processing technology.  Illumina did not provide evidence
that such technology would have been considered inapplicable to the
sequence of processing steps performed on microparticles as taught by
Brenner.  Furthermore, as both Brenner and Luck were imaging objects
(cells, microparticles) in a planar array, a person of ordinary skill in the art
would have reasonably looked to Luck for guidance in the imaging
technology, as each reference was concerned with imaging.  "The
combination of familiar elements according to known methods is likely to be
obvious when it does no more than yield predictable results."  *KSR Int'l Co.
v. Teleflex, Inc.*, 550 U.S. 398, 416 (2007).

Accordingly, we affirm the obviousness rejection of claim 2-6 over
Brenner and Luck.

4.  Brenner in view of Sizto (claims 2-6)

The Examiner found that Sizto described a computerized method with
software to analyze cells within a sample in a container, such as a blood
sample, by generating a plurality of digital images of the cells and
processing the images by correlating optical signals generated at the site of
each of the cells with its corresponding digital image (see the abstract and
column 2, lines 42-67 of Sizto).  RAN 43.  The Examiner found that Sizto
described imaging technology that met the limitations of dependent claims
2-6.  *Id.* at 43-44.  The Examiner concluded that it would have been obvious
to the ordinary skilled worker

> to have employed the system described by Sizto to efficiently
> track the particles within Brenner's planar array during a
> sequence of processing steps. The person of ordinary skill in the

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

> art at the time of the invention would have been motivated to
> combine the references because Brenner contemplates
> analyzing many polynucleotides or other molecules
> simultaneously and Sizto teaches that his system is able to
> process large volumes of data rapidly and accurately.

*Id.* at 44.

Illumina contends that Sizto is not directed to scanning planar arrays
of microparticles or imaging during a "sequence of processing steps" as
recited in the claims. PO App. Br. 23.

Illumina's argument is not persuasive. The Examiner explicitly relied
upon Sizto for its imaging processing techniques, not for its disclosure of
microparticles or processing steps. The Examiner gave a logical and fact-
based reason for combining the prior art. "[I]f a technique has been used to
improve one device, and a person of ordinary skill in the art would recognize
that it would improve similar devices in the same way, using the technique is
obvious unless its actual application is beyond his or her skill." *KSR* at 417.
Accordingly, we affirm the obviousness rejection of claim 2-6 over Brenner
and Sizto.

7. Brenner in view of Gelles (claims 2-6)

The Examiner found that Brenner described the same method as
recited in claim 1, but not the specific image processing steps recited in
claims 2-6. RAN 54. However, the Examiner found that Gelles described
such steps. *Id.* at 54-55. The Examiner concluded that "person of ordinary
skill in the art at the time of the invention would have been motivated to
combine the references because Gelles teaches that his method can provide

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

insights into various biologic processes, such as the hybridization of the oligonucleotides disclosed in Brenner." *Id.* at 55.

Illumina contends that Gelles does not disclose imaging during a sequence of processing steps and therefore a person of skill in the art would not combine the references. PO App. Br. 24. Dr. Gelles, a coauthor of the Gelles publication, testified in his written declaration that the Gelles publication does not teach the imaging steps recited in the dependent claims. Dr. Gelles states:

> Gelles describes determining the locations of microparticles using all pixels of an image kernel, and the location is then "taken as the bead position of the bead in a." (Gelles Fig. 1, last paragraph). The location corresponds to a fixed position relative to the actual center of the microparticle - that is, the calculated location defines a precise (repeatable) position, but is not necessarily an accurate measurement of the microparticle center. This calculated location does not necessarily correspond to the center (or centroid) of the microparticle itself. Depending on the kernel chosen, it is possible for the calculated location to be outside of the microparticle. *Calculating this location allows motion of the microparticle to be very accurately determined, but does not provide an accurate determination or approximation of the microparticle center.*

Gelles Decl. ¶ 62 (emphasis added.)

From Dr. Gelles's testimony, it would be concluded that dependent claim 2, which recites "wherein said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle," is not taught by the Gelles publication. Specifically, Dr. Gelles says that the calculations performed in the Gelles publication do "not provide an accurate determination or approximation of the microparticle center." Gelles Decl. ¶ 62. The Examiner referred to

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Figure 1 of Gelles as pointing to the particle center. RAN 54-55. However, Dr. Gelles expressly says that calculated center "location does not necessarily correspond to the center (or centroid) of the microparticle itself. Depending on the kernel chosen, it is possible for the calculated location to be outside of the microparticle." Gelles Decl. ¶ 62. In the same paragraph, Dr. Gelles provides a fact-based explanation of the calculations performed in the Gelles publication. *Id.* Thus, Dr. Gelles's declaration is not conclusory as alleged by Life Technologies. Req. Res. Br. 7. There is insufficient reason in this record to doubt Dr. Gelles's testimony. We therefore reverse the rejections of claim 2, and claims 3-6 which depend, directly or indirectly, on claim 2 for the reasons given in Dr. Gelles's declaration. *See* Gelles Decl. ¶¶ 62-64.

C3. Anticipation of claims 10-30 by Brenner

Claims 10-30 stand rejected by the Examiner as anticipated by Brenner. RAN 15. We determined that claims 10-30 are entitled to the priority date of December 19, 1994. Therefore, Brenner is not prior art and we are compelled to reverse the rejection.

CROSS-APPEAL BY LIFE TECHNOLOGIES

Life Technologies in their cross-appeal set forth the following two issues for review:

1. Whether the Examiner erred by declining to adopt Requester's proposed claim rejections under 35 U.S.C. § 103 on the ground that the Examiner found certain base claims to be anticipated under 35 U.S.C. § 102?

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Req. App. Br. 3. These rejections were listed in Exhibit A of the Appeal
Brief.

2. Whether the Examiner erred by entering newly-added claims 10-13,
15, 17-27, and 30 without establishing on the record how these claims
comply with the requirements of 35 U.S.C. § 112. Req. App. Br. 3.

With respect to Issue 1, the non-adopted rejections listed in Exhibit A
are limited to claims 1-6. As we have found claims 1-6 unpatentable on
other grounds, we find it unnecessary to consider these non-adopted
rejections.

With respect to Issue 2 regarding non-compliance with the written
description requirement of § 112, Life Technologies contends that the
Examiner had an independent duty to evaluate whether Patent Owner's new
claims find support in the '505 patent specification. Req. App. Br. 7. Life
Technologies contends that the Examiner erred by not evaluating the § 112
issues and ultimately entered claims that do not comply with the written
description requirement of 35 U.S.C. § 112. *Id.*

We do not agree. Assessment of compliance with § 112 is part of the
normal examination process. *Manual of Patent Examining Procedure* §
2163. When an Examiner finds that claims do not comply with the written
description requirement, the Examiner has the burden of presenting evidence
or reasons why the skilled worker would not recognize a description in the
specification of the invention defined by the claims. *Id.* Thus, even though
an analysis was not made explicit, we presume that the Examiner evaluated
the claims for compliance with § 112, which is a statutory requirement.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

It is true that the '505 Patent does not recite in identical wording the claimed limitation of "correlating the optical signals generated at each micro particle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments."  However, a person of ordinary skill in the art would have recognized such step upon reading the '505 Patent.  In particular, the '505 Patent expressly describes obtaining nucleotide sequence from the same polynucleotide loaded on a microparticle after multiple cycles of ligation, nucleotide sequence identification, and cleavage.  '505 Patent, col. 14, l. 65 to col. 15, l. 58.  The cycles of ligation, identification, and cleavage are expressly taught in the '505 Patent to involve successive fluorescent images.  '505 Patent, col. 19, l. 38 to col. 20, l. 15.  It is necessary, as stated in Dr. Gelles's declaration, that assembling these into sequences would require a correlation step to determine the sequence from multiple cycles performed on the same bead. Gelles Decl. ¶ 29.

## SUMMARY

The anticipation and obviousness rejections of claims 1-6 over Dow, Gelles, and Schmidt are reversed.

The anticipation rejection of claims 1 and 7-9 over Brenner is affirmed.

The obviousness rejections of claims 2-6 over Brenner and Luck, and Brenner and Sizto, are affirmed.

The obviousness rejection of claims 2-6 over Brenner and Gelles is reversed.

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

The anticipation rejection of claims 10-30 over Brenner is reversed.

## TIME PERIOD FOR RESPONSE

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956. *See* also 37 C.F.R. § 41.79.

## AFFIRMED-IN-PART

KMF

Patent Owner:
    REINHART BOERNER VAN DEUREN S.C.
    ATTN: LINDA KASULKE, DOCKET COORDINATOR
    1000 North Water Street, Suite 2100
    Milwaukee, WI 53202

Third Party Requester:
    David J. Ball, Jr., Esq.
    PAUL WEISS RIFKIND WHARTON & GARRISON LLP
    2001 K Street, NW
    Washington, DC 20006



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,292 | 12/31/2009 | 6,654,505 B2 | 048522-0004 | 9037 |

22922        7590        09/20/2013
REINHART BOERNER VAN DEUREN S.C.
ATTN: AMANDA RUTTER, PARALEGAL
1000 NORTH WATER STREET
SUITE 2100
MILWAUKEE, WI 53202

| EXAMINER |
|---|
| PONNALURI, PADMASHRI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/20/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Add. 43

UNITED STATES PATENT AND TRADEMARK OFFICE

———

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———

Illumina, Inc.
(Patent Owner and Appellant)

v.

Life Technologies Corporation
(Requester and Cross-Appellant)

———

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505
Technology Center 3900

———

Before RICHARD M. LEBOVITZ, JEFFREY B. ROBERTSON, and
RAE LYNN P. GUEST, *Administrative Patent Judges.*

LEBOVITZ, *Administrative Patent Judge.*


DECISION ON REHEARING

Illumina, Inc. ("Illumina") requests rehearing under 37 C.F.R. § 41.79
in the above-identified *inter partes* reexamination of US 6,654,505 ("the
'505 patent") with respect to the conclusion of the Patent Trial and Appeal

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Board ("Board") that claims 2-6 are obvious under 35 U.S.C. § 103 in view
of Brenner and Sizto (Req. Reh'g 1). Illumina is the Patent Owner. Life
Technologies Corporation ("Life") is the Third Party Requester.

In the Decision on Appeal mailed November 29, 2012 ("Decision"),
the Board affirmed the rejection of claims 2-6 as obvious in view of Brenner
and Sizto (Decision 36). Illumina argues, as follows, that the Board erred in
reaching this decision.

### Cells versus microparticle

According to Illumina, the Examiner combined the Brenner and Sizto
publications on the misapprehension that the biological cells subject to
imaging in the Sizto reference constitute "microparticles." Illumina argues
that, since the Board rejected the Examiner's conclusion that biological cells
are equivalent to microparticles, the rejection should be reversed (Req.
Reh'g 1-2).

We already considered this argument and found it unpersuasive. As
stated in the Decision: "The Examiner explicitly relied upon Sizto for its
imaging processing techniques, not for its disclosure of microparticles . . . ."
(Decision 36.) Illumina did not provide evidence that the Examiner erred in
finding that Sizto's method would work with microparticles as described in
Brenner (RAN 43-44). Thus, Illumina has failed to identify the points
misapprehended or overlooked by the Board in the Decision.

2

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

### Claims 2 and 5

Claim 2 is directed to the process of claim 1, where "said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle." Claim 5 is drawn to a similar step. Illumina contends that "there is no indication that Sizto determines that the pixels being analyzed are actually located at the center point of the cell itself, as opposed to the center of an arbitrary pixel map." (Req. Reh'g 2.) Illumina did not point to where in their Briefs this argument had been made before. Under 37 C.F.R. § 41.79(b)(1):

> (1) The request for rehearing must state with particularity the points believed to have been misapprehended or overlooked in rendering the Board's opinion reflecting its decision. Arguments not raised in the briefs before the Board and evidence not previously relied upon in the briefs are not permitted in the request for rehearing except as permitted by paragraphs (b)(2) and (b)(3) of this section.

Paragraph (b)(2) relates to new arguments based on a recent relevant decision of the Board or the U.S. Court of Appeals for the Federal Circuit. Paragraph (b)(3) relates to arguments responding to a new ground of rejection. Neither of these exceptions is argued by Illumina.

In their Appeal Brief on page 23, Illumina argued that Sizto does not disclose a "sequence of processing steps" as recited in claim 1. Illumina did not separately argue claims 2 and 5 as they are now in this Request for Rehearing. Illumina also did not separately address claims 2 and 5 in their Amendment and Response to the Examiner's First Office Action (*see* page 26 of Illumina's Response dated May 21, 2010) or their subsequent response dated October 20, 2010 (*see* page 21). Thus, Illumina's arguments about claims 2 and 5 appear to be new arguments "not previously relied upon in

3

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

the briefs." 37 C.F.R. § 41.79(b)(1). The request for rehearing with respect to claims 2 and 5 is therefore improper under the rule.

Nonetheless, Life addressed this new argument in their Comments on the Request for Rehearing (dated January 31, 2013). Life points out that "Sizto's detection algorithm evaluates every pixel against its neighboring pixels within a 5 x 5 pixel array to determine whether the reference pixel is the brightest pixel in the local neighborhood, and, if so, the coordinates of that pixel are noted down as corresponding to an approximate center of a microparticle" and cites support in Sizto for this statement (Comments, p. 5). Indeed, as Life argues, the Sizto's purpose is to identify cells in a field, the same purpose as the '505 patent. The algorithms utilized by Sizto achieves this purpose as indicated in the passages cited by Life in their Comments and by the Examiner on pages 43-44 of the Right of Appeal Notice ("RAN"). Thus, we fail to see a defect in the Examiner's rejection based on Sizto as set forth in the RAN.

Claim 4

Claim 4 depends on claim 1 and recites that "the number of pixels assigned to a given microparticle is . . . based on" any one of three recited criteria, including microparticle size and uniformity of microparticle shape. Illumina asserts that pixel assignment described in Sizto "is not analogous to the pixel assignment of the '505 patent at col. 9, ll. 6-31, which discloses assignment of pixels within the margin of a bead in order to eliminate spurious signal from adjacent microparticles, rather than including those very pixels as contemplated by Sizto." (Req. Reh'g 2-3.)

4

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Illumina does not identify a point "misapprehended or overlooked in rendering the Board's opinion reflecting its decision," but rather appears to be relying on new arguments that were not made in the brief, which is an improper basis for a request for rehearing under 37 C.F.R. § 41.79(b)(1). In particular, we fail to see where in the briefs claim 4 was separately argued by Illumina or where such argument about the bead margin was previously made. Moreover, as pointed out by Life, Illumina's argument that all the assigned pixels be within the margin of a bead does not correspond to a limitation in claim 4 and is an attempt to improperly import limitations from the '505 patent's written description into claim 4 (Comments, p. 6) (*Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005).

For the above reasons, the Request for Rehearing is:

<u>DENIED</u>

peb

5

Appeal 2012-007309
Application 95/001,292
US Patent 6,654,505

Third Party Requester:
     ALAN HAMMOND
     LIFE TECHNOLOGIES CORPORATION
     ATTN: IP DEPARTMENT
     5791 Van Alley Way
     Carlsbad, CA 92008

Patent Owner:
     REINHART BOERNER VAN DEUREN S.C.
     ATTN: LINDA KASULKE, DOCKET COORDINATOR
     1000 North Water Street, Suite 2100
     Milwaukee, WI 53202

6



US006654505B2

(12) **United States Patent**
Bridgham et al.

(10) Patent No.: **US 6,654,505 B2**
(45) Date of Patent: **Nov. 25, 2003**

(54) **SYSTEM AND APPARATUS FOR SEQUENTIAL PROCESSING OF ANALYTES**

(75) Inventors: **John Bridgham**, Hillsborough, CA (US); **Kevin Corcoran**, Fremont, CA (US); **George Golda**, El Granada, CA (US); **Michael C. Pallas**, San Bruno, CA (US); **Sydney Brenner**, La Jolla, CA (US)

(73) Assignee: **Lynx Therapeutics, Inc.,** Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 259 days.

(21) Appl. No.: **09/907,795**

(22) Filed: **Jul. 17, 2001**

(65) **Prior Publication Data**

US 2002/0137052 A1 Sep. 26, 2002

**Related U.S. Application Data**

(60) Division of application No. 09/424,028, filed as application No. PCT/US98/11224 on May 22, 1998, now Pat. No. 6,406,848, which is a continuation-in-part of application No. 08/862,610, filed on May 23, 1997, now abandoned.

(51) Int. Cl.[7] ........................................... G06F 15/316
(52) U.S. Cl. ...................................... 382/278; 382/129
(58) Field of Search ................................ 382/278, 288, 382/129, 133, 128; 435/6, 288.3, 297.5, 299.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,116,765 A | 5/1992 | Watanabe | 436/165 |
| 5,604,097 A | 2/1997 | Brenner | 435/6 |

| | | | |
|---|---|---|---|
| 5,631,734 A | 5/1997 | Stern | 356/317 |
| 5,834,195 A | 11/1998 | Benkovic | 435/6 |
| 5,854,684 A | 12/1998 | Stabile | 356/440 |
| 5,856,174 A | 1/1999 | Lipshutz | 435/286.5 |
| 5,872,623 A | 2/1999 | Stabile | 356/73 |
| 5,889,881 A | * 3/1999 | MacAulay et al. | 382/133 |
| 6,026,174 A | * 2/2000 | Palcic et al. | 382/133 |
| 6,031,930 A | * 2/2000 | Bacus et al. | 435/1.1 |
| 6,511,802 B1 | * 1/2003 | Albrecht et al. | 435/6 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 392 546 | 10/1990 |
| EP | 0 573 098 | 12/1993 |

* cited by examiner

*Primary Examiner*—Yon J. Couso
(74) *Attorney, Agent, or Firm*—Stephen C. Macevicz; Vincent M. Powers; LeeAnn Gorthey

(57) **ABSTRACT**

An apparatus and system are provided for simultaneously analyzing a plurality of analytes anchored to microparticles. Microparticles each having a uniform population of a single kind of analyte attached are disposed as a substantially immobilized planar array inside a flow chamber where steps of an analytical process are carried out by delivering a sequence of processing reagents to the microparticles by a fluidic system under microprocessor control. In response to such process steps, an optical signal is generated at the surface of each microparticle which is characteristic of the interaction between the analyte carried by the microparticle and the delivered processing reagent. The plurality of analytes are simultaneously analyzed by collecting and recording images of the optical signals generated by all the microparticles in the planar array. A key feature of the invention is the correlation of the sequence of optical signals generated by each microparticle in the planar array during the analytical process.

**6 Claims, 10 Drawing Sheets**





# Fig. 1A



# Fig. 1B



Case: 14-1215 Case: 14-1215 Document: 24 Page: 122 Filed: 03/10/2014 Filed: 03/10/2014





**Fig. 3A**          **Fig. 3B**

**Fig. 3C**          **Fig. 3D**



# Fig. 4



# Fig. 5



Fig. 6A

Fig. 6B



Fig. 7



**Fig. 8**

US 6,654,505 B2

1

**SYSTEM AND APPARATUS FOR SEQUENTIAL PROCESSING OF ANALYTES**

This application is a divisional of U.S. patent application Ser. No. 09/424,028, filed Nov. 16, 1999 now U.S. Pat. No. 6,406,848, which is a 371 of PCT/US98/1124, filed May 22, 1998, which is a C-I-P of U.S. patent application Ser. No. 08/862,610, filed May 23, 1997 now abandoned, all of which are incorporated in their entirety herein by reference.

FIELD OF THE INVENTION

The invention relates generally to systems and apparatus for carrying out large scale parallel reactions on solid phase supports, and more particularly, to systems and apparatus for monitoring and carrying out reactions on arrays of microparticles.

BACKGROUND

The desire to understand and analyze complex chemical and biological systems has led to the development of analytical techniques that employ parallelization and miniaturization of analyte processing, e.g. Graber et al, Current Opinion in Biotechnology, 9: 14–18 (1998); Fodor et al, Nature, 364: 555–556 (1993); Meier-Ewert et al, Nature, 361: 375–376 (1993); Taylor et al, Nucleic Acids Research, 25: 3164–3168 (1997); Garner et al, BioTechniques, 14: 112–115 (1993); Lam et al, Nature, 354: 82–84 (1991); Ohlmeyer et al, Proc. Natl. Acad. Sci., 90: 10922–10926 (1993); DeRisi et al, Science, 278: 680–686 (1997); Wodicka et al, Nature Biotechnology, 15: 1359–1367 (1997); and the like.

Many of these techniques employ microparticles for synthesizing analytes or for capturing analytes for subsequent analysis, e.g. Lam et al (cited above); Benkovic et al, International patent application PCT/US95/03355; Gavin et al, International patent application PCT/EP97/02039; Brenner et al, International patent application PCT/US96/09513, and the like. Even though the properties of different types of microparticles can vary widely, microparticles generally facilitate the construction and manipulation of large repertoires of analytes with minimal reagent and/or sample consumption. However, handling and manipulating large numbers of microparticles, e.g. tens to hundreds of thousands, for carrying out specific chemical and/or biochemical analyses gives rise to many difficulties, including whether sufficient signal is generated on individual microparticles for detection, how to track individual microparticles through multiple steps of a process, mechanical strength of microparticles under pressure or flow conditions, the ability to uniformly deliver reagents to microparticles for carrying out steps of an analytical process, whether clumping or other inappropriate interaction of microparticles and/or reagents occurs, the degree to which analytes and/or processing reagents adsorb onto vessel walls, whether protein reagents or analytes denature causing a disruption of reagent distribution and access, whether adjacent microparticles will interact, e.g. to degrade or obscure a signal or to inhibit reagent access, and the like.

In view of these difficulties, it would be desirable to provide a system and apparatus for handling and processing multiple solid phase supports, such as populations of microparticles. It would be especially desirable if such system and apparatus permitted the tracking and analysis of multiple analytes anchored to separate microparticles through a sequence of several processing and/or analysis steps.

SUMMARY OF THE INVENTION

Accordingly, objects of our invention include, but are not limited to, providing a system and apparatus for sequentially

2

delivering reagents to a population of analytes anchored to separate microparticles; providing an apparatus for simultaneously monitoring the interactions of processing reagents and analytes on the surfaces of microparticles disposed in a planar array; providing an apparatus for detecting optical signals generated by, or as the result of, interactions of processing reagents and analytes on the surfaces of microparticles disposed in a planar array; providing an apparatus for detecting pluralities of optical signals, each such plurality being generated at the surface of the same microparticle as a result of interactions between processing reagents and an analyte anchored to the surface of such microparticle; providing an apparatus for simultaneously tracking the positions of individual microparticles in a population of microparticles disposed in a flow chamber as a closely packed planar array; and providing a system and apparatus for simultaneously analyzing the nucleotide sequences of a population of polynucleotides anchored to microparticles disposed in a planar array in a flow chamber.

Our invention achieves these and other objects with an apparatus comprising a flow chamber for disposing a population of microparticles in a planar array; fluidic means for sequentially delivering processing reagents from one or more reagent reservoirs to the flow chamber; and detection means for detecting a sequence of optical signals from each of the microparticles of the population. Preferably, the sequences of optical signals are generated as a result of a multi-step analytical process, such as nucleic acid sequence analysis.

In one aspect, the invention provides a system for simultaneously monitoring a population of analytes which includes the apparatus of the invention, microparticles carrying the analytes, and software means for processing images of, and/or optical signals generated by, the microparticles when disposed in a planar array. Preferably, the flow chamber includes constraining means for restricting the movement of microparticles during cycles of reagent delivery.

In another aspect, the invention includes a system for simultaneously analyzing the nucleotide sequences of a population of polynucleotides. Copies of each kind of polynucleotide in the population are sorted onto and anchored to one or more microparticles so that a population of loaded microparticles is formed. Loaded microparticles are disposed in a planar array in a flow chamber through which processing reagents are sequentially delivered to the loaded microparticles from one or more reagent reservoirs by a fluidic means. Optical signals generated by, or produced as a result of, the interaction of processing reagents and polynucleotides on the microparticles are imaged by a detection means. Preferably, when analysis include determining the nucleotide sequence of a portion of each polynucleotide on the different microparticles, massively parallel signature sequencing (MPSS) analysis is employed, e.g. as described in Albrecht et al, International patent application PCT/US97/09472.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1a is a schematic representation of a flow chamber and fluidics and detection systems for observing a planar array of microparticles loaded with analyte molecules, such as cDNA molecules for sequencing.

FIG. 1b is a schematic of a preferred holder for a flow chamber.

FIG. 2a is bilateral cut away view of a flow chamber.

FIG. 2b is a top view of a flow chamber.

US 6,654,505 B2

3

FIG. 2c is an illustration of microparticles being loaded into a flow chamber.

FIGS. 3a through 3d schematically illustrate microparticle constraining means for a flow chamber.

FIG. 4 is a schematic representation of a device for loading microparticles into a flow chamber.

FIG. 5 is a schematic representation of a fluidics system for use with the invention.

FIGS. 6a and 6b schematically illustrate top-lighting and back-lighting approaches for determining microparticle centers in an array.

FIG. 7 schematically illustrates the assignment of pixels to microparticles for data processing.

FIG. 8 is a flow chart summarizing operation of the system of the invention.

## DEFINITIONS

"Complement" or "tag complement" as used herein in reference to oligonucleotide tags refers to an oligonucleotide to which a oligonucleotide tag specifically hybridizes to form a perfectly matched duplex or triplex. In embodiments where specific hybridization results in a triplex, the oligonucleotide tag may be selected to be either double stranded or single stranded. Thus, where triplexes are formed, the term "complement" is meant to encompass either a double stranded complement of a single stranded oligonucleotide tag or a single stranded complement of a double stranded oligonucleotide tag.

The term "oligonucleotide" as used herein includes linear oligomers of natural or modified monomers or linkages, including deoxyribonucleosides, ribonucleosides, anomeric forms thereof, peptide nucleic acids (PNAs), and the like, capable of specifically binding to a target polynucleotide by way of a regular pattern of monomer-to-monomer interactions, such as Watson-Crick type of base pairing, base stacking, Hoogsteen or reverse Hoogsteen types of base pairing, or the like. Usually monomers are linked by phosphodiester bonds or analogs thereof to form oligonucleotides ranging in size from a few monomeric units, e.g. 3–4, to several tens of monomeric units, e.g. 40–60. Whenever an oligonucleotide is represented by a sequence of letters, such as "ATGCCTG," it will be understood that the nucleotides are in 5'→3' order from left to right and that "A" denotes deoxyadenosine, "C" denotes deoxycytidine, "G" denotes deoxyguanosine, and "T" denotes thymidine, unless otherwise-noted. Usually oligonucleotides of the invention comprise the four natural nucleotides; however, they may also comprise non-natural nucleotide analogs. It is clear to those skilled in the art when oligonucleotides having natural or non-natural nucleotides may be employed, e.g. where processing by enzymes is called for, usually oligonucleotides consisting of natural nucleotides are required.

"Perfectly matched" in reference to a duplex means that the poly- or oligonucleotide strands making up the duplex form a double stranded structure with one other such that every nucleotide in each strand undergoes Watson-Crick basepairing with a nucleotide in the other strand. The term also comprehends the pairing of nucleoside analogs, such as deoxyinosine, nucleosides with 2-aminopurine bases, and the like, that may be employed. In reference to a triplex, the term means that the triplex consists of a perfectly matched duplex and a third strand in which every nucleotide undergoes Hoogsteen or reverse Hoogsteen association with a basepair of the perfectly matched duplex. Conversely, a "mismatch" in a duplex between a tag and an oligonucle-

4

otide means that a pair or triplet of nucleotides in the duplex or triplex fails to undergo Watson-Crick and/or Hoogsteen and/or reverse Hoogsteen bonding.

As used herein, "nucleoside" includes the natural nucleosides, including 2'-deoxy and 2'-hydroxyl forms, e.g. as described in Kornberg and Baker, DNA Replication, 2nd Ed. (Freeman, San Francisco, 1992). "Analogs" in reference to nucleosides includes synthetic nucleosides having modified base moieties and/or modified sugar moieties, e. g. described by Scheit, Nucleotide Analogs (John Wiley, New York, 1980); Uhlman and Peyman, Chemical Reviews, 90: 543–584 (1990), or the like, with the only proviso that they are capable of specific hybridization. Such analogs include synthetic nucleosides designed to enhance binding properties, reduce complexity, increase specificity, and the like.

As used herein "sequence determination" or "determining a nucleotide sequence" in reference to polynucleotides includes determination of partial as well as full sequence information of the polynucleotide. That is, the term includes sequence comparisons, fingerprinting, and like levels of information about a target polynucleotide, as well as the express identification and ordering of nucleosides, usually each nucleoside, in a target polynucleotide. The term also includes the determination of the identification, ordering, and locations of one, two, or three of the four types of nucleotides within a target polynucleotide. For example, in some embodiments sequence determination may be effected by identifying the ordering and locations of a single type of nucleotide, e.g. cytosines, within the target polynucleotide "CATCGC . . . " so that its sequence is represented as a binary code, e.g. "100101 . . . " for "C-(not C)-(not C)-C-(not C)-C . . . " and the like.

As used herein, the term "complexity" in reference to a population of polynucleotides means the number of different species of molecule present in the population.

## DETAILED DESCRIPTION OF THE INVENTION

The system and apparatus of the invention is particularly applicable to the analysis of molecules that can be anchored in populations of duplicate copies to particulate solid phase supports. That is, in accordance with the invention, each analyte of a population is present on at least one microparticle in a quantity sufficient for the type of analysis being performed. For example, if combinatorially synthesized peptides on the microparticles are screened against a soluble receptor protein for detecting those that form stable complexes, the number of peptides available for binding on the surface of the microparticles must be large enough to generate a detectable signal when a binding event occurs. Of course, many additional factors well known in the art will present additional design constraints, such as the nature of the system for generating optical signals, the concentration of receptors, pH, salt concentration, the density and accessibility of the peptides on the microparticle surface, the solvent system employed, and the like. Analyte populations particularly relevant for use with the present apparatus include combinatorial libraries synthesized on microparticle supports, e.g. as disclosed in Lam et al, Chem. Rev., 97: 411–448 (1997); or Dower et al, U.S. Pat. No. 5,708,153, and polynucleotide libraries sorted onto microparticle supports, e.g. as disclosed in Brenner (cited above).

FIG. 1a is a schematic representation of an embodiment of the invention for detecting fluorescent signals. Flow chamber (100) having inlet (102), outlet (104) and planar

US 6,654,505 B2

5

cavity (106) holds microparticles in a planar array from which optical signals (108) generated by analytes and/or reactants on microparticles can be collected and imaged. Flow chamber (100) is operationally associated with fluidic system (112) and detection system (114), so that delivery of fluids and collection of signals is under control of computer (116). Preferably, optical signals are collected by microscope (118) and are imaged onto a solid state imaging device, such as charge-coupled device (CCD) (120) which is capable of generating a digital image of the physical image of the microparticle array with sufficient resolution for individual microparticles to be distinguished. For fluorescent signals, detection system (114) usually includes appropriate bandpass filter (122) for optical signal (108), bandpass filter (124) for excitation beam (128) generated by light source (126), and other standard components. As illustrated, a conventional fluorescence microscope is preferred which is configured for epiilumination. There is a great deal of guidance in the art for selecting appropriate fluorescence microscopes, e.g. Wang and Taylor, editors, Fluroescence Microscopy of Living Cells in Culture, Parts A and B, Methods in Cell Biology, Vols. 29 and 30 (Academic Press, New York, 1989).

A key feature of the invention is flow chamber (100). Body (130) of flow chamber (100) preferably comprised inlet (102), outlet (104) and planar cavity (106) which are formed by standard micromachining techniques, e.g. Ekstrom et al, International patent application PCT/SE91/00327; Brown, U.S. Pat. No. 4,911,782; Harrison et al, Anal. Chem. 64: 1926–1932 (1992); and the like. Transparent plate (132) is sealingly attached to body (130) to form an operational flow chamber (100). Body (130) may be constructed from any of several different materials including glass, silicon, polyethylene, polyester, teflon, other plastics, and the like. Preferably, transparent plate (132) is glass or quartz; and, when body (130) and transparent plate (132) are glass or silicon, transparent plate (132) is preferably attached to body (130) by anodic bonding, e.g. Pomerantz, U.S. Pat. No. 3,397,279. Key functions of the flow chamber include i) holding a population of microparticles in a substantially immobilized planar array, or monolayer, during a sequence of processing steps, ii) ensuring that processing reagents can access each microparticle during each step of a process, and iii) minimizing processing reagent usage. The degree of immobilization required may vary among different embodiments. Generally, more movement of microparticles within a planar array increases the computational and measurement burden of tracking positions of microparticles by image processing software. Design trade-offs therefore exist between the use of image processing software and the use of physical and/or chemical means for constraining microparticle movement. Preferably, physical and/or chemical means are employed to constrain microparticle movement within the planar array of microparticles in flow chamber (100). Such means are referred to herein as "movement constraining means." Most preferably, physical, or mechanical, movement constraining means are employed.

Preferably, microparticles are disposed in flow chamber (100) in a closely packed planar array. As used herein, "closely packed" in reference to a planar array means either that the number of microparticles per unit area of a planar array is at least eighty percent of the number of microparticles in a hexagonal array of equal area, or that the average distance between centers of adjacent microparticles is less than two microparticle diameters. As used herein, a "hexagonal" array of microparticles means a planar array of microparticles in which every microparticle in the array contacts at least six other adjacent microparticles, as shown in FIG. 3a.

6

Additions features of flow chamber (100) of a preferred embodiment are illustrated in FIGS. 2a through 2c. FIG. 2a is a cross sectional view along a longitudinal plane that bisects flow chamber (100). The same view, in a more abstracted rendition, is shown in FIG. 2c. In both Figures, inlet (102) fluidly communicates with planar cavity (106) and outlet (104). Microparticles (200) carrying analytes enter inlet (102) and are carried by a suspending buffer to planar cavity (106) where they become packed against dam (202) which prevents the microparticles from exiting the flow chamber through outlet (104). Structurally, dam (202) may be formed by a sudden reduction of the vertical dimension of planar cavity (106). Preferably, vertical dimension (204) of planar cavity (106) is selected so that microparticles (200) are constrained to a plane, i.e. a monolayer, when they pack against dam (202). More preferably, vertical dimension (204) is selected to be between about 120 to 150 percent of the diameter of the microparticles employed. For example, when microparticles are employed that have diameters of 5 $\mu$m, vertical dimension (204) may be 7 $\mu$m. Magnetic microparticles may be constrained to a plane and constrained from movement by applying a magnetic field so that the microparticles are attracted to the ceiling or to the floor of planar cavity (106). Width (206) of planar cavity (106) is not a critical dimension; however, for convenience and efficiency, width (206) may be selected to correspond to the dimensions of the signal collection region of detection system (114). Such regions labeled l through k in FIG. 2b are referred to herein as "tiles." That is, the region of planar cavity (106) occupied by microparticles may be divided into non-overlapping areas, referred to as "tiles," that cover the entire occupied region. FIG. 2b, which is a top view of the flow chamber of FIG. 2a, also shows inlet (102), planar cavity (106), dam (202), and outlet (104) that lie in sequence along axis (217) of flow chamber (100).

Many movement constraining means may be selected for use with the flow chamber, either alone or in combination. Such means include loading microparticles with trace amounts of a chemically reactive species which may be activated and cross-linked; providing physical, or mechanical structures, such as ridges, within the flow chamber; providing magnetically responsive microparticles which may be immobilized by an external magnetic field; providing a second population of microparticles that are loaded into a flow chamber after the analyte-containing population, which forces the analyte-containing population against dam (202); and the like. Exemplary chemically reactive species for use with nucleic acid analytes are disclosed in Summerton et al, U.S. Pat. No. 4,123,610; Gamper et al, J. Mol. Biol., 197: 349–362 (1987); Hearst, Ann. Rev. Phys. Chem. 39: 291–315 (1988); Pieles et al, Nucleic Acids Research, 17: 8967–8978 (1989); and the like.

Preferably, microparticle movement is constrained by providing a flow chamber with planar cavity (106) containing a plurality of ridges running parallel to axis (217) of the flow chamber, i.e. parallel to the direction of reagent flow, so that microparticles are arranged into rows, which may be single-file, or several microparticles wide, as shown in FIGS. 3a and 3b. The particular selection may depend on several factors, including the degree of immobilization desired, constraints imposed by the fabrication technique used to construct the flow chamber, the amount of reagent access desired, the degree to which flow resistance or back-pressure can be tolerated, and the like. FIGS. 3a and 3b illustrate two possible distances between parallel ridges. In FIG. 3a, the distance is selected to permit maximal packing of microparticles into a hexagonal array, and in FIG. 3b, the

US 6,654,505 B2

7

distance is selected for less efficient packing, but for increased reagent access to microparticle surfaces. FIGS. 3c and 3d are axial views of the flow chamber showing the microparticle arrangements of FIGS. 3a and 3b, respectively.

In some embodiments, such as those employing enzymatic processes, the inner surfaces of flow chamber (100) may be passivated, that is, treated to render such surfaces inert and/or non-adsorbing with respect to enzymes. The type of treatment depends on the sensitivity of the enzymes used in the process, and their affinity for the surfaces. Surface treatments include silanization, e.g. with commercially available reagents (Pierce, Rockford, Ill.); and/or adsorption of various blocking polymers, such as poly-a-alanine, polyglycine, polyadenylic acid, polymaleimide, polyvinylpyrrolidone, or the like, e.g. Shoffner et al, Nucleic Acids Research, 24: 375–379 (1996). Preferably, glass inner surfaces of flow chamber (100) are covalently coated with a neutral coating, such as allyl methacrylate, using the technique disclosed in Sandoval et al, U.S. Pat. No. 5,326,738, which is incorporated by reference.

FIG. 1b illustrates flow chamber (100) mounted between holders (140) and (142) which sealingly connect inlet (102) to inlet tubing (144) and outlet (104) to outlet tubing (146), respectively. Preferably, holder (140) contains a rotary valve (not shown) operated by actuator (148) that shunts fluid flowing through inlet tubing (144) to inlet (102) or to waste line (150). Such a valve minimizes the amount of process reagent from a previous step that must be passed through flow chamber (100) prior to the initiation of the next process step. That is, such a rotary valve permits reagent in inlet tubing (144) to be shunted to waste and replaced by processing reagent required for the next step in the process being executed. Preferably, for use in DNA analysis, peltier block (152) is employed to control temperature in flow chamber (100) and the entire assembly including flow chamber (100) and peltier block (152) is mounted on xyz-stage (154) which is under control of computer (116).

Preferably, microparticles are loaded into flow chamber (100) prior to attachment of holders (140) and (142) and the initiation of processing steps. FIG. 4 illustrates a microparticle loader for loading microparticles into flow chamber (100). Flow chamber (100) is mounted between holders (400), (402), (404), and (406). Holders (400) and (402) sealingly clamp onto the inlet end (101) of flow chamber (100) and holders (404) and (406) sealingly clamp onto the outlet end (103) of flow chamber (100) so that inlet tubing (408) is in fluid communication with outlet tubing (410) when the microparticle loader is assembled. Inlet tubing (408) is connected to syringe (416) which is used to drive fluid through flow chamber (100). Holder (400) is constructed to have conical passage (412) which narrows to match the diameter of inlet (102) of flow chamber (100). After assembly of holders (400), (402), (404), and (406) a suspension of microparticles is placed in the conical passage after which fitting (414) is sealingly connected to holder (400). Fluid pressure and flow generated by syringe (416) then drives the microparticles into planar cavity (106) and against dam (202). In a preferred embodiment which employs 5 µm diameter GMA microparticles carrying DNA, approximately 500 thousand microparticles are loaded into flow chamber (100) by placing 5 µL of a 100 thousand microparticle/µL solution (TE buffer, pH 8.0, Sambrook et al, Molecular Cloning, Second Edition (Cold Spring Harbor Laboratory, New York, 1989)) in conical passage (412), attaching fitting (414), and using syringe (416) to drive the microparticles through inlet (102) and into planar cavity

8

(106). After loading, holders (400), (402), (404), and (406) are removed from flow chamber (100), which is then mounted on the apparatus as shown in FIG. 1b.

Preferably, process reagents are delivered to flow chamber (100) by the fluidic system illustrated in FIG. 5 which has the capacity to handle many different reagents for complex analytical processes. In the illustrated embodiment, which is used in connection with DNA sequencing, the fluidics system may accommodate up to 38 reagents, including wash buffers, rinses, enzymes, hybridization probes, adaptors, and the like. Preferably, the function of the fluidics system is the sequential metering of selected processing reagents to flow chamber (100). Inlet (102) of flow chamber (100) is sealingly connected to holder (140) which contains rotary valve (actuator shown as 148) (not shown in FIG. 5). The function of the rotary valve is described above. A variety of means may be employed for moving processing reagents from reservoirs, through tubing, and into flow chamber (100), including gravity feed, pressure feed, and pumps, e.g. peristaltic, syringe, and the like. Preferably, common syringe pump (500) is employed for removing predetermined amounts processing reagents from reservoirs and for forcing such reagents through flow chamber (100) at a predetermined flow rate. Under control of computer (116), pump (500) in operational association with valve block (502) and rotary valve (504) removes a predetermined amount of processing reagent from a selected reservoir by siphoning reagent out of the reservoir on the out-stroke of plunger (501) of pump (500). On the in-stroke of plunger (501), rotary valve (504) directs processing reagent from tubing (503) to reservoir (505) of pump (500). On the out-stroke of plunger (501), state of rotary valve (504) is changed to direct processing reagent from reservoir (505) to inlet tubing (144). Tubing (503) connects rotary valve (504) with manifold (508) which, in turn, is connected to a plurality (five shown) of banks of zero dead volume valves (506). Zero dead volume valves (506) connect individual reservoirs holding processing reagents to a common passageway (not shown in FIG. 5) that runs through each of the banks of valves connecting to manifold (508).

A preferred zero dead volume valve is described in U.S. Pat. Nos. 4,558, 845 and 4,703,913, which are incorporated by reference. Process reagents from reservoirs (514) are distributed to the banks of dead volume valves by way of manifold (510). Alternative valve blocks for controlling delivery of process reagents to flow chamber (100) include the valve matrix disclosed in U.S. Pat. No. 5,203,368.

An important feature of detection means (114) of the invention is the ability to keep track of individual microparticles through multiple process steps and/or cycles. In connection with such tracking, detection means (114) periodically records optical characteristics of individual microparticles that provide a close approximation microparticle centers. Preferably, when trans-illumination, or "back lighting" of flow chamber (100) is possible, the optical characteristic is the focused back light from the microparticles. That is, in reference to FIG. 6a, back light (600) passes vertically through flow chamber (100) where it is focused by microparticles (602) onto focal plane (604). The image of focal plane (604) in this configuration appears as a field of bright points, where each point is located at the approximate center of its corresponding microparticle. In an epillumination system, light from above flow chamber (100), i.e. "top light (610)," is directed from a vertical direction onto microparticles (602) where it scatters from the top surface of the microparticles. In this configuration, the optical characteristic is the scatter center of a microparticle. Thus, an

US 6,654,505 B2

9

image is collected from the plane containing scatter centers (612) resulting from such top lighting. As with focused back lighting, the image of the scatter centers provides a convenient way to readily determine the approximate centers of the microparticles.

In the preferred image processing approach, once microparticle centers (700) are determined, pixels (702) are assigned for determining characteristics, e.g. intensity, of an optical signal generated at each microparticle (602). The size of microparticle (602) and pixel area determine how many pixels are assigned to each microparticle. In making such an assignment, important factors include the degree to which the calculated center of a microparticle (as described above) is likely to deviate from the geometric center, the extent to which optical signal collected from the edge of an image contains spurious information (e.g. signal from an overlapping or adjacent microparticle), the uniformity of microparticle diameter and shape, and the like. In the preferred apparatus of the invention, 5 $\mu$m diameter microparticles are employed and the pixel dimensions of the CCD detector are about 0.9 $\mu$m×0.9 $\mu$m. Thus, nine pixels fit easily within the interior of a microparticle image with a margin of at least about 1 $\mu$m between any pixel and the edge of the microparticle image. In the preferred embodiment, an initial pixel is assigned which encloses the computed center of a microparticle, e.g. pixel "5" in FIG. 7. Thereafter, additional pixels are assigned, usually the immediately adjacent pixels. Preferably, the value of the optical signal generated by a process at the surface of a microparticle is the average value of the optical signals collected by pixels assigned to that microparticle.

The general operation of the system of the preferred embodiment is summarized by the flow chart of FIG. 8. At the start (800) of an analysis, microparticles with anchored analytes have been loaded into flow chamber (100) which has been operationally mounted in holders 140 and 142. The initial operation is the calibration of the microparticle focal plane (802). That is, the vertical, or "z", position of the xyz-stage is determined which optimizes the focus of either the scatter centers of the microparticles, i.e. the microparticle tops for top-lighting, or the focus points of the microparticles for back-lighting. The optimization is carried out by a conventional autofocusing algorithm which provides an image contrast function constructed from a predetermined sample of regions within a collected image. For example, the contrast function may be evaluated iteratively for sequence of z-positions so that the differences of successive values of the contrast function can be determined. These are tested until a difference is found below a predetermined threshold, which is taken as the maximum of the contrast function. Focal plane location is taken as the z position which maximizes the image contrast function. Such calibration is carried out for each tile, if more than one tile is employed, so that a correction table is constructed of changes in stage setting values with respect to the settings of the first tile that are required to bring the system into focus upon translation to subsequent tiles. These values are stored by computer (116).

After calibration, process steps are initiated (804) by way of a fluidics controller operationally associated with computer (116). After process steps (804) are completed, stage settings are adjusted to place the first tile into focus using the autofocus algorithm (806), which places the focal plane of the microscope objective approximately at the tops of the microparticles. Stage settings are then adjusted (808) to bring the focal plane of the microscope objective to the approximate centers of the microparticles, as illustrated

10

(606) in FIGS. 6a and 6b. The amount of stage movement in this re-focusing depends on the diameter of the microparticles being used. After appropriate selection of filters (124) and (122), a fluorescent image of the first tile is collected (810) and transferred to data server (812). Fluorescent images are collected on the plane of the microparticle centers because of imperfections in the planar array. That is, microparticles in planar cavity (106) do not lie in a perfect planar array for a variety of reasons. For example, some microparticles are elevated above others as a result of packing into the flow chamber, there is some variability in the size and shape of the microparticles; and, the floor of planar cavity (106) may be uneven. After the fluorescent image is collected, the focal plane of the microscope objective is returned (814) to the microparticle focal plane, where another image is collected (816) for the purpose of computing microparticle centers as described above. The image of microparticle centers is transferred to data server (812) where data processor (818) assigns pixels of the fluorescent image to each microparticle center, as described above. After the image of microparticle centers is collected (816), the stage is moved so that an image of the next tile can be collected (822). If there are no further tiles of microparticles (820), then the next steps and/or cycles of the process are executed (826). If there are no further process steps (824), then the process is complete and the apparatus is placed in a holding mode.

Optical signals collected in the course of analysis may be generated by a variety of mechanisms, including absorption and fluorescence, chemiluminescence, electrochemiluminescence, or bioluminescence emission. Extensive guidance is available for selecting appropriate optical signaling means, e.g. Kessler, editor, Nonradioactive Labeling and Detection of Biomolecules (Springer-Verlag, Berlin); Keller and Manak, DNA Probes, Second Edition (Stockton Press, New York, 1993); and the like. Preferably, optical signals generated in processing steps are fluorescence emissions.

Microparticles

An important feature of the system of the invention is the use of microparticles for carrying analytes. A variety of microparticles may be employed depending on particular applications. Generally, microparticles must consist of a material compatible with the reagents and chemistry of the process steps being carried out and microparticle must be substantially mechanically rigid so that they retain their shape and size during process steps. Preferably, as used herein, the term "substantially mechanically rigid" means that microparticles neither swell nor contract by more than ten percent (as measure by diameter) in any process solvent or reagent. Preferably, microparticles are microspheres of uniform size, i.e. microparticles are monodisperse. More preferably, the diameters of spherical microparticles have a coefficient of variation less than five percent, and most preferably, less than two percent. Microparticle diameters are in the range of from 0.1 $\mu$m to 100 $\mu$m. Preferably, microparticle diameters range from 1 $\mu$m to 20 $\mu$m. Most preferably, microparticle diameters are in the range of 1 to 5 $\mu$m. Suitable microparticle materials include inorganic support materials such as glass, e.g. controlled-pore glass, Balltoni beads; silica, zirconia, and the like, e.g. Weetall, Methods in Enzymology, 44: 134–148 (1976); and organic support materials such as highly cross-linked polystyrene, polyacrylate, polymethylmethacrylate, glycidylmethacrylate (GMA), Dynabeads (Dynal, Oslo, Norway), and the like, Rembaum et al, U.S. Pat. No. 4,046,720; Hodge and

US 6,654,505 B2

11

12

Sherrington, editors, pages 435–456, Polymer-supported Reactions in Organic Synthesis (Wiley & Sons, New York, 1980); Andrus et al, U.S. Pat. No. 5,047,524; and the like.

Attaching Identical Copies of Polynucleotides to Microparticles by Solid Phase Cloning

In a preferred embodiment of the invention, identical copies of polynucleotides from a population are anchored to separate microparticles by solid phase cloning, i.e. the use of oligonucleotide tags for sorting polynucleotides onto microparticles such that only the same kind of polynucleotide will be attached to the same microparticle, e.g. Brenner, U.S. Pat. No. 5,604,097, which is incorporated by reference. This condition is accomplished by taking a sample of the full ensemble of tag-polynucleotide conjugates. (It is acceptable that identical polynucleotides have different tags, as it merely results in the same polynucleotide being operated on or analyzed twice in two different locations.) Such sampling can be carried out either overtly—for example, by taking a small volume from a larger mixture—after the tags have been attached to the polynucleotides, it can be carried out inherently as a secondary effect of the techniques used to process the polynucleotides and tags, or sampling can be carried out both overtly and as an inherent part of processing steps.

Oligonucleotide tags for use with the invention are members of a minimally cross-hybridizing set of oligonucleotides. The sequences of oligonucleotides of such a set differ from the sequences of every other member of the same set by at least two nucleotides. Thus, each member of such a set cannot form a duplex (or triplex) with the complement of any other member with less than two mismatches. Complements of oligonucleotide tags of the invention, referred to herein as "tag complements," may comprise natural nucleotides or non-natural nucleotide analogs. Tag complements are attached to microparticles.

Minimally cross-hybridizing sets of oligonucleotide tags and tag complements may be synthesized either combinatorially or individually depending on the size of the set desired and the degree to which cross-hybridization is sought to be minimized (or stated another way, the degree to which specificity is sought to be enhanced). For example, a minimally cross-hybridizing set may consist of a set of individually synthesized 10-mer sequences that differ from each other by at least 4 nucleotides, such set having a maximum size of 332 (when composed of 3 kinds of nucleotides and counted using a computer program such as disclosed in Appendix Ic of International patent application PCT/US96/09513). Alternatively, a minimally cross-hybridizing set of oligonucleotide tags may also be assembled combinatorially from subunits which themselves are selected from a minimally cross-hybridizing set. For example, a set of minimally cross-hybridizing 12-mers differing from one another by at least three nucleotides may be synthesized by assembling 3 subunits selected from a set of minimally cross-hybridizing 4-mers that each differ from one another by three nucleotides. Such an embodiment gives a maximally sized set of $9^3$, or 729, 12-mers. "9" is number of oligonucleotides generated by the computer program of Appendix Ia of International patent application PCT/US96/09513, which assumes, as with the 10-mers, that only 3 of the 4 different types of nucleotides are used. The set is described as "maximal" because the computer programs disclosed in International patent application PCT/US96/09513 provide the largest set for a given input (e.g. length, composition, difference in number of nucleotides between members). Additional minimally cross-hybridizing sets may be formed from subsets of such calculated sets.

When synthesized combinatorially, an oligonucleotide tag of the invention preferably consists of a plurality of subunits, each subunit consisting of an oligonucleotide of 3 to 9 nucleotides in length wherein each subunit is selected from the same minimally cross-hybridizing set. In such embodiments, the number of oligonucleotide tags available depends on the number of subunits per tag and on the length of the subunits.

As used herein in reference to oligonucleotide tags and tag complements, the term "repertoire" means the set of minimally cross-hybridizing set of oligonucleotides that make up the tags in a particular embodiment or the corresponding set of tag complements.

Preferably, in constructing a cDNA library where substantially all different cDNAs have different tags, a tag repertoire is employed whose complexity, or number of distinct tags, greatly exceeds the total number of mRNAs extracted from a cell or tissue sample. Preferably, the complexity of the tag repertoire is at least 10 times that of the polynucleotide population; and more preferably, the complexity of the tag repertoire is at least 100 times that the polynucleotide population. Below, a protocol is disclosed for cDNA library construction using a primer mixture that contains a full repertoire of exemplary 9-word tags. Such a mixture of tag-containing primers has a complexity of $8^9$, or about $1.34 \times 10^8$. As indicated by Winslow et al, Nucleic Acids Research, 19: 3251–3253 (1991), mRNA for library construction can be extracted from as few as 10–100 mammalian cells. Since a single mammalian cell contains about $5 \times 10^5$ copies of mRNA molecules of about $3.4 \times 10^4$ different kinds, by standard techniques one can isolate the mRNA from about 100 cells, or (theoretically) about $5 \times 10^7$ mRNA molecules. Comparing this number to the complexity of the primer mixture shows that without any additional steps, and even assuming that mRNAs are converted into cDNAs with perfect efficiency (1% efficiency or less is more accurate), the cDNA library construction protocol results in a population containing no more than 37% of the total number of different tags. That is, without any overt sampling step at all, the protocol inherently generates a sample that comprises 37%, or less, of the tag repertoire. The probability of obtaining a double under these conditions is about 5%, which is within the preferred range. With mRNA from 10 cells, the fraction of the tag repertoire sampled is reduced to only 3.7%, even assuming that all the processing steps take place at 100% efficiency. In fact, the efficiencies of the processing steps for constructing cDNA libraries are very low, a "rule of thumb" being that good library should contain about $10^8$ cDNA clones from mRNA extracted from $10^6$ mammalian cells.

Use of larger amounts of mRNA in the above protocol, or for larger amounts of polynucleotides in general, where the number of such molecules exceeds the complexity of the tag repertoire, a tag-polynucleotide conjugate mixture potentially contains every possible pairing of tags and types of mRNA or polynucleotide. In such cases, overt sampling may be implemented by removing a sample volume after a serial dilution of the starting mixture of tag-polynucleotide conjugates. The amount of dilution required depends on the amount of starting material and the efficiencies of the processing steps, which are readily estimated.

If mRNA were extracted from $10^6$ cells (which would correspond to about 0.5 $\mu g$ of poly(A)$^+$ RNA), and if primers were present in about 10–100 fold concentration excess—as is called for in a typical protocol, e.g. Sambrook et al, Molecular Cloning, Second Edition, page 8.61 [10 $\mu L$ 1.8 kb mRNA at 1 mg/mL equals about $1.68 \times 10^{-11}$ moles and 10

US 6,654,505 B2

13

μL 18-mer primer at 1 mg/mL equals about $1.68 \times^{-9}$ moles], then the total number of tag-polynucleotide conjugates in a cDNA library would simply be equal to or less than the starting number of mRNAs, or about $5 \times 10^{11}$ vectors containing tag-polynucleotide conjugates—again this assumes that each step in cDNA construction—first strand synthesis, second strand synthesis, ligation into a vector—occurs with perfect efficiency, which is a very conservative estimate. The actual number is significantly less.

If a sample of n tag-polynucleotide conjugates are randomly drawn from a reaction mixture—as could be effected by taking a sample volume, the probability of obtaining conjugates having the same tag is described by the Poisson distribution, $P(r) = e^{-\lambda}(\lambda)^r/r$, where r is the number of conjugates having the same tag and $\lambda = np$, where p is the probability of a given tag being selected. If $n = 10^6$ and $p = 1/(1.34 \times 10^8)$, then $\lambda = 0.00746$ and $P(2) = 2.76 \times 10^{-5}$. Thus, a sample of one million molecules gives rise to an expected number of doubles well within the preferred range. Such a sample is readily obtained as follows: Assume that the $5 \times 10^{11}$ mRNAs are perfectly converted into $5 \times 10^{11}$ vectors with tag-cDNA conjugates as inserts and that the $5 \times 10^{11}$ vectors are in a reaction solution having a volume of 100 μl. Four 10-fold serial dilutions may be carried out by transferring 10 μl from the original solution into a vessel containing 90 μl of an appropriate buffer, such as TE. This process may be repeated for three additional dilutions to obtain a 100 μl solution containing $5 \times 10^5$ vector molecules per μl. A 2 μl aliquot from this solution yields $10^6$ vectors containing tag-cDNA conjugates as inserts. This sample is then amplified by straight forward transformation of a competent host cell followed by culturing.

Of course, as mentioned above, no step in the above process proceeds with perfect efficiency. In particular, when vectors are employed to amplify a sample of tag-polynucleotide conjugates, the step of transforming a host is very inefficient. Usually, no more than 1% of the vectors are taken up by the host and replicated. Thus, for such a method of amplification, even fewer dilutions would be required to obtain a sample of $10^6$ conjugates.

A repertoire of oligonucleotide tags can be conjugated to a population of polynucleotides in a number of ways, including direct enzymatic ligation, amplification, e.g. via PCR, using primers containing the tag sequences, and the like. The initial ligating step produces a very large population of tag-polynucleotide conjugates such that a single tag is generally attached to many different polynucleotides. However, as noted above, by taking a sufficiently small sample of the conjugates, the probability of obtaining "doubles," i.e. the same tag on two different polynucleotides, can be made negligible. Generally, the larger the sample the greater the probability of obtaining a double. Thus, a design trade-off exists between selecting a large sample of tag-polynucleotide conjugates—which, for example, ensures adequate coverage of a target polynucleotide in a shotgun sequencing operation or adequate representation of a rapidly changing mRNA pool, and selecting a small sample which ensures that a minimal number of doubles will be present. In most embodiments, the presence of doubles merely adds an additional source of noise or, in the case of sequencing, a minor complication in scanning and signal processing, as microparticles giving multiple fluorescent signals can simply be ignored.

As used herein, the term "substantially all" in reference to attaching tags to molecules, especially polynucleotides, is meant to reflect the statistical nature of the sampling procedure employed to obtain a population of tag-molecule

14

conjugates essentially free of doubles. The meaning of substantially all in terms of actual percentages of tag-molecule conjugates depends on how the tags are being employed. Preferably, for nucleic acid sequencing, substantially all means that at least eighty percent of the polynucleotides have unique tags attached. More preferably, it means that at least ninety percent of the polynucleotides have unique tags attached. Still more preferably, it means that at least ninety-five percent of the polynucleotides have unique tags attached. And, most preferably, it means that at least ninety-nine percent of the polynucleotides have unique tags attached.

Tags can be conjugated to cDNAs of existing libraries by standard cloning methods. cDNAs are excised from their existing vector, isolated, and then ligated into a vector containing a repertoire of tags. Preferably, the tag-containing vector is linearized by cleaving with two restriction enzymes so that the excised cDNAs can be ligated in a predetermined orientation. The concentration of the linearized tag-containing vector is in substantial excess over that of the cDNA inserts so that ligation provides an inherent sampling of tags.

A general method for exposing the single stranded tag after amplification involves digesting a target polynucleotide-containing conjugate with the 5'→3' exonuclease activity of T4 DNA polymerase, or a like enzyme, e.g. as described in Kuijper et al, Gene, 112: 147–155 (1992). When used in the presence of a single deoxynucleoside triphosphate, such a polymerase will cleave nucleotides from 3' recessed ends present on the non-template strand of a double stranded fragment until a complement of the single deoxynucleoside triphosphate is reached on the template strand. When such a nucleotide is reached the 5'→3' digestion effectively ceases, as the polymerase's extension activity adds nucleotides at a higher rate than the excision activity removes nucleotides. Consequently, single stranded tags constructed with three nucleotides are readily prepared for loading onto solid phase supports.

After the oligonucleotide tags are prepared for specific hybridization, e.g. by rendering them single stranded as described above, the polynucleotides are mixed with microparticles containing the complementary sequences of the tags under conditions that favor the formation of perfectly matched duplexes between the tags and their complements. There is extensive guidance in the literature for creating these conditions. Exemplary references providing such guidance include Wetmur, Critical Reviews in Biochemistry and Molecular Biology, 26: 227–259 (1991); Sambrook et al, Molecular Cloning: A Laboratory Manual, 2nd Edition (Cold Spring Harbor Laboratory, New York, 1989); and the like. Preferably, the hybridization conditions are sufficiently stringent so that only perfectly matched sequences form stable duplexes. Under such conditions the polynucleotides specifically hybridized through their tags may be ligated to the complementary sequences attached to the microparticles. Finally, the microparticles are washed to remove polynucleotides with unligated and/or mismatched tags.

Preferably, for sequencing applications, standard CPG beads of diameter in the range of 20–50 μm are loaded with about $10^5$ polynucleotides, and glycidalmethacrylate (GMA) beads available from Bangs Laboratories (Carmel, Ind.) of diameter in the range of 5–10 μm are loaded with a few tens of thousand polynucleotide, e.g. $4 \times 10^4$ to $6 \times 10^4$, to a hundred thousand polynucleotides.

## DNA Sequencing

Polynucleotides loaded onto microparticles may be simultaneously sequenced in the instant apparatus using a "base-by-base" DNA sequencing methodology. Such sequencing

Add. 67

US 6,654,505 B2

15

methodology permits the stepwise identification of a sequence of nucleotides in a target polynucleotide, usually one base at a time, through successive cycles of treatment and detection. Base-by-base approaches are disclosed in the following references: Cheeseman, U.S. Pat. No. 5,302,509; Tsien et al, International application WO 91/06678; Rosenthal et al, International application WO 93/21340; Canard et al, Gene, 148: 1–6 (1994); Metzker et al, Nucleic Acids Research, 22: 4259–4267 (1994); and the like. Preferably, the base-by-base approach disclosed by Brenner in U.S. Pat. No. 5,599,675 is used with the apparatus of the invention to sequence polynucleotides on a population of loaded microparticles disposed as a planar array in the flow chamber. Accordingly, Brenner, U.S. Pat. No. 5,599,675 is incorporated by reference. Preferably, the a population of loaded microparticles for sequencing includes at least ten thousand loaded microparticles; more preferably, such a population includes at least fifty thousand loaded microparticles; and still more preferably, such a population includes at least one hundred thousand loaded microparticles.

Preferably, the sequencing method of Brenner (cited above) is employed in the embodiment disclosed in Albrecht et al International patent application PCT/US97/09472 which discloses the use of encoded adaptors. An encoded adaptor is a doable stranded oligonucleotide comprising a protruding strand and an oligonucleotide tag selected from a minimally cross-hybridizing set of oligonucleotides. Encoded adaptors whose protruding strands form perfectly matched duplexes with the complementary protruding strands of the target polynucleotide are ligated. After ligation, the identity and ordering of the nucleotides in the protruding strands are determined, or "decoded," by specifically hybridizing a labeled tag complement to its corresponding tag on the ligated adaptor. Encoded adaptors may be used in an adaptor-based method of DNA sequencing that

16

probability that each cDNA will have a unique tag for sorting. After mRNA extraction, first strand synthesis is carried out in the presence of 5-Me-dCTP (to block certain cDNA restriction sites) and a biotinylated primer mixture containing the oligonucleotide tags. After conventional second strand synthesis, the tag-cDNA conjugates are cleaved with Dpn II (which is unaffected by the 5-Me-deoxycytosines), the biotinylated portions are separated from the reaction mixture using streptavidin-coated magnetic beads, and the tag-cDNA conjugates are recovered by cleaving them from the magnetic beads via a Bsm BI site carried by the biotinylated primer. The Bsm BI-Dpn II fragment containing the tag-cDNA conjugate is then inserted into a plasmid and amplified. After isolation of the plasmids, tag-cDNA conjugates are amplified out of the plasmids by PCR in the presence of 5-Me-dCTP, using biotinylated and fluorescently labeled primers containing pre-defined restriction endonuclease sites. After affinity purification with streptavidin coated magnetic beads, the tag-cDNA conjugates are cleaved from the beads, treated with T4 DNA polymerase in the presence of dGTP to render the tags single stranded, and then combined with a repertoire of GMA beads having tag complements attached. After stringent hybridization and ligation, the GMA beads are sorted via FACS to produce an enriched population of GMA beads loaded with cDNAs. The enriched population of loaded GMA beads are immobilized in a planar array in a flow chamber where base-by-base sequence takes place using encoded adaptors, as disclosed in Albrecht et al, International patent application PCT/US97/09472.

Approximately 5 $\mu$g of poly(A+) mRNA is extracted from DBY746 yeast cells using conventional protocols. First and second strand cDNA synthesis is carried out by combining 100–150 pmoles of the following primer (SEQ ID NO: 1):

```
5'-biotin-ACTAATCGTCTCACTATTTAATTAA[W,W,W,G]₈CC(T)₁₈V-3'
```

includes repeated cycles of ligation, identification, and cleavage, such as the method described in Brenner (cited above). Briefly, such a method comprises the following steps: (a) ligating an encoded adaptor to an end of a polynucleotide, the encoded adaptor having a nuclease recognition site of a nuclease whose cleavage site is separate from its recognition site; (b) identifying one or more nucleotides at the end of the polynucleotide by the identity of the encoded adaptor ligated thereto; (c) cleaving the polynucleotide with a nuclease recognizing the nuclease recognition site of the encoded adaptor such that the polynucleotide is shortened by one or more nucleotides; and (d) repeating said steps (a) through (c) until said nucleotide sequence of the polynucleotide is determined. In the identification step, successive sets of tag complements are specifically hybridized to the respective tags carried by encoded adaptors ligated to the ends of the target polynucleotides, as described above. The type and sequence of nucleotides in the protruding strands of the polynucleotides are identified by the label carried by the specifically hybridized tag complement and the set from which the tag complement came.

### Construction and Sorting of cDNA Library for Signature Sequencing with Encoded Adaptors

In this example, a cDNA library is constructed in which an oligonucleotide tag consisting of 8 four-nucleotide "words" is attached to each cDNA. As described above, the repertoire of oligonucleotide tags of this size is sufficiently large (about $10^8$) so that if the cDNAs are synthesized from a population of about $10^6$ mRNAs, then there is a high

with the poly(A+) mRNA using a Stratagene (La Jolla, Calif.) cDNA Synthesis Kit in accordance with the manufacturer's protocol. This results in cDNAs whose first stand deoxycytosines are methylated at the 5-carbon position. In the above formula, "V" is G, C, or A, "[W, W, W, G]" is a four-nucleotide word selected from Table II of Brenner, International patent application PCT/US96/09513, the single underlined portion is a Bsm BI recognition site, and the double underlined portion is a Pac I recognition site. After size fractionation (GIBCO-BRL cDNA Size Fractionation Kit) using conventional protocols, the cDNAs are digested with Dpn II (New England Bioscience, Beverly, Mass.) using manufacturer's protocol and affinity purified with streptavidin-coated magnetic beads (M-280 beads, Dynal A. S., Oslo, Norway). The DNA captured by the beads is digested with Bsm BI to release the tag-cDNA conjugates for cloning into a modified pBCSK⁻ vector (Stratagene, La Jolla, Calif.) using standard protocols. The pBCSK⁻ vector is modified by adding a Bbs I site by inserting the following fragment (SEQ ID NO: 2) into the Kpn I/Eco RV digested vector.

```
             CGAAGACCC
3'-CATGGCTTCTGGGGATA-5'
```

Bsm BI/Dpn II digested tag-cDNA conjugate is inserted in the pBCSK⁻ which is previously digested with Bbs I and Bam HI. After ligation, the vector is transfected into the manufacturer's recommended host for amplification.

US 6,654,505 B2

17

After isolating the above pBCSK⁻ vector from a standard plasmid miniprep, the tag-cDNA conjugates are amplified by PCR in the presence of 5-Me-dCTP using 20-mer primers complementary to vector sequences flanking the tag-cDNA insert. The "upstream" primer, i.e. adjacent to the tag, is biotinylated and the "downstream" primer, i.e. adjacent to the cDNA, is labeled with fluorescein. After amplification, the PCR product is affinity purified then cleaved with Pac I to release fluorescently labeled tag-cDNA conjugates. The tags of the conjugates are rendered single stranded by treating them with T4 DNA polymerase in the presence of dGTP. After the reaction is quenched, the tag-cDNA conjugate is purified by phenol-chloroform extraction and combined with 5.5 mm GMA beads carrying tag complements, each tag complement having a 5′ phosphate. Hybridization is conducted under stringent conditions in the presence of a thermal stable ligase so that only tags forming perfectly matched duplexes with their complements are ligated. The GMA beads are washed and the loaded beads are concentrated by FACS sorting, using the fluorescently labeled cDNAs to identify loaded GMA beads. The tag-cDNA conjugates attached to the GMA beads are digested with Dpn II to remove the fluorescent label and treated with alkaline phosphatase to prepare the cDNAs for sequencing. That is, phasphatase is used to remove the 5′ phosphate from the ends of the cDNAs to prevent unwanted cDNA-cDNA ligations by way of the palindromic Dpn II site.

The following cleavage adaptor (SEQ ID NO:3) is ligated to the Dpn II-digested and phosphatase treated cDNAs:

```
5'-pGATCAGCTGCTGCAAATTT
      pTCGACGACGTTTAAA
```

After ligation, the 3′ phosphate is removed by alkaline phosphatase, the 5′ strand of the cDNA is treated with T4 DNA kinase, and the nick between the cleavage adaptor and cDNA is ligated. After cleavage by Bbv I, encoded adaptors are ligated to the ends of the cDNAs and the beads are ready for loading into the flow chamber.

Ligation of the adaptors to the target polynucleotide is carried out in a mixture consisting of 5 μl beads (20 mg), 3 μL NEB 10×ligase buffer, 5 μL adaptor mix (25 nM), 2.5 μL NEB #2 restriction buffer, 2000 units/μL, and 14.5 μL distilled water. The mixture is incubated at 16° C. for 30 minutes, after which the beads are washed 3 times in TE (pH 8.0).

After centrifugation and removal of TE, the 3′ phosphates of the ligated adaptors are removed by treating the polynucleotide-bead mixture with calf intestinal alkaline phosphatase (CIP) (New England Biolabs, Beverly, Mass.), using the manufacturers protocol. After removal of the 3′ phosphates, the CIP may be inactivated by proteolytic digestion, e.g. using Pronase™ (available form Boeringer Mannhiem, Indianapolis, Ind.), or an equivalent protease, with the manufacturer's protocol. The polynucleotide-bead mixture is then washed, treated with a mixture of T4 polynucleotide kinase and T4 DNA ligase (New England Biolibs, Beverly, Mass.) to add a 5′ phosphate at the gap between the target polynucleotide and the adaptor, and to complete the ligation of the adaptors to the target polynucleotide. The bead-polynucleotide mixture is then wased in TE, diluted to a concentration of approximately 100 thousand beads per μL, and 5 μL of the resulting solution is loaded into a flow chamber with the help of the holders of FIG. 4.

The top strands of the following 16 sets of 64 encoded adaptors (SEQ ID NO: 4 through SEQ ID NO: 19) are each separately synthesized on an automated DNA synthesizer (model 392 Applied Biosystems, Foster City) using standard methods. The bottom strand, (SEQ ID NO: 20), which is the

18

same for all adaptors, is synthesized separately then hybridized to the respective top strands:

| SEQ ID NO. | Encoded Adaptor |
|---|---|
| 4 | 5'-pANNNTACAGCTGCATCCCttggcgctgagg<br>pATGCACGCGTAGGG-5' |
| 5 | 5'-pNANNTACAGCTGCATCCCtgggcctgtaag<br>pATGCACGCGTAGGG-5' |
| 6 | 5'-pCNNNTACAGCTGCATCCCttgacgggtctc<br>pATGCACGCGTAGGG-5' |
| 7 | 5'-pNCNNTACAGCTGCATCCCtgcccgcacagt<br>pATGCACGCGTAGGG-5' |
| 8 | 5'-pGNNNTACAGCTGCATCCCttcgcctcggac<br>pATGCACGCGTAGGG-5' |
| 9 | 5'-pNGNNTACAGCTGCATCCCtgatccgctagc<br>pATGCACGCGTAGGG-5' |
| 10 | 5'-pTNNNTACAGCTGCATCCCttccgaacccgc<br>pATGCACGCGTAGGG-5' |
| 11 | 5'-pNTNNTACAGCTGCATCCCtgaggggatag<br>pATGCACGCGTAGGG-5' |
| 12 | 5'-pNNANTACAGCTGCATCCCtcccgctacac<br>pATGCACGCGTAGGG-5' |
| 13 | 5'-pNNNATACAGCTGCATCCCtgactccccgag<br>pATGCACGCGTAGGG-5' |
| 14 | 5'-pNNCNTACAGCTGCATCCCtgtgttgcgcgg<br>pATGCACGCGTAGGG-5' |
| 15 | 5'-pNNNCTACAGCTGCATCCCtctacagcagcg<br>pATGCACGCGTAGGG-5' |
| 16 | 5'-pNNGNTACAGCTGCATCCCtgtcgcgtcgtt<br>pATGCACGCGTAGGG-5' |
| 17 | 5'-pNNNGTACAGCTGCATCCCtcggagcaacct<br>pATGCACGCGTAGGG-5' |
| 18 | 5'-pNNTNTACAGCTGCATCCCtggtgaccgtag<br>pATGCACGCGTAGGG-5' |
| 19 | 5'-pNNNTTACAGCTGCATCCCtcccctgtcgga<br>pATGCACGCGTAGGG-5' |

where N and p are as defined above, and the nucleotides indicated in lower case letters are the 12-mer oligonucleotide tags. Each tag differs from every other by 6 nucleotides. Equal molar quantities of each adaptor are combined in NEB #2 restriction buffer (New England Biolabs, Beverly, Mass.) to form a mixture at a concentration of 1000 pmol/μL.

Each of the 16 tag complements are separately synthesized as amino-derivatized oligonucleotides and are each labeled with a fluorescein molecule (using an NHS-ester of fluorescein, available from Molecular Probes, Eugene, Oreg.) which is attached to the 5′ end of the tag complement through a polyethylene glycol linker (Clonetech Laboratories, Palo Alto, Calif.). The sequences of the tag complements are simply the 12-mer complements of the tags listed above.

A flow chamber of the design shown in FIGS. 2a and 2b is employed in association with an Olympus Optical Co., Ltd. (Tokyo, Japan) model BX60MF5 fluorescent microscope fitted with a model U-ULS75XE 75 watt Xenon arc lamp, a motorized filter wheel, a Ludl Electronic Products, Ltd. computer-controlled stage, and a Photometrics, Ltd. (Tucson, Ariz.) PXL CCD camera with a 2000×2000 pixel array. Appropriate bandpass filters (**122**) and (**124**) are

US 6,654,505 B2

19

20

employed for exciting fluorescein and transmitting fluorescent signal to CCD camera (120). Microparticle positions are determined by top-lighting with broadband light from Xenon lamp (126) reduced by a factor of about $10^{-4}$ with a neutral density filter. Fluorescent images are collected with about 2 minute exposure times.

Height (204) of flow chamber (201) is selected to be 7 μm, or approximately 140% of the diameter of the GMA beads. Width (210) of flow chamber (201) is selected so as to ensure that a 3x3 array of 9 image pixels will cover approximately 40–60% of a bead's image after 10xmagnification (as illustrated in FIG. 7). Thus, in order to capture images of tiles of about 100 thousand 5 μm GMA beads, width (210) is selected to have a value of 1.7 mm. Length (212) is selected so that the flow chamber can hold from 1 to 10 tiles of about one hundred thousand 5 μm diameter beads each. The cross section (220) of inlet passage (214) matches that of the inlet tubing and gradually enlarges to match that of flow chamber (201) in the region of the planar cavity, i.e. the region holding the GMA beads on which analysis is performed. It is desirable to have a constant cross section through the planar cavity of flow chamber (201) to minimize the creation of non-uniform flow patterns, as might occur with sudden constrictions and/or expansions in cross section. Both body (218) and cover (216) of flow chamber (201) are glass, and the planar cavity and channels of body (218) are formed by standard chemical etching techniques. Cross section (222) of outlet passage (224) is selected to match the cross section of flow chamber (201) at dam (202).

The fluidics system of FIG. 5a which includes all valves, syringe pump (500), and Peltier block (152), is controlled by code written in LabVIEW 5.0 (National Instruments, Austin, Tex.) and run on a Compact Deskpro Pentium-based microprocessor, which is connected to the various components of the fluidics system by standard I/O circuit boards. Detection system (114) and overall control of the instrument is effected through a Sun Microsystems (Mountain View, Calif.) Sparcstation 5.

Three cycles of duration, identification, and cleavage are carried out in flow chamber (201) to give the sequences of 12 nucleotides at the termini of each of approximately 500,000 cDNAs. That is, five tiles of GMA beads are analyzed in the following series of process steps:

1. Calibrate focal plane of GMA beads.
2. Hybridize decoder.
3. Autofocus on tile 1.
4. Set focus to bead centers.
5. Collect fluorescent image.
6. Set focus to bead focal plane (scatter centers).
7. Collect image.
8. Repeat steps 4–7 for remaining tiles.

9. Wash.
10. Repeat steps 2–9 for remaining decoders.
11. Cleave encoded adaptor.
12. Wash.
13. Ligate top strand of next encoded adaptor.
14. Wash.
15. Repeat steps 13–14.
16. Kinase bottom strand of encoded adaptor.
17. Wash.
18. Ligate bottom strand of encoded adaptor.
19. Wash.
20. Repeat steps 2–9.
21. Repeat steps 11–19 for next encoded adaptor.

In steps 2–9, nucleotides of the cDNAs are identified by hybridizing tag complements to the encoded adaptors. Specifically hybridized tag complements are detected by exciting their fluorescent labels with illumination beam (110) from Xenon arc lamp (126). In step 13, encoded adaptors and T4 DNA ligase (Promega, Madison, Wis.) at about 0.75 units per μL are passed through the flow chamber at a flow rate of about 1–2 μL per minute for about 20–30 minutes at 16° C., after which wash of step 14 is executed by flowing, in succession, a solution of Pronase™ (Boehringer Mannheim, Indianapolis, Ind.), a salt wash solution, and an ethanol wash solution through the flow chamber, all with the same flow rate of 1–2 μL per minute and for durations of 15, 10, and 10 minutes, respectively. The salt wash solution is 150 mM NaCl and 10 mM Tris-HCl (pH 8.5), and the ethanol wash solution is 3:1 (v/v) solution of the salt wash solution and ethanol. The ligation and wash steps 13 and 14 are repeated once, after which the adaptors and the cDNAs are prepared for second strand ligation by passing T4 DNA kinase (New England Bioscience, Beverly, Mass.) at 7 units per μL through the flow cham ber at 37° C. with a flow rate of 1–2 μL per minute for 15–20 minutes. Ligation of the second strand is carried out by flowing T4 DNA ligase (0.75 units per mL, Promega) through the flow chamber for 20–30 minutes at a rate of 1–2 μL per minute, followed by Pronase™ treatment and washing as described above. Tag complements at 25 nM concentration are passed through the flow chamber at a flow rate of 1–2 μL per minute for 10 minutes at 20° C., after which the fluorescent labels carried by the tag complements are illuminated and fluorescence is collected. The tag complements are melted from the encoded adaptors by passing NEB #2 restriction buffer with 3 mM MgCl₂ through the flow chamber at a flow rate of 1–2 μL per minute at 55° C. for 10 minutes. Encoded adaptors are cleaved from the cDNAs by passing Bbv I (New England Biosciences, Beverly, Mass.) at 1 unit/μL at a flow rate of 1–2 μL per minute for 20 minutes at 37° C., followed by Pronase™ treatment and washing, as described above.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 20

<210> SEQ ID NO 1
<211> LENGTH: 78
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: primer
<221> NAME/KEY: misc_feature
<222> LOCATION: (26)...(57)
<223> OTHER INFORMATION: n = A,T,C or G
```

US 6,654,505 B2

-continued

<400> SEQUENCE: 1

actaatcgtc tcactattta attaannnnn nnnnnnnnnn nnnnnnnnnn nnnnnnnggt          60

tttttttttt ttttttttv                                                      78


<210> SEQ ID NO 2
<211> LENGTH: 17
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic fragment

<400> SEQUENCE: 2

atagggagtct tcggtac                                                       17


<210> SEQ ID NO 3
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic cleavage adaptor

<400> SEQUENCE: 3

gatcagctgc tgcaaattt                                                      19


<210> SEQ ID NO 4
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (2)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 4

annntacagc tgcatcccct ggcgctgagg                                          30


<210> SEQ ID NO 5
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 5

nanntacagc tgcatccctg ggcctgtaag                                          30


<210> SEQ ID NO 6
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (2)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 6

cnnntacagc tgcatcccct gacgggtctc                                          30


<210> SEQ ID NO 7
<211> LENGTH: 30

Add. 71

US 6,654,505 B2

23                                                                          24

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 7

ncnntacagc tgcatccctg cccgcacagt                                30


<210> SEQ ID NO 8
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (2)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 8

gnnntacagc tgcatccctt cgcctcggac                                30


<210> SEQ ID NO 9
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 9

ngnntacagc tgcatccctg atccgctagc                                30


<210> SEQ ID NO 10
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (2)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 10

tnnntacagc tgcatccctt ccgaacccgc                                30


<210> SEQ ID NO 11
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 11

ntnntacagc tgcatccctg aggggggatag                               30


<210> SEQ ID NO 12
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
```

Add. 72

US 6,654,505 B2

25            26

-continued

```
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 12

nnantacagc tgcatccctt cccgctacac                                    30


<210> SEQ ID NO 13
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(3)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 13

nnnatacagc tgcatccctg actcccgag                                     30


<210> SEQ ID NO 14
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 14

nncntacagc tgcatccctg tgttgcgcgg                                    30


<210> SEQ ID NO 15
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(3)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 15

nnnctacagc tgcatccctc tacagcagcg                                    30


<210> SEQ ID NO 16
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 16

nngntacagc tgcatccctg tcgcgtcgtt                                    30


<210> SEQ ID NO 17
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(3)
<223> OTHER INFORMATION: n = A,T,C or G
```

US 6,654,505 B2

27                                                                                          28

−continued

```
<400> SEQUENCE: 17

nnngtacagc tgcatccctc ggagcaacct                              30


<210> SEQ ID NO 18
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(4)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 18

nntntacagc tgcatccctg gtgaccgtag                              30


<210> SEQ ID NO 19
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic encoded adaptor
<221> NAME/KEY: misc_feature
<222> LOCATION: (1)...(3)
<223> OTHER INFORMATION: n = A,T,C or G

<400> SEQUENCE: 19

nnnttacagc tgcatccctc ccctgtcgga                              30


<210> SEQ ID NO 20
<211> LENGTH: 14
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: synthetic oligonucleotide

<400> SEQUENCE: 20

gggatgcgca cgta                                               14
```

We claim:

1. A device-readable medium embodying a program of instructions for execution by said device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, said program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; and

processing the plurality of digital images, wherein said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images.

2. The device-readable medium of claim 1, wherein said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle.

3. The device-readable medium of claim 2, wherein said processing further includes assigning a plurality of pixels to each microparticle, for determining at least one property of the optical signals generated at each microparticle.

4. The device-readable medium of claim 3, wherein the number of pixels assigned to a given microparticle is determined based on at least one of:

(i) the degree to which the approximated center of the given microparticle is likely to deviate from the geometric center;

(ii) the size of the given microparticle; and

(iii) the uniformity of the diameter and shape of the given microparticle.

5. The device-readable medium of claim 3, wherein an initial pixel of the plurality of pixels is assigned to each microparticle which encloses the approximated center of that microparticle.

6. The device-readable medium of claim 5, wherein said processing further includes assigning additional pixels, immediately adjacent the initial pixel, to each microparticle, after the initial pixel is assigned.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 6,654,505 B2                                   Page 1 of 1
APPLICATION NO.  : 09/907795
DATED             : November 25, 2003
INVENTOR(S)      : John Bridgham et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

The text at Column 1, lines 4-9 (first full paragraph after the heading "SYSTEM AND APPARATUS FOR SEQUENTIAL PROCESSING OF ANALYTES") reading:

> "This application is a divisional of U.S. patent application Ser. No. 09/424,028, filed Nov. 16, 1999 now U.S. Pat. No. 6,406,848, which is a 371 of PCT/US98/1124, filed May 22, 1998, which is a C-I-P of U.S. patent application Ser. No. 08/862,610, filed May 23, 1997 now abandoned, all of which are incorporated in their entirety herein by reference."

should be:

-- CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a divisional of U.S. Application Ser. No. 09/424,028, filed November 16, 1999, now U.S. Patent No. 6,406,848, which (1) is a National Stage of International Application No. PCT/US98/11224 filed on May 22, 1998, and (2) is a continuation-in-part of U.S. Application Ser. No. 08/946,138, filed October 7, 1997, now U.S. Patent No. 6,013,445, which (i) is a continuation-in-part of U.S. Application Ser. No. 08/862,610, filed May 23, 1997, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/689,587, filed August 12, 1996, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, and (ii) is a continuation-in-part of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which is a continuation-in-part of U.S. Application Ser. No. 08/358,810, filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a continuation-in-part of U.S. Application Ser. No. 08/322,348, filed October 13, 1994, now abandoned. The entire disclosures of U.S. Application Ser. No. 09/424,028, International Application No. --

Signed and Sealed this
First Day of March, 2011

David J. Kappos

David J. Kappos
*Director of the United States Patent and Trademark Office*

# <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that, on this the 10th day of March, 2014, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered users:

> David G. Hanson
> Robert A. Lawler
> REINHART, BOERNER & VAN DEUREN, P.C.
> 1000 North Water St.
> Suite 1700
> P.O. Box 2965
> Milwaukee, WI 53202
> dhanson@reinhartlaw.com
> rlawler@reinhartlaw.com

*Counsel for Cross-Appellant*

I further certify that, upon acceptance and request from the Court, the

required paper copies of the foregoing will be deposited with United Parcel Service

for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL

CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

> /s/ Adrienne R. Acra-Passehl
> Adrienne R. Acra-Passehl
> GIBSON MOORE APPELLATE SERVICES
> 421 East Franklin Street, Suite 230
> Richmond, VA 23219

## CERTIFICATE OF COMPLIANCE
### With Type-Volume Limitation, Typeface Requirements,
### And Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>12,288</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

Dated: March 10, 2014       */s/ Kevin R. Casey* _____

Kevin R. Casey, Esquire
Brian A. Cocca, Esquire
Michelle C. Orloski, Esquire
Stradley Ronon Stevens & Young, LLP
Great Valley Corporate Center
30 Valley Stream Parkway
Malvern, PA 19355
Telephone (610) 640-5800
Facsimile (610) 640-1965

Attorneys for Appellant,
Life Technologies Corporation