Nos. 2014-1215, 2014-1216

## In the United States Court of Appeals for the Federal Circuit

LIFE TECHNOLOGIES CORPORATION,

*Appellant,*

v.

ILLUMINA, INC.,

*Cross-Appellant.*

Appeal from Decision of the United States Patent and Trademark Office's Patent Trial and Appeal Board on Inter Partes Re-Examination Application 95/001,292

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANT

CHRISTOPHER N. SIPES
COVINGTON & BURLING, LLP
1201 Pennsylvania Ave., NW
Washington, D.C. 20004
202.662.6000 phone
202.662.6291 facsimile

*Counsel for Cross-Appellant Illumina, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellant Illumina, Inc. certifies the following information in compliance with Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rules 26.1 and 47.4:

1.  The full name of every party or amicus represented by us is:

    Illumina, Inc.

2.  The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by us are:

    Illumina, Inc.

3.  All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are:

    None

4.  The names of all law firms and the partners or associates that appeared for the party or amicus represented by us in the trial court or agency or are expected to appear in this Court are:

    Christopher N. Sipes
    Bradley K. Ervin (Federal Circuit admission pending)
    COVINGTON & BURLING, LLP
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C. 20004

    James G. Morrow
    David G. Hanson
    Robert A. Lawler
    Jessica Hutson Polakowski
    REINHART BOERNER VAN DEUREN, S.C.
    1000 North Water Street, Suite 1700
    Milwaukee, WI 53202

_/s/ Christopher N. Sipes_
Christopher N. Sipes

Dated: May 27, 2014

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................... i

TABLE OF CONTENTS ................................................................... iii

TABLE OF AUTHORITIES .............................................................. v

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ON LIFE TECH'S APPEAL ............................ 1

STATEMENT OF THE ISSUES ON ILLUMINA'S CROSS-APPEAL ............... 2

INTRODUCTION ............................................................................. 3

STATEMENT OF THE CASE ............................................................. 5

STATEMENT OF THE FACTS ........................................................... 8

    A.    The Patents Underlying the Dispute. .................................... 8

        1.    The '445 Patent. ........................................................ 8

        2.    The '505 Patent. ...................................................... 12

            a)    *The '505 specification.* .................................... 12

            b)    *The disputed '505 claims.* ............................. 16

    B.    Litigation Context of the *Inter Partes* Reexamination....................... 17

    C.    The *Inter Partes* Reexamination Proceedings Before the USPTO. ........................................................................... 18

        1.    Proceedings Before the Examiner. ........................... 18

        2.    Proceedings Before the Patent Trial and Appeal Board. ......... 21

SUMMARY OF THE ARGUMENT ................................................... 26

ARGUMENT ............................................................................... 30

I.   Substantial Evidence Supports the PTAB's Determination that the
     '445 Patent Discloses the Correlating Step of Claims 10-30. ..................... 31

     A.   The USPTO Affords a Claim its "Broadest Reasonable
          Interpretation." .................................................................... 33

     B.   The '445 Patent's Specification Satisfies the Written
          Description Requirement for the '505 Patent's Correlating Step. ..... 38

     C.   The Gelles Declaration Confirms the PTAB's Reading of the
          '445 Patent. ......................................................................... 44

     D.   Life Tech's Challenge to the USPTO's Decision to Consider
          the Gelles Declaration is Not Properly Before this Court, and
          Otherwise Lacks Merit. ........................................................... 51

II.  The PTAB Correctly Reversed the Examiner's Patentability
     Rejections of Claims 10-30 Based on Brenner ............................................ 53

III. The PTAB Erred in Finding that Claims 1-9 Lack Adequate Written
     Description Support in the '505 Patent's Predecessor Patents. .................... 54

     A.   The PTAB Erred in Finding No Adequate Written Description
          of Claim 1 in the '445 Patent's Specification that Discloses
          Each and Every Limitation of Those Claims. ............................... 55

     B.   The '445 Patent's Specification is Otherwise Commensurate
          With Claim 1. ......................................................................... 58

     C.   The PTAB Erred in Finding No Adequate Written Description
          of Claim 1 in the Specifications of the '097 and '719 Patents. .......... 61

IV.  The PTAB Erred in Determining that Claims 1-9 of the '505 Patent
     Are Invalid. ................................................................................................. 63

CONCLUSION .................................................................................................. 64

# TABLE OF AUTHORITIES

**Cases**

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ............................................................57

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) ...............................................................41

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir 2010) ............................................... 39, 41, 44

*Brunswick Corp. v. United States*,
  Nos. 97-5017, 97-5021, 1998 WL 163700 (Fed. Cir. Mar. 31, 1998) ................44

*Cisco Sys., Inc. v. Lee*,
  Nos. 12-1513, 12-1514, 2014 WL 658027 (Fed. Cir. Feb. 21, 2014) .................38

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...........................................................................53

*Cooper Cameron Corp. v. Kvarner Oilfield Prods., Inc.*,
  291 F.3d 1317 (Fed. Cir. 2002) ............................................................59

*Cordis Corp. v. Medtronic Ave, Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003) ............................................................59

*Flo Healthcare Solutions, LLC v. Kappos*,
  697 F.3d 1367 (Fed. Cir. 2012) ............................................................61

*Friends of the Earth, Inc. v. EPA*,
  446 F.3d 140 (D.C. Cir. 2006)...............................................................53

*Gentry Gallery, Inc. v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998) ............................................... 29, 56, 57

*Hyatt v. Boone*,
  146 F.3d 1348 (Fed. Cir. 1998) ............................... 45, 46, 49, 56, 63

*Illumina, Inc. v. Life Technologies Corp.*,
  Nos. 14-1374, 14-1375 (Fed. Cir.) .............................................. vii, 18

*In re Alton*,
  76 F.3d 1168 (Fed. Cir. 1996) ................................................ 45, 48, 56

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) ............................................................44

*In re Avid Identification Sys., Inc.*,
    504 F. App'x 885 (Fed. Cir. 2013) ................................................. 31, 38

*In re Berger*,
    279 F.3d 975 (Fed. Cir. 2002) ....................................................... 52

*In re Bimeda Research & Dev. Ltd.*,
    724 F.3d 1320 (Fed. Cir. 2013) ................................................ 31, 41

*In re Giannelli*,
    739 F.3d 1375 (Fed. Cir. 2014) ...................................................... 53

*In re Jones*,
    10 F. App'x 822 (Fed. Cir. 2001) ....................... 32, 38, 42, 45, 46, 56

*In re Meyer Mfg. Corp.*,
    411 F. App'x 316 (Fed. Cir. 2010) .................................................. 52

*In re Morris*,
    127 F.3d 1048 (Fed. Cir. 1997) ............................. 34, 38, 43, 60

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ..................................................... 34

*In re Pond*,
    466 F. App'x 876 (Fed. Cir. 2012) ......................... 31, 34, 38, 44, 51

*In re Trans Texas Holdings Corp.*,
    498 F.3d 1290 (Fed. Cir. 2007) ..................................................... 42

*In re Wright*,
    999 F.2d 1557 (Fed. Cir. 1993) ..................................................... 49

*Institut Pasteur v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ............................. 26, 32, 58

*Intamin, Ltd. v. Magnetar Techs., Corp.*,
    483 F.3d 1328 (Fed. Cir. 2007) ..................................................... 61

*Leo Pharm. Prods., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ..................................................... 31

*Life Technologies Corp., et al. v. Illumina, Inc., et al.*,
    No. 09-cv-00706-RK (D. Del.) ............................................. vii, 17

*Life Technologies Corp., et al. v. Illumina, Inc., et al.*,
    No. 11-cv-00703-BTM (S.D. Ca.) ......................................... vii, 18

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) ..................................................... 39

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ..............................................................59

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ................................................. 45, 46

*Schoemakers v. Office of Personal Mgmt.*,
    180 F.3d 1377 (Fed. Cir. 1999) ..............................................................49

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) ................................................. 30, 39, 56

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998) ................................................. 47, 56

*Union Oil Co. of Ca. v. Atlantic Richfield Co.*,
    208 F.3d 989 (Fed. Cir. 2000) ..............................................................45

## **Statutes**

28 U.S.C. § 1295(a)(4)(A) ..........................................................................1

35 U.S.C. § 112 ..........................................................................................4

35 U.S.C. § 120 ........................................................................... 4, 19, 30

35 U.S.C. § 134 ..........................................................................................1

35 U.S.C. § 315 ..........................................................................................1

35 U.S.C. § 6(b) ..........................................................................................1

## **Other Authorities**

Merriam-Webster Online Dictionary ........................................................12

## **Regulations**

37 C.F.R. § 1.116(e) ................................................................... 51, 52, 53

37 C.F.R. § 1.132 .....................................................................................20

vii

## STATEMENT OF RELATED CASES

No appeal in or from this *inter partes* reexamination proceeding before the United States Patent and Trademark Office Patent Trial and Appeal Board was previously before this or any other appellate court.

U.S. Patent No. 6,654,505 was the subject of litigation in *Life Technologies Corp., et al. v. Illumina, Inc., et al.*, No. 09-cv-00706-RK (D. Del.) filed September 21, 2009, and subsequently transferred to the United States District Court for the Southern District of California. *See Life Technologies Corp., et al. v. Illumina, Inc., et al.*, No. 11-cv-00703-BTM (S.D. Ca.). On January 16, 2013, the district court entered an order staying litigation of the claim(s) involving U.S. Patent No. 6,654,505 pending completion of the *inter partes* reexamination. *See id.*, Dkt. No. 431.

The litigation also includes U.S. Patent Nos. 6,831,994 and 7,232,656. Life Tech also filed requests for *inter partes* reexamination of these patents. And the district court likewise entered an order staying litigation of the claims involving U.S. Patent Nos. 6,831,994 and 7,232,656 pending completion of the *inter partes* reexamination proceedings. *See id.*, Dkt. No. 431. The reexamination of U.S. Patent No. 6,831,994 is the subject of a separate appeal before this Court, *see Illumina, Inc. v. Life Technologies Corp.*, Nos. 14-1374, 14-1375 (Fed. Cir.), while the U.S. Patent No. 7,232,656 remains before the PTAB.

## JURISDICTIONAL STATEMENT

Cross-Appellant Illumina, Inc. ("Illumina") agrees with Appellant Life Technologies Corporation's ("Life Tech") statement regarding the statutory basis of the Patent Trial and Appeal Board's ("PTAB") and this Court's jurisdiction. *See* Brief of Appellant Life Tech ("Life Tech Br.") at 1. *See also* 35 U.S.C. §§ 6(b), 134, and 315; 28 U.S.C. § 1295(a)(4)(A).

On December 2, 2013, Illumina timely cross-appealed from the PTAB's November 29, 2012 Decision on Appeal and September 20, 2013 Decision on Rehearing by filing a Notice of Cross-Appeal to Life Tech's November 19, 2013 Notice of Appeal. The PTAB's judgment in the *inter partes* reexamination is final.

## STATEMENT OF THE ISSUES ON LIFE TECH'S APPEAL

1.      Whether substantial evidence supports the PTAB's determination that the written description of predecessor U.S. Patent No. 6,013,445 (the '445 Patent) adequately discloses, to one reasonably skilled in the art, the inventor's possession of the term "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" (the "correlating step") in claims 10-30 of U.S. Patent No. 6,654,505 (the '505 Patent).

2.      Whether Life Tech's procedural challenge to the United States Patent and Trademark Office's ("USPTO") consideration of Illumina's expert declaration

is properly before this Court.  And, if so, whether the Examiner and PTAB abused their discretion to consider the declaration.

3.      Whether the PTAB correctly held that Sydney Brenner's PCT publication WO 96/12014 (April 25, 1996) (hereinafter, "Brenner") is not prior art to claims 10-30 of the '505 Patent given the latter's priority claim to December 19, 1994.

## STATEMENT OF THE ISSUES ON ILLUMINA'S CROSS-APPEAL

1.      Did the PTAB err in concluding that the disclosure of each limitation of independent claim 1 of the '505 Patent in a chain of predecessor patents nevertheless fails to provide adequate written description support for claims 1-9 of the '505 Patent?

2.      Did the PTAB err in determining that claims 1-9 of the '505 Patent, which are entitled to a priority date of December 19, 1994, are nevertheless invalid in light of the 1996 Brenner publication?

**INTRODUCTION**

Illumina is a leading developer, manufacturer, and marketer of life science tools and integrated systems for the analysis of genetic variation and function. Among other things, Illumina manufactures and markets products incorporating innovative techniques for the analysis of complex chemical or biological systems, including DNA sequencing tools. Illumina protects its innovations through the patent process.

The instant *inter partes* reexamination proceeding turns on two such patents, the '505 Patent and the '445 Patent, which are based upon a chain of patent applications representing successive continuations-in-part from a patent application filed December 19, 1994. The patented inventions solve a series of problems in existing techniques for processing and analyzing microparticles, which may number in the tens to hundreds of thousands, in applications such as DNA sequencing. As part of the solution to improve miniaturization and parallel implementation of such microparticle analysis, the patents describe a method and apparatus for imaging and processing microparticles loaded with biological or chemical analytes.

Life Tech instituted the instant *inter partes* reexamination from a more comprehensive district court litigation between the competitors over a series of patents. After nearly three years of proceedings before the USPTO, Life Tech's

initial allegations—in a request for reexamination extending more than three-hundred pages—of seventy-five grounds for invalidity of the '505 Patent's claims have winnowed down to a single reference, Brenner, published in 1996.

The PTAB rejected Life Tech's request to invalidate the '505 Patent's claims 10-30 based on the Brenner reference that post-dates, by two years, Illumina's chain of continuing patent applications extending from the '505 Patent, and through the '445 Patent, to an application first filed December 19, 1994. Pursuant to 35 U.S.C. §§ 120 and 112, the PTAB found that the earlier applications, principally the '445 Patent, provide an adequate written description for the disputed "correlating step" in the '505 Patent's claims 10-30, thereby entitling those claims to the 1994 priority date that antedates Brenner.

Before this Court, Life Tech conflates a simple case of judicial review of the PTAB's factual determinations for substantial evidence with a specious construction of the correlating step limitation in representative claim 10. Thereafter, the majority of Life Tech's arguments to this Court simply assume Life Tech's own erroneous and irrelevant construction of the correlating step. Life Tech's argument ignores the agency's distinct obligation to afford a claim its broadest reasonable interpretation during examination. Life Tech's claim construction is, moreover, irrelevant because the '445 Patent adequately describes the correlating step even under Life Tech's construction. Substantial evidence in

the '445 Patent's specification, further confirmed by the expert testimony of Dr. Jeff Gelles, therefore supports the PTAB's determination with respect to claims 10-30, which should be affirmed.

In contrast, although the '445 Patent and other predecessor patents disclose each and every limitation of the '505 Patent's claims 1-9, the PTAB nevertheless determined that those claims lack adequate written description. Because the PTAB's decision misunderstands the nature of the invention described in claims 1-9, and otherwise ignores the symmetry between the chain of predecessor patents and the '505 Patent, the PTAB's written description determination—and resulting conclusion that Brenner invalidates claims 1-9—should be reversed.

## STATEMENT OF THE CASE

On September 21, 2009, Life Tech filed suit in the United States District Court for the District of Delaware, alleging that Illumina's Genome Analyzer® DNA-sequencing system infringes various claims of three patents exclusively licensed to Life Tech. After Illumina filed counterclaims alleging infringement by Life Tech of various claims of four Illumina patents, including the '505 Patent, Life Tech promptly filed the instant request for *inter partes* reexamination of original claims 1-6 of the '505 Patent. Life Tech asserted seventy-five anticipation and obviousness challenges based on sixteen prior art references.

The Examiner initially adopted thirty-five of Life Tech's proposed patentability rejections of claims 1-6. Illumina thereafter amended the '505 Patent to add claims 7-30, which include all of the limitations of claim 1 (along with additional limitations), '505 Patent, claim 1 (A74); A322–28, and which Life Tech challenged as unpatentable and lacking written description support in the specifications of either the '505 Patent or its predecessor '445 Patent. On September 20, 2010, the Examiner issued an Action Closing Prosecution reaffirming the rejections of claims 1-6, rejecting the '505 Patent's claim to a 1994 priority date, and rejecting amended claims 7-30 as anticipated by Brenner. The Examiner concluded proceedings with a Right of Appeal Notice that summarily dismissed the opinion of Illumina's expert, Dr. Jeff Gelles, regarding the '505 Patent's priority claim, and, accordingly, reaffirmed the rejections of Illumina's priority claim for the '505 Patent and claims 1-30.

Illumina and Life Tech cross-appealed to the PTAB. On November 29, 2012, the PTAB issued a Decision on Appeal reversing the Examiner's rejections of '505 Patent claims 10-30, and upholding the Examiner's rejection of claims 1-9 as anticipated and obvious in light of Brenner. The PTAB first concluded that claims 1-9 of the '505 Patent lacked written description support in the '445 Patent because, in the PTAB's view, the latter's disclosures were implicitly limited to DNA sequencing, A15–16, whereas claims 1-9 had no such explicit limitation.

6

Claims 1-9 were therefore denied priority antedating the 1996 Brenner publication. A33–37.

With respect to claims 10-30 of the '505 Patent, the PTAB rejected Life Tech's assertion that the '445 Patent does not disclose the '505 Patent's "correlating step." The PTAB found that the '445 Patent's specification would be understood to disclose the disputed step by describing a process and apparatus for sequencing nucleotides through detection and imaging of microparticles carrying tagged polynucleotides. A17–18. In addition, the PTAB found further support for its reading of the '445 Patent in the Declaration of Dr. Gelles, which the PTAB found "entirely consistent and supported by the written description of the '445 Patent." A18–20. In light of this evidence, the PTAB concluded that determination of "the sequence of a polynucleotide on the same microparticle of a bead array when multiple cycles of ligation and identification are carried out," as the '445 Patent provides, necessitates that "the optical signals generated at each microparticle must be correlated." A22. *See also*, *e.g.*, *infra* pp. 8–11 (describing the '445 Patent).

Having resolved the claims of priority, the PTAB reversed the Examiner's rejections of claims 10-30 as anticipated by Brenner, and affirmed the Examiner's rejections of claims 1-9 as anticipated and/or obvious in light of Brenner. A33–39. This cross-appeal followed. The overarching question to be resolved is whether

substantial evidence supports the PTAB's decision that the '445 Patent's specification provides an adequate written description of '505 Patent claims 10-30, but not of claims 1-9.

## STATEMENT OF THE FACTS

### A.    The Patents Underlying the Dispute.

#### 1.    The '445 Patent.

The '445 Patent issued on January 11, 2000, based upon an application filed October 7, 1997, *see* A369.[1]  Following a reissue published on January 10, 2012, the '445 Patent claims priority, through a chain of patent applications representing successive continuations-in-part, from a patent application—now U.S. Patent No. 5,604,097—filed December 19, 1994.  *See* A6–7.

The '445 Patent is entitled "Massively Parallel Signature Sequence by Ligation of Encoded Adaptors."   A369.   "The invention relates generally to methods for determining the nucleotide sequence of a polynucleotide . . . ."  '445 Patent, 1:13–14 (A381).  The '445 Patent describes a method that solves problems with preexisting sequencing techniques, which did "not readily lend [themselves] to **miniaturization** or to massively **parallel** implementation,"  *id*., 1:38–40 (A381) (emphases added), or otherwise suffered from, *inter alia*, "inefficient chemistries," *id*., 1:59 (A381), that limited sequencing scale and efficiency.

---

[1]    The listed inventors include Glenn Albrecht, Sydney Brenner, Robert B. DuBridge, David H. Lloyd, and Michael C. Pallas.  *See* A369.

In brief, the '445 Patent resolves the prior-art limitations by providing an advance in "**base-by-base** sequencing technology," "especially in automated systems," *id.*, 2:8–9 (A381) (emphasis added), "a method of nucleic acid sequence analysis based on the ligation of one or more sets of encoded adaptors to a terminus of a target polynucleotide," *id.*, 2:33–35 (A381),[2] with a complementary nucleotide sequence. Each encoded adaptor consists of (1) a strand that ligates to a specific nucleotide or nucleotide sequence—generally at the terminus—of the target polynucleotide (*i.e.*, the nucleotide being sequenced), and (2) a separate oligonucleotide tag. *See id.*, 2:37–39 (A381).[3]

After the encoded adaptor is ligated to the target polynucleotide, "the identity and ordering of the nucleotides . . . are determined . . . by specifically hybridizing a labeled tag complement to its corresponding [oligonucleotide] tag on the ligated [encoded] adaptor." *See id.*, 2:42–46 (A381). *See also id.*, 3:38–47 (A382). Both the ligated target nucleotide and the tag complement are loaded onto microparticles for analysis. *See id.*, 10:66 through 11:9 (A385–86). The tag

---

[2]    As used in the '445 Patent, "'ligation' means the formation of a covalent bond between the ends of one or more . . . oligonucleotides." '445 Patent, 4:6–8 (A382).

[3]    "The term 'oligonucleotide' . . . includes linear oligomers of natural or modified monomers or linkages . . . capable of specifically binding to a target polynucleotide by way of a regular pattern of monomer-to-monomer interactions, such as Watson-Crick type of base pairing . . . ." '445 Patent, 4:38–44 (A382). The oligonucleotides typically consist of the four natural nucleotides: adenine, guanine, cytosine, and thymine. *See id*, 4:55–56 (A382).

9

complement ultimately provides sequence information to the user, and can be labeled (for reading by the user) "in a variety of ways," *id.*, 20:4–8 (A390), but "[p]referably, one or more fluorescent dyes are [used] as labels . . . ," *id.*, 20:31–32 (A390). As Examples 1 and 2 illustrate, once attached, the tag complement is excited "***and the presence or absence of a fluorescent signal is measured***" in order to identify the complement and, by extension, the nucleotide in the target polynucleotide that is ligated to the encoded adaptor. *See id.*, 36:35–36 (A398) (emphasis added).

In one aspect of the invention, successive nucleotides in the target polynucleotide are sequenced through "repeated cycles of ligation, identification, and cleavage . . .," *id.*, 5:61–65 (A383), whereby the polynucleotide's terminus is successively cleaved so that each cycle results in a different terminus of the polynucleotide for identification. In brief, this process,

> comprises the following steps: (a) ligating an encoded adaptor to an end of a polynucleotide, the encoded adaptor having a nuclease recognition site of a nuclease whose cleavage site is separate from its recognition site; (b) identifying one or more nucleotides at the end of the polynucleotide by the identity of the encoded adaptor ligated [thereto]; (c) cleaving the polynucleotide with a nuclease . . . such that the polynucleotide is shortened by one or more nucleotides; and (d) repeating said steps (a) through (c) until said nucleotide sequence of the polynucleotide is determined.

*Id.*, 11:46 through 12:11 (A386). "In the identification step, successive sets of tag complements are specifically hybridized to the respective tags carried by encoded

adaptors ligated to the ends of the target polynucleotides . . . ." *Id.*, 12:11–14 (A386).

To realize the invention's objectives for efficiency and parallel administration, the entire method may be automated and controlled by the system set forth in Figure 5:



**Fig. 5**

Figure 5 describes "a schematic representation of a flow chamber and detection apparatus for observing a planar array of microparticles loaded with cDNA molecules for sequencing." *See* '445 Patent, Figure 5 (A380); *see also id.*, 3:65–67 (A382); *id.*, 38:30–66 (A399).

11

## 2.    The '505 Patent.

The '505 Patent issued on November 25, 2003 based upon an application filed July 17, 2001.  *See* A50.[4]  It claims priority, through a chain of patent applications representing successive continuations-in-part, from the '445 Patent and, by extension, a patent application—now U.S. Patent No. 5,604,097—filed December 19, 1994.  *See* A473–75; A6–7.

### a)    *The '505 specification.*

The '505 Patent is entitled "System and Apparatus for Sequential Processing of Analytes."    A50.[5]    The invention relates to "systems and apparatus for monitoring and carrying out reactions on arrays of microparticles."  *Id.*, 1:13–15 (A61).  In particular, the invention is designed to facilitate "analytical techniques that employ ***parallelization and miniaturization*** of analyte processing," *id.*, 1:18–20 (A61) (emphasis added), "to understand and analyze complex chemical and biological systems," *id.*, 1:17–18 (A61).  While "microparticles generally facilitate the construction and manipulation of large repertoires of analytes . . . ," *id.*, 1:37–39 (A61), "handling and manipulating large numbers of microparticles, e.g. tens to hundreds of thousands, . . . gives rise to many difficulties" in analyzing complex

---

[4]    The listed inventors include John Bridgham, Kevin Corcoran, George Golda, Michael C. Pallas, and Sydney Brenner.  *See* A50.

[5]    An "analyte" is any substance that is the subject of analysis.  *See*, *e.g.*, Merriam-Webster  Online  Dictionary,  *available  at*  http://www.merriam-webster.com/dictionary/analyte.

chemical and biological systems through a series of processing steps, *id.*, 1:40–43 (A61).

The '505 Patent therefore describes a "system and apparatus [that] permit[s] the tracking and analysis of multiple analytes anchored to separate microparticles through a sequence of several processing and/or analysis steps." *Id.*, 1:60–64 (A61). *See also id.*, 8:48–50 (A64) ("An important feature of detection means of the invention is the ability to keep track of individual microparticles through multiple process steps and/or cycles."). In its various aspects, the invention provides, *inter alia*, "software means for processing images of, and/or optical signals generated by, the microparticles when disposed in a planar array," *id.*, 2:33–35 (A61), and "detection means" for imaging "[o]ptical signals generated by, or produced as a result of, the interaction of processing reagents and polynucleotides on the microparticles . . .," *id.*, 2:48–51 (A61).

Among other things, the '505 Patent discloses "a system and apparatus for simultaneously analyzing the nucleotide sequences of a population of polynucleotides anchored to microparticles disposed in a planar array in a flow chamber." *Id.*, 2:16–19 (A61). The invention accomplishes this goal:

> with an apparatus comprising a flow chamber for disposing a population of microparticles in a planar array; fluidic means for sequentially delivering processing reagents . . .; and detection means for detecting a sequence of optical signals from each of the microparticles of the population . . . .

13

*Id.*, 2:20–26 (A61).

Like its predecessor, the '445 Patent, the '505 Patent discloses "a schematic representation" of an apparatus with such flow chamber and detection system for use in analyzing microparticles, "such as cDNA molecules for sequencing," at Figure 1*a*. *Id.*, 2:60–64 (A61).



**Fig. 1A**

*Id.*, Figure 1*a* (A51). This schematic embodiment "for detecting fluorescent signals" includes a flow chamber that "holds microparticles in a planar array from

which optical signals generated by analytes and/or reactants on microparticles can be collected and imaged," all under the control of a computer. *See id.*, 4:65 through 5: 6 (A62–63).

Indeed, "[p]olynucleotides loaded onto microparticles may be simultaneously sequenced in the instant apparatus using a '***base-by base***' DNA sequencing methodology," *id.*, 14:65–67 (A67) (emphasis added), such as the use of "[*e*]***ncoded adaptors***" through "repeated ***cycles of ligation, identification, and cleavage***," *id.*, 15:32–40 (A68) (emphases added). Again mirroring the '445 Patent, *see supra* pp. 10–11,

> such a method comprises the following steps: (a) ligating an encoded adaptor to an end of a polynucleotide, the encoded adaptor having a nuclease recognition site of a nuclease whose cleavage site is separate from its recognition site; (b) identifying one or more nucleotides at the end of the polynucleotide by the identity of the encoded adaptor ligated thereto; (c) cleaving the polynucleotide with a nuclease . . . such that the polynucleotide is shortened by one or more nucleotides; and (d) repeating said steps (a) through (c) until said nucleotide sequence of the polynucleotide is determined.

*Id.*, 15:40–51 (A68). As in the '445 Patent, "[i]n the identification step, successive sets of tag complements are specifically hybridized to the respective tags carried by encoded adaptors ligated to the ends of the target polynucleotides . . . ." *Id.* 15:51–55 (A68).

15

**b)** *The disputed '505 claims.*

At the time of issuance, the '505 Patent included six claims. Independent claim 1 recites (disputed terms emphasized):

> A device-readable medium embodying a program of instructions for execution by said device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, said program of instructions comprising instructions for:
>
>> rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; and
>>
>> processing the plurality of digital images, wherein *said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images*.

*Id.*, 27:43–56 (A74).

During the *inter partes* reexamination proceedings, Illumina amended the '505 Patent to include claims 7-30, which include all of the limitations of claim 1 (as well as additional limitations), *compare id.* (A74) *with* A322–28. Independent claim 10 recites (disputed terms emphasized):

> A device-readable medium comprising:
>
>> a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of the nucleotides; and

processing the plurality of digital images, wherein *the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images* to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments.

A322–23 (emphasis added).

## B.   Litigation Context of the *Inter Partes* Reexamination.

On September 21, 2009, Life Tech and associated plaintiffs filed suit in the United States District Court for the District of Delaware, alleging that Illumina's Genome Analyzer® DNA-sequencing system infringes various claims of three patents exclusively licensed to Life Tech.  *See Life Technologies Corp., et al. v. Illumina, Inc., et al.*, No. 09-cv-00706-RK (D. Del.).   On October 13, 2009, Illumina filed counterclaims alleging that Life Tech's SOLiD™ DNA sequencing system infringes various claims of four Illumina patents, including the '505 Patent as well as U.S. Patent Nos. 6,831,994 (the '994 Patent) and 7,232,656 (the '656 Patent).

Life Tech promptly filed the instant request for *inter partes* reexamination. Life Tech likewise filed requests for *inter partes* reexamination of both the '994

Patent and the '656 Patent.[6]  After the patent infringement lawsuit was transferred to the United States District Court for the Southern District of California, *see Life Technologies Corp., et al. v. Illumina, Inc., et al.*, No. 11-cv-00703-BTM (S.D. Ca.), the district court entered an order staying litigation of Illumina's counterclaims involving the '505, '994, and '656 Patents pending completion of the *inter partes* reexamination proceedings.  *See id.*, Dkt. No. 431.[7]

## C. The *Inter Partes* Reexamination Proceedings Before the USPTO.

### 1. Proceedings Before the Examiner.

On December 31, 2009, Life Tech requested an *inter partes* reexamination of claims 1-6 of the '505 Patent.  *See* A77; A82.  Across the more than three hundred-page request, Life Tech asserted seventy-five anticipation and obviousness challenges to the patentability of claims 1-6, based on sixteen prior art references (either alone or in various combinations).  *See* A85–181.  On March 24, 2010, the Examiner issued a Non-Final Office Action adopting thirty-five of Life Tech's proposed rejections of claims 1-6.  *See* A85–182.

---

[6]    The reexamination of the '994 Patent is the subject of a separate appeal before this Court, *see Illumina, Inc. v. Life Technologies Corp.*, Nos. 14-1374, 14-1375 (Fed. Cir.), while the '656 Patent remains before the PTAB.

[7]    By opinion and order dated March 20, 2013, the District Court granted Illumina's motion for summary judgment of non-infringement of the Life Tech Patents.  *See Life Technologies Corp.*, No. 11-cv-00703-BTM, Dkt. No. 488.  The Court entered final judgment of non-infringement on April 28, 2014.  *See id.*, Dkt. No. 526.

In response, Illumina substantively contested the Examiner's findings of anticipation and obviousness, and amended the '505 Patent to add claims 7-30, which include all of the limitations of claim 1 (as well as additional limitations). *See* A320; '505 Patent, claim 1 (A74); A322–28.[8] For its part, Life Tech further challenged the patentability of amended claims 7-30 and asserted that amended claims 7-30 lack written description support in the specifications of the either the '505 Patent or the '445 Patent. *See* A418, 453–72. *See also generally* A479.

On September 20, 2010, the Examiner issued an Action Closing Prosecution reaffirming the rejections of claims 1-6, *see* A544–697, and rejecting amended claims 7-30 as anticipated by Sydney Brenner's PCT publication WO 96/12014 (April 25, 1996) ("Brenner"), *see* A697–701. With regard to the '505 Patent's claim to a December 19, 1994 priority date, *see supra* pp. 12 & n.8, antedating Brenner, the Examiner offered only the fleeting conclusion:

> The earlier filed parent applications disclose planar arrays and methods of nucleic acid sequencing. There is no contemplation of the presently claimed device-readable medium, methods of generating

---

[8] At the same time, Illumina petitioned the USPTO Director to accept an unintentionally delayed claim under 35 U.S.C. § 120 for the benefit of prior-filed applications, including a chain of patent applications representing successive continuations-in-part to a patent application—now U.S. Patent No. 5,604,097— filed December 19, 1994. *See* A410–13. The Director accepted Illumina's late claim for priority by Order dated June 30, 2010. *See* A473–75. While Life Tech attempts to cloud both the facts and merits on appeal with reference to the correction process by which the '445 and '505 Patents obtained their present priority claims, *see*, *e.g.*, Life Tech Br. at 9 (alleging "attempt to re-write history"), such procedures are not before this Court, *see* A7.

images of a planar array of microparticles, assigning pixels to the microparticles, or tracking positions of the microparticles during a sequence of processing steps.

A540. The Examiner expressly "invited [Illumina] to point out specifically where in the earlier parent disclosures support for the '505 patent claims may be found." A541. *See also* A705–06 (noting the Action Closing Prosecution "is not a final Office action").

Illumina accordingly submitted a response to the Action Closing Prosecution challenging, *inter alia*, the Examiner's determination that the '505 Patent's claims are not entitled to a priority date antedating Brenner, and offering in support the declaration of Dr. Jeff Gelles to demonstrate the understanding of a skilled artisan with respect to written description support for claim 1 of the '505 Patent. *See* A711–16; Declaration of Jeff Gelles Under Rule 37 C.F.R. § 1.132 (hereinafter, "Gelles Decl.") (A764).[9]

Over Life Tech's objection to its timeliness, *see* A826–27, the Examiner considered the Gelles Declaration in issuing a Right of Appeal Notice, *see* A859, 863. The Examiner, however, summarily dismissed the Gelles Declaration as "not persuasive because it is limited to opinion and it lacks factual support for the opinions that are set forth therein." A863. Accordingly, the Examiner rejected

---

[9] With respect to the correlating step terms principally at issue before this Court, claim 1 and claim 10 of the '505 Patent are largely identical. *See supra* pp. 16–17.

20

Illumina's priority claim for the '505 Patent, and maintained the rejections of claims 1-30 as anticipated or obvious.

### 2. Proceedings Before the Patent Trial and Appeal Board.

Illumina timely appealed the Examiner's rejections of claims 1-30 of the '505 Patent to the PTAB. *See* A78; A1029–58. Life Tech cross-appealed the Examiner's refusal to adopt all of the grounds raised by Life Tech for rejecting the '505 Patent's claims. *See* A78; A1007–18. On November 29, 2012, the PTAB issued a Decision on Appeal reversing the Examiner's rejections of '505 Patent claims 10-30, and upholding the Examiner's rejection of claims 1-9 as anticipated and obvious in light of Brenner. *See* A1; A41–42.

As an initial matter, the PTAB explained that the USPTO Director's decision to correct the priority claims of the '445 Patent—through a reissue (US RE43,097E)—and of the '505 Patent—through a certificate of correction—to incorporate earlier filed patent applications is outside the jurisdiction of the PTAB. *See* A7. Moving on to whether the written descriptions of prior patent applications—principally the '445 Patent—support the '505 Patent's claims, *see* A9, the PTAB made twenty-two separate findings of fact regarding the '505 Patent's predecessors, *see* A10–15.

On that review, the PTAB first concluded that the '445 Patent does not disclose claims 1-9 of the '505 Patent. *See* A15–16. According to the PTAB, "the

disclosure of the '445 Patent is restricted to DNA sequencing methods," whereas "[n]one of the claimed steps [in claims 1-9 of the '505 Patent] are limited to DNA sequencing." A15.[10] Thus, the PTAB denied claims 1-9 priority to earlier-filed applications that antedate Brenner.

In contrast, the PTAB explained, claims 10-30 of the '505 Patent "all involve DNA sequencing" and are thus "commensurate with the scope of the written description" of the '445 Patent. A16. *See also* A4 ("Claims 10-30 have similar steps, but are specifically drawn to a device-readable medium for determining nucleotide sequences of DNA fragments."). After surmounting this initial hurdle, the PTAB rejected Life Tech's further assertion that the '445 Patent does not disclose the '505 Patent's "correlating step," *see* A16–23, which provides—as recited in representative claim 10—for:

> processing the plurality of digital images, wherein ***the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images*** to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments.

A5–6 (emphasis added). Rather, the PTAB found that the '445 Patent "teaches successive cycles of ligation and identification in order to determine the sequence

---

[10]    The PTAB similarly concluded that the disclosures in the earlier patents— U.S. Patent No. 5,604,097 (the '097 Patent) and U.S. Patent No. 5,846,719 (the '719 Patent)—while "broader" in describing methods of sorting molecules using oligonucleotide tags, nonetheless failed to support claims 1-9. *See* A16.

of 16 terminal nucleotides of the polynucleotide attached to the bead" through "detection of the optical signal from the fluorescence . . . for processing and analysis." A17 (citing PTAB Findings of Fact 12–13).

Indeed, the PTAB concluded that, although the '445 Patent does not use the term "correlated" as it occurs in the '505 Patent, "the following disclosure [in the '445 Patent] would be understood to support," A17, the '505 Patent's correlating step:

> After describing the successive cycles of ligation and identification which reveal the sequence of the target polynucleotide, the '445 Patent describes an imaging system which enables the capture of the optical signals from the sequencing reactions. According to this passage, the fluorescent labels on a tag complement are excited and the resulting fluorescence is 'collected by confocal microscope (532), passes through filter (534), and directed to . . . camera (536), which creates an electronic image of the bead array for processing and analysis by workstation (538).

A17–18 (citing PTAB Finding of Fact 13); *see also* A12 (Finding of Fact 13, referring to the '445 Patent's Figure 5); '445 Patent, 38:50–65 (A399).

In addition, the PTAB found support for its reading of the '445 Patent in the Declaration of Dr. Gelles. *See* A18.[11] In particular, the PTAB pointed to Dr.

---

[11] The PTAB "conclude[d] that Dr. Gelles is an expert who is qualified to testify in this matter" based upon his education and experience. *See* A18. Dr. Gelles is a Professor of Biochemistry and Molecular Pharmacology at Brandeis University with research interests in, among other things, biochemistry and molecular biophysics of complex systems involved in cellular organization and gene expression. *See* Gelles Decl. ¶¶ 1–6 (A764–65). As part of this research, Dr. Gelles "use[s] several imaging technologies, including Differential Interference

Gelles's testimony in Paragraphs 28, 29, and 30 of his declaration explaining his understanding of the '445 Patent's specification to disclose the '505 Patent's correlating step. *See* A18–19; Gelles Decl. ¶¶ 28–30 (A768) (describing the '445 Patent's process for "[a]ssembling a longer sequence" of a polynucleotide from smaller segments) (citing the '445 Patent, 38:61–65 & Figures 4 and 5); *see also id.* ¶¶ 21, 23 (A767) (citing the '445 Patent, 38:30–65 and 36:41–47); *infra* pp. 46–49. The PTAB disagreed with Life Tech's assertion that the Gelles Declaration is improperly conclusory. *See* A19. Instead, as the PTAB explained,

> [W]e find it difficult to ignore ***the disclosure in the '445 Patent*** of 1) assembling data from three different tag complements successively collected at the same microparticle as shown in Figure 4 to produce a sequence of positions 5-12 of the target polynucleotide; and 2) creating an electronic image of the fluorescence. Since each tag is successively removed during the process, the electronic image would necessarily be taken at each cycle prior to tag removal.

A19 (citing PTAB Findings of Fact 8–9, 12–14) (emphasis added). The PTAB accordingly found that Dr. Gelles's testimony on the correlating step flowed "logical[ly]" from the need to assemble a sequence of nucleotides, *see* A19, and was therefore "entirely consistent and supported by the written description of the '445 Patent," A20.

---

Contrast Microscopy and Multi-wavelength Single Molecule Fluorescence Microscopy." *Id.* ¶ 4 (A765). Dr. Gelles was the first author of a prior art reference cited by the Examiner in rejecting certain claims of the '505 Patent. *See*, *e.g.*, *id.* ¶ 49 (A770). *See also* A866, 869–70.

The PTAB found that determination of "the sequence . . . on the same microparticle of a bead array when multiple cycles of ligation and identification are carried out," as the '445 Patent provides, necessitates that "the optical signals generated at each microparticle must be correlated." A22. Because both Dr. Gelles's testimony and the PTAB's own "independent findings on the '445 Patent" supported this fact, the PTAB found "that the written description of the '445 Patent conveys to one of ordinary skill in the art that inventors had possession of the claimed [correlating] step." A22. As a result, claims 10-30 of the '505 Patent enjoyed a priority date through the '445 Patent to prior patent applications with an initial filing date on December 19, 1994[12] that antedates the Brenner reference.

Having resolved the claims of priority, the PTAB reversed the Examiner's rejections of claims 10-30 as anticipated by Brenner because "Brenner is not prior art" to claims 10-30 based upon their December 19, 1994 priority date. *See* A39. By the same token, the PTAB affirmed the Examiner's rejections of claims 1-9 as anticipated and/or obvious in light of Brenner, *see* A33–37, because the PTAB

---

[12] The PTAB expressly found that such earlier applications "describe the disputed limitations" "[f]or similar reasons." A22. Life Tech does not challenge this conclusion on appeal, but rather focuses on the disclosures of the '445 Patent. *See generally* Life Tech Br. at 19–42.

concluded, *see supra*, that claims 1-9 could not claim a priority date that antedates Brenner.[13]

After the PTAB denied Illumina's request for rehearing, *see* A48, the parties timely appealed to this Court.

## SUMMARY OF THE ARGUMENT

Although it relates to complex technology, Life Tech's appeal presents a simple case of judicial review of an administrative agency's factual determinations. This Court's review of such determinations is "deferential" under the "'substantial evidence' standard of review." *Institut Pasteur v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013).

1. Substantial evidence supports the PTAB's finding "that the written description of the '445 Patent conveys to one of ordinary skill in the art that inventors had possession of the claimed [correlating] step" found in claims 10-30 of the '505 Patent. A22. As the PTAB explained, the '445 Patent's specification would be understood to disclose the correlating step, and the testimony of Illumina's expert—Dr. Jeff Gelles—confirms the reasonableness of that reading. Life Tech's arguments to the contrary rest upon peripheral issues unrelated to the

---

[13] The PTAB also reversed the Examiner's rejections of claims 1-6 as anticipated and/or obvious in light of non-Brenner prior art. *See* A23–33. Life Tech does not challenge those reversals on appeal and, instead, relies solely on Brenner. *See* Life Tech Br. at 54–55.

substance of the PTAB's decision, and otherwise unavailing on the record before the agency.

      **a.**     Life Tech first attempts to cloud the case and side-step the PTAB's analysis of the record by focusing its appeal on an improper and irrelevant claim construction argument. In contending that the correlating step of representative claim 10 requires correlation of positive optical signals in every photograph taken of an array of microparticles, Life Tech ignores the "broadest reasonable interpretation" standard that the USPTO applies to patent claims during examination. In addition, Life Tech's claim construction is unavailing because the '445 Patent provides—in textual and schematic form—an adequate written description of the correlating step, even as construed by Life Tech, through disclosure of measured null and positive signals in digital images of microparticles loaded with polynucleotides for sequencing.

      **b.**     Life Tech further attacks the PTAB's decision tangentially by challenging the declaration submitted by Dr. Gelles. Life Tech, however, overstates the role of Dr. Gelles's declaration in the PTAB's decision. Rather than "deferr[ing]" to the Gelles Declaration, *see* Life Tech Br. at 42, the PTAB principally relied on Dr. Gelles to confirm the PTAB's own "independent findings on the '445 Patent," A22. By referencing and explaining the '445 Patent disclosures supporting his opinion, Dr. Gelles's "logical," A19, testimony simply

bolstered the already substantial evidence supporting the PTAB's decision relating to claims 10-30.

      **c.**    In a final attempt to distract the Court from the record evidence, Life Tech contends that the PTAB's consideration of the Gelles Declaration was procedurally improper in the first instance due to its purported untimeliness. Life Tech's argument falters on, *inter alia*, (1) the Commissioner's exclusive jurisdiction over such timeliness issues, (2) the confirmatory nature of Dr. Gelles's declaration in the PTAB's decision, and (3) the longstanding presumption that an agency follows its own regulations—here, the regulations governing submission of evidence following an Action Closing Prosecution. As above, Life Tech's flawed arguments fall well short of demonstrating that the PTAB's decision with respect to claims 10–30 lacks the support of substantial evidence.

      **2.**    The PTAB correctly reversed the Examiner's rejections of claims 10-30 based on the 1996 Brenner reference. Based on the PTAB's decision, supported by substantial evidence, that claims 10-30 are entitled to a priority date of December 19, 1994, the PTAB correctly held that the 1996 Brenner reference cannot form the basis of an invalidity rejection of those claims.

      **3.**    In contrast to its decision relating to claims 10-30 of the '505 Patent, the PTAB's determination that claims 1-9 lack an adequate written description in the '445 Patent is not supported by substantial evidence. The PTAB erred by

failing to recognize that the '445 Patent discloses—consistent with the PTAB's correct determination that the '445 Patent adequately discloses the nearly identical claim 10—each and every limitation of the '505 Patent's representative claim 1. Instead, the PTAB misapplied this Court's decision in *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998) grounded in the PTAB's misunderstanding of the actual invention(s) described in the '445 Patent.

Moreover, the PTAB ignored the basic symmetry between the '445 Patent and the '505 Patent. In particular, the patents disclose a nearly identical description and drawing of an apparatus to conduct the analysis and processing of microparticles loaded with polynucleotides or other complex chemical or biological analytes. These key similarities bolster the conclusion that an artisan of ordinary skill would conclude that the '445 Patent discloses the invention described in claim 1 of the '505 Patent.

For the same reasons, the PTAB's corollary conclusion that claims 1-9 lack adequate written description in the '097 Patent and '719 Patent specifications is not supported by substantial evidence.

Because the PTAB erred in finding that claims 1-9 lack an adequate description in the predecessor chain of patent applications and, as a result, is not entitled to a priority date of December 19, 1994, the PTAB further erred, by extension, in finding claims 1-9 invalid over the 1996 Brenner reference.

\*     \*     \*

This Court should affirm the PTAB's determinations that claims 10-30 of the '505 Patent are supported by the '445 Patent's written description, are entitled to a December 19, 1994 priority date, and, accordingly, are not invalid. This Court should reverse the PTAB's contrary decisions with respect to '505 claims 1-9.

## ARGUMENT

Under 35 U.S.C. § 120, "in a chain of continuing [patent] applications, a claim in a later application receives the benefit of the filing date of an earlier application so long as the disclosure in the earlier application meets," among other things, "the written description requirement, with respect to that claim." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326 (Fed. Cir. 2008). Because the patentability of the disputed '505 Patent claims turns on their entitlement to a December 19, 1994 priority date—that antedates the 1996 Brenner reference— through a chain of continuing applications including, *inter alia*, the '445 Patent, the principal issue before this Court is whether the '445 Patent's specification provides an adequate written description of the disputed '505 Patent claims. *See*, *e.g.*, *supra* pp. 21–26; Life Tech Br. at 15.[14] As set forth below, the '445 Patent, and earlier patents, provide that written description.

---

[14]     Life Tech does not challenge the PTAB's determination of priority through any application in the chain other than the '445 Patent. *See* Life Tech Br. at 22–42.

## I. Substantial Evidence Supports the PTAB's Determination that the '445 Patent Discloses the Correlating Step of Claims 10-30.

The PTAB thoroughly analyzed the disputed correlating step in representative claim 10 of the '505 Patent,[15] the disclosures in the '445 Patent's specification, and supporting documentation regarding the understanding of an ordinarily skilled artisan. *See* A16–23. As a result of that analysis, the PTAB concluded that "the written description of the '445 Patent conveys to one of ordinary skill in the art that inventors had possession of the claimed [correlating] step." A22.

"Written description . . . is a question of fact, and on appeal from the Board, [this Court] review[s] such questions for substantial evidence." *In re Bimeda Research & Dev. Ltd.*, 724 F.3d 1320, 1323 (Fed. Cir. 2013). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *In re Avid Identification Sys., Inc.*, 504 F. App'x 885, 888 (Fed. Cir. 2013). In other words, "[s]ubstantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . ." *In re Pond*, 466 F. App'x 876, 879 (Fed. Cir. 2012) (quotation omitted). The substantial evidence standard thus imposes a "challenging" burden on Life Tech in its appeal, *see Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1348 (Fed. Cir. 2013). Life

---

[15] Because claims 11-30 depend upon, and incorporate, the correlating step from claim 10, only claim 10 is discussed herein for ease of reference.

Tech's attach on the PTAB's decision does not come close to meeting this exacting burden.

Life Tech contends that the PTAB's decision lacks substantial supporting evidence on the grounds that the PTAB erred (1) in construing the correlating step, *see*, *e.g.*, Life Tech Br. at 15–16, and (2) in "deferr[ing] to the Gelles Declaration," *see*, *e.g.*, *id.* at 42. In contrast to the PTAB decision, however, Life Tech's brief is short on legal and factual citations in support of its arguments. Rather, Life Tech repeatedly recites its preferred gloss on the '505 Patent's correlating step (with little reference to the '505 Patent itself), *see*, *e.g.*, Life Tech Br. at 46; *id.* at 27 ("paraphras[ing]" step), and otherwise relies on "unsupported attorney argument" that cannot replace record evidence. *In re Jones*, 10 F. App'x 822, 828 (Fed. Cir. 2001). Life Tech, moreover, misstates or misunderstands the standards governing the USPTO's review of patent claims, the reasoning underlying the PTAB's decision with respect to claims 10-30, and the standards governing this Court's review of the PTAB's determinations.

In this context, the PTAB's decision with respect to claims 10-30 comfortably satisfies "the deferential 'substantial evidence' standard of review." *Institut Pasteur*, 738 F.3d at 1345.

### A. The USPTO Affords a Claim its "Broadest Reasonable Interpretation."

At the outset, Life Tech challenges the PTAB written description decision at a preliminary step—the meaning of the '505 Patent term (the correlating step) subject to written description inquiry. Life Tech argues that the PTAB improperly failed to "expressly interpret the claimed correlating step" or otherwise "misconstrued the claim limitations." Life Tech Br. at 21. In Life Tech's view, the PTAB "failed to accord" four alleged sub-limitations in the correlating step "their ordinary meaning in combination." *Id*. at 21–22; *see also*, *e.g.*, *id*. at 15. This argument—and Life Tech's contrary preferred gloss on the correlating step, *see infra*—both underlies each of Life Tech's subsequent grounds for challenging the PTAB decision,[16] and reflects an attempt to escape the deferential substantial evidence standard of written description review through appeal to "an issue of law subject to de novo review on appeal," *id*. at 22.

Life Tech's alleged "error of claim construction," *id*. at 22, however, misunderstands the PTAB's role and obligations. Contrary to the impression given by Life Tech's argument and citations to this Court's review of trial court decisions, *see*, *e.g.*, *id*. at 22, "[i]n reexamination, claims are to be given their broadest reasonable interpretation consistent with the specification, and claim language should be read in light of the specification as it would be interpreted by

---

[16]    *See* Life Tech Br. at 22, 24, 27, 29, 38–39, 44, 46, 47, 50.

one of ordinary skill in the art." *In re NTP, Inc.*, 654 F.3d 1279, 1287 (Fed. Cir. 2011) (quotation and alteration omitted). "Thus, while reviewing claim construction *de novo*, this court must determine whether the Board's construction of the term was reasonable." *Id.* (internal citations omitted). *See also In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997); *In re Pond*, 466 F. App'x at 879 ("This court must address whether the Board's interpretation of [a term] is reasonable.").

Here, the PTAB explained that the correlating step of representative claim 10 broadly "requires that the optical signals for each nucleotide at a specific bead be correlated with 'its corresponding image in each of the plurality of digital images.'" A17 (quoting '505 Patent, claim 10). For its part, Life Tech parses this correlating step into sub-steps to "include[] each microparticle in each digital image," and to correlate "us[ing] optical signals that are generated at each microparticle (as opposed to using the absence of optical signals)." Life Tech Br. at 22. Life Tech's assertion that the PTAB erred in not conducting Life Tech's preferred interpretation and, instead, "considering the overall correlating step without relation to the specific limitations required to carry out the correlating step," Life Tech Br. at 17, misses the mark.

First, Life Tech's assertion that the PTAB erred in failing to parse the correlating step, *see* Life Tech Br. at 20–22, misstates the PTAB's obligations with respect to claim interpretation. *See supra* pp. 33–34; *In re Morris*, 127 F.3d at

34

1053–54.  Life Tech's recourse to "proverb[]," *see* Life Tech Br. at 39 (arguing that PTAB failed to "dig into" the '445 Patent in search of the alleged sub-steps within the '505 Patent's correlating step), does not require the PTAB to adopt Life Tech's interpretive method or supply authority (which Life Tech does not otherwise offer) for imposing an obligation upon the USPTO that the law simply does not provide.

Moreover, Life Tech's complaint that the PTAB considered "the **overall** correlating step," Life Tech Br. at 17 (emphasis added); *see also id*, at 41 (same), effectively concedes that the PTAB employed the "broadest" interpretation.  At the same time, the correlating step's language demonstrates that the PTAB's broad interpretation is reasonable, with the latter differing from the former principally in the PTAB's incorporation of DNA sequencing terminology.  *Compare* A17 (stating that claim "requires that the optical signals for each nucleotide at a specific bead be correlated with 'its corresponding image in each of the plurality of digital images'" (quoting '505 Patent, claim 10)) *with* '505 Patent, claim 10 (A322–23) (providing for "correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images").  The '505 specification does not require a different meaning.

In contrast, the '505 Patent undercuts Life Tech's preferred interpretation. Life Tech's reading requires each microparticle to generate a positive optical signal

in each digital image in order to perform the required correlation, and posits that no correlation can occur between a microparticle and the <u>absence</u> of a positive signal. *See* Life Tech Br. at 22. *See also id*. at 29 (arguing that under the '505 Patent "<u>each</u> and every bead" in the array must "emit fluorescent 'optical signals'" "in <u>each</u> photograph of the bead array"). But the claim language does not require correlating a positive optical signal at every microparticle in every image; rather, claim 10 simply requires "correlating the optical signals generated at each microparticle with ***its*** [*i.e.*, the microparticle's] corresponding ***image*** in each of the plurality of digital images." '505 Patent, claim 10 (A322–23) (emphasis added).

To require positive optical signals on each microparticle in each image, as Life Tech would prefer, the '505 Patent would have to read: "correlating the [**positive**] optical signals generated at each microparticle with [***their corresponding images***] in each of the plurality of digital images."[17] Indeed, in disclosing one aspect of the invention, the '505 patent further clarifies that images of optical signals and microparticles may be separate, explaining that the invention includes "software means for processing images of, and/or optical signals generated by, the microparticles . . . ." '505 Patent, 2:33–35 (A61). The ultimate focus on the microparticle itself is unremarkable because the '505 Patent makes

---

[17] Nor does the plural usage of "optical signals" suggest a contrary result. Instead, the plural form merely recognizes that each microparticle may be loaded with numerous target polynucleotides.

clear, for example, that an embodiment of the invention includes a device "which is capable of generating a digital image of the physical image of the microparticle array with sufficient resolution for individual microparticles to be distinguished." *Id.*, 5:9–12 (A63).

Life Tech's construction is further contrary to an embodiment of the '505 Patent. *See* '505 Patent, 19:38 through 20:51 (A70). That embodiment describes, in step 2, applying a subset of "decoder" probes that detect a subset of sequences (*i.e.*, nucleic acids on a subset of the beads) in the flow cell. *See id.*, 19:44 (A70). A fluorescent image of the beads is then taken in step 5. *See id.*, 19:47 (A70). Since only a subset of the probes are used in step 2, only a subset of the beads will have DNA with a positive optical signal in the image of step 5. That the remainder of the beads will not return a positive optical signal in this embodiment of the '505 Patent confirms the PTAB's determination, and contradicts Life Tech's construction of claim 10's requirements.[18]

---

[18]    Continuing the theme, after imaging the first subset of decoder probes, *see* '505 Patent, 19:50 (A70); *id.*, Figure 2B (A53); *id.*, 6:24–32 (A63), those probes are washed away in step 9, *see id.*, 20:1 (A70). After the wash, the "remaining" subsets of decoder probes are tested and images taken in step 10. *See id.*, 20:2 (A70). Again, since only a subset of the decoder probes are used, only a subset of the beads will return a positive optical signal in the images taken. Only after all subsets of decoder probes are tested, does the cleavage step occur, *see id.*, 20:3 (A70), in this embodiment to allow testing of the next base positions in the sequenced strand. *See id.*, 15:47–50 (A68); *id.*, 20:3–4 (A70).

At any rate, to satisfy its obligation to afford a claim its broadest reasonable interpretation, the PTAB's interpretation need not be the only possible interpretation of the term. *See*, *e.g.*, *In re Avid Identification Sys., Inc.*, 504 F. App'x 885, 888 (Fed. Cir. 2013) (finding interpretive standard satisfied where "there was no consistent, explicit definition in the specification, and there were varied uses of the phrase in the patent"); *In re Pond*, 466 F. App'x at 879 (finding reading of claim term reasonable where interpretation included, but was not limited to, construction). Thus, the fact that Life Tech can provide descriptions of the '505 Patent that it believes "conform to [its] interpretation does not make the PTO's [interpretation] unreasonable . . . ." *In re Morris*, 127 F.3d at 1056.[19]

### B. The '445 Patent's Specification Satisfies the Written Description Requirement for the '505 Patent's Correlating Step.

In the context of a priority claim, "[t]o satisfy the written description requirement, the disclosure of the earlier filed application must describe the later claimed invention 'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date

---

[19]    Furthermore, it is unclear that Life Tech raised its specific claim interpretation prior to its oral argument before the PTAB. *See* A1249–51; A1126–27; Life Tech Br. at 19–22. Because this Court's "review of the Board's decision is confined to the four corners of that record . . .," *In re Avid Identification Sys*, 504 F. App'x at 891 (quotation omitted); *see also Cisco Sys., Inc. v. Lee*, Nos. 12-1513, 12-1514, 2014 WL 658027, at *7 (Fed. Cir. Feb. 21, 2014) ("Absent exceptional circumstances, this court does not consider arguments not raised before the Board." (quotation omitted)), such arguments that Life Tech did not "first raise . . . to the Board . . . are waived" on appeal. *In re Jones*, 10 F. App'x at 829.

sought.'" *Tech Licensing Corp.*, 545 F.3d at 1331 (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). "While the earlier application need not describe the claimed subject matter in precisely the same terms as found in the claims at issue, the prior application must convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention." *Id.* at 1331–32 (quotation and emphasis omitted). Thus, "the test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir 2010).

Here, the "four corners" of the '445 Patent's specification demonstrate a basic symmetry with the '505 Patent. For example, (1) both patents improve miniaturization and parallel implementation in base-by-base sequencing methods, *compare* '445 Patent, 1:38–40 (A381), *id.*, 2:8–9 (A381) *with* '505 Patent, 1:18–20 (A61); (2) the '445 Patent describes, *see*, *e.g.*, *supra* pp. 9–11, and the '505 Patent relies on, *see*, *e.g.*, '505 Patent, 15:32–40 (A68), sequencing with the use of encoded adaptors through "repeated cycles of ligation, identification, and cleavage;" (3) both patents further delineate an identical process that:

> comprises the following steps: (a) ligating an encoded adaptor to an end of a polynucleotide, the encoded adaptor having a nuclease recognition site of a nuclease whose cleavage site is separate from its recognition site; (b) identifying one or more nucleotides at the end of the polynucleotide by the identity of the encoded adaptor ligated [thereto]; (c) cleaving the polynucleotide with a nuclease . . . such

39

that the polynucleotide is shortened by one or more nucleotides; and
(d) repeating said steps (a) through (c) until said nucleotide sequence
of the polynucleotide is determined.

'505 Patent, 15:40–51 (A68); '445 Patent, 11:66 through 12:11 (A386); and (4)

both patents describe and illustrate the same "schematic representation," '445

Patent, Figure 5 (A380); *see also id.*, 3:65–67 (A382); 38:30–66 (A399); '505

Patent, Figure 1*a* (A51), for collecting fluorescent images and creating an

electronic image for processing and analysis of loaded microparticles, *compare*,

*e.g.*, '445 Patent, 38:50–66 (A399) *with*, *e.g.*, '505 Patent, 4:65 through 5:6 (A62–

63).

Focusing more specifically on correlation, the PTAB reviewed the '445

Patent's disclosure of a method for sequencing nucleotides in a target

polynucleotide using encoded adaptors through "repeated cycles of ligation,

identification, and cleavage." '445 Patent, 5:61–65 (A383). *See* A17–18. As part

of that method, tag complements attached to the encoded adaptor are excited "and

the presence or absence of a fluorescent signal is measured" in order to reveal the

nucleotide sequence of the target polynucleotide attached to the other end of the

encoded adaptor. *See*, *e.g.*, '445 Patent, 36:8–50 (A398). After thus "describing

the successive cycles of ligation and identification which reveal the sequence of

the target polynucleotide, the '445 Patent describes an imaging system which

40

enables the capture of the optical signals from the sequencing reactions." A17–18; *see also* '445 Patent, 38:50–65 (A399).

Because the PTAB found that this description "would be understood to support" the correlating step of the '505 Patent, *see* A17, it concluded that the '445 Patent's specification satisfies the written description requirement for the '505 Patent's correlating step. *See*, *e.g.*, A22. In fact, to provide a method for sequencing through multiple cycles of ligation, identification, and cleavage, *see supra* pp. 9–11, the PTAB explained, "the optical signals generated at each microparticle **must** be correlated." *See* A22 (emphasis added). *See In re Bimeda Research & Dev.*, 724 F.3d at 1324 (upholding Board interpretation where contrary view would violate an object of the invention); *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (same).[20]

While Life Tech discounts the PTAB's analysis of these provisions of the '445 Patent "because it made no findings with respect to whether the '445 patent conveys . . . the four limitations" of the correlating step, Life Tech Br. at 22, that argument merely begs the question of the correlating step's scope and, therefore, assumes that Life Tech's interpretation of the correlating step controls. The failure of that interpretation argument, *see supra* pp. 33–38, likewise condemns Life

---

[20] The '445 Patent's relation to the correlating step is thus in stark contrast to written descriptions found inadequate by this Court in the past, such as a description "that amounts to little more than a research plan . . . ." *Ariad Pharm.*, 598 F.3d at 1354.

Tech's written description argument. *See In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1299 (Fed. Cir. 2007) (rejecting arguments where party "has relied only on its erroneous claim construction").

In any event, Life Tech's claim construction argument is a red herring because it is substantively unavailing in light of the teachings of the '445 Patent. Life Tech contends that the '445 Patent does not disclose the correlating step because (1) each "cycle of ligation, identification, and cleavage involves taking a series of <u>sixteen</u> separate photographs of the bead array during the identification step," Life Tech Br. at 27, and (b) "[n]one of these sixteen photographs of the array contains a fluorescent image of each bead in the array, because only some, but not all, beads emit a fluorescent signal when any one photograph is taken," *id*. at 28. *See also id*. at 39 ("The PTAB made [its] determination, in error, because it considered only whether correlating occurs with respect to assembly of a nucleic acid sequence . . . and not whether correlating at each sub-step . . . occurs . . . ."). In Life Tech's view, and without any cited authority, *see*, *e.g.*, *In re Jones*, 10 F. App'x at 828 (rejecting "unsupported attorney argument"), "because only a fraction of the microparticles actually generate a fluorescent signal in a particular digital image, and because that fraction changes with each digital image, ***it is impossible to correlate*** the optical signal generated at <u>each</u> microparticle with its corresponding image in <u>each</u> of the plurality of digital images," Life Tech Br. at

38 (emphasis added).  *See also id*. at 38–39 (alleging that it is "mathematically impossible" to correlate null images).

In other words, Life Tech makes the unsupported factual assertion that a null image (*i.e.*, no fluorescent optical signal) cannot be used to correlate images of microparticles.  The '445 Patent, however, directly contradicts Life Tech's proposed impossibility.  As the '445 specification explains, when a tag complement is excited "the presence or absence of a fluorescent signal *is measured*" in order to identify the complement.  *See* '445 Patent, 36:35–36 (A398) (emphasis added).  *See also id*., 33:55–57 (A397).  That a null value can be (and, in fact, is) "measured" belies Life Tech's claim of "impossibility" in processing or correlating with a null value.[21]

Even if Life Tech's contention bore some merit in the patent specification (which it does not), that does not deprive the PTAB's analysis of substantial support in evidence.  *See*, *e.g.*, *In re Morris*, 127 F.3d at 1056 ("[T]he fact that appellants can point to definitions or usages that conform to their interpretation does not make the PTO's definition unreasonable when the PTO can point to other sources that support its interpretation.").  Here, viewed as a whole, the path of the PTAB's reasoning "may reasonably be discerned," *see*, *e.g.*, *In re Applied*

---

[21]    As further explained above, *see supra* pp. 35–37, the '505 Patent likewise dispels the notion that a microparticle image necessarily requires an optical signal in order to allow processing. *See also* '505 Patent, 2:33–35 (A61).

*Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quotation omitted), and its analysis unquestionably rests on "something . . . more than a mere scintilla of evidence . . . ." *In re Pond*, 466 F. App'x at 879.

### C.    The Gelles Declaration Confirms the PTAB's Reading of the '445 Patent.

"A patent is addressed to one of skill in the relevant art . . . ." *Brunswick Corp. v. United States*, Nos. 97-5017, 97-5021, 1998 WL 163700, at *5 (Fed. Cir. Mar. 31, 1998). As detailed above, *see supra* pp. 38–39, determining whether a specification satisfies the written description requirement for a claim accordingly depends upon "the perspective of a person of ordinary skill in the art." *Ariad Pharm.*, 598 F.3d at 1351. After analyzing the '445 Patent and finding that its disclosures "would be understood" to support the correlating step, *see* A17–18, the PTAB turned to the declaration of Dr. Jeff Gelles to confirm the understanding of an ordinarily skilled artisan, *see* A22.

Life Tech challenges this conscientious analytical step as (a) improperly "deferr[ing] to the Gelles Declaration" in order to (b) find "inherent" disclosure of the correlating step in the '445 Patent. Life Tech Brief at 42. Life Tech's arguments falter on its misreading of both the PTAB's use of the Gelles Declaration, and the fundamental feature of an "inherent" disclosure.

As an initial matter, Life Tech's contention that the Gelles Declaration attempts, and fails, to demonstrate inherent disclosure of the correlating step, *see*

Life Tech. Br. at 42–48, elevates form over substance by favoring a pedantic view of labels—"inherent" versus "express" disclosure—at the expense of the animating principles of the written description inquiry. The touchstone for determining the scope of a disclosure, express or inherent, is what "a person of ordinary skill would have understood at the time the patent application was filed . . . ." *Hyatt v. Boone*, 146 F.3d 1348, 1353 (Fed. Cir. 1998); *see also id.* at 1355; *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) (noting that compliance with written description depends upon what "one skilled in the art would recognize" in the disclosure (quotation omitted)); *In re Jones*, 10 F. App'x at 828 ("A disclosure is of course interpreted from the vantage point of an ordinarily skilled artisan . . . ."); *Union Oil Co. of Ca. v. Atlantic Richfield Co.*, 208 F.3d 989, 997, 998 (Fed. Cir. 2000) (explaining that written description requirement "does not depend on a particular claim format, but rather on whether the patent's description would show those of ordinary skill in the . . . art that the inventors possessed the claimed invention").[22]

In other words, the "issue is whether one of skill in the art could derive the claim[] . . . from the patent's disclosure." *Id.* at 997, 1001 *See also In re Alton*, 76 F.3d 1168, 1175 (Fed. Cir. 1996) ("If a person of ordinary skill in the art would

---

[22]  Life Tech's "inherency" argument likewise cites decades-old caselaw of this Court's predecessor, *see* Life Tech Br. at 25; as the cases cited *supra* make clear, this Court has subsequently clarified the law of written description.

have understood the inventor to have been in possession of the claimed invention at the time of filing, even if every nuance of the claims is not explicitly described in the specification, then the adequate written description requirement is met."). For this reason, Life Tech's emphasis on whether the specification "necessarily," *see*, *e.g.*, Life Tech Br. at 29, discloses material is simple question-begging. What is "necessarily" present in a disclosure depends upon the understanding of the skilled artisan.[23] The latter is therefore the key issue, which the PTAB addressed in its reading of the '445 Patent, *see supra* pp. 22–25, and confirmed in its references to the Gelles Declaration, *see infra*.[24]

With respect to the latter, Life Tech mischaracterizes the role the Gelles Declaration played in the PTAB's decision. Rather than "deferr[ing]" or otherwise depending upon Gelles, *see* Life Tech Br. at 42, the PTAB instead concluded that the Gelles Declaration—evincing the analysis of "an expert who is qualified to

---

[23]     Nor is the "necessarily" formulation confined to inherent, as opposed to actual disclosures. *See PowerOasis*, 522 F.3d at 1306 (reciting that material "must necessarily be present," and explaining that "[t]his requires that the written description actually or inherently disclose the claim element"). At any rate, "[i]nherency is . . . a factual issue" that this Court reviews for substantial evidence, *In re Jones*, 10 F. App'x at 827, and the PTAB found substantial evidence for its written description determination independently in both the '445 Patent's specification and the Gelles Declaration.

[24]     Life Tech failed to offer any contrary position on the knowledge of a person of ordinary skill in the art. *Compare Hyatt*, 146 F.3d at 1354. For this failure, Life Tech cannot blame the timing of the Gelles Declaration, since Life Tech's own assertions, by challenging the written description support of the '445 Patent, put the understanding of a skilled artisan at issue.

testify in this matter," A18—was consistent with its own "independent findings on the '445 Patent," *see* A22.  *See also Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) (noting expert testimony was "consistent with the express language in the . . . specification").

Indeed, the PTAB referenced testimony from the Gelles Declaration regarding the very '445 Patent disclosures that the PTAB independently considered.  *See* A18–19 (referencing Gelles Declaration ¶¶ 27–30); *supra* pp. 22–25.  Upon his analysis of those disclosures, Dr. Gelles concluded:

> Thus, I understand that the analysis performed by the workstation of the '445 patent includes assembling separate four-nucleotide sequences identified during each cycle into a longer base pair sequence in the order . . . the nucleotides are attached to a microparticle.  ***Assembling a longer sequence*** from four-nucleotide 'words' as shown in figure 4 of the '445 patent ***would require correlating*** each of the separate 'words' with the microparticle.

Gelles Decl. ¶ 28 (A768) (citing the '445 Patent, 38:61–65 and Figure 4) (emphases added).  More broadly, Dr. Gelles explained the basic functioning of the described system:

> The disclosure of the '445 patent describes a computer based system for generating images of microparticles for observing signals generated at the microparticles (fluorescence).  The system records digital images containing signals from the microparticles during a sequence of processing steps (repeated cycles of ligation, identification, and cleavage).  The system scans the substrate, acquires an image, and ***associates the images*** obtained in successive cycles (*i.e.*, correlates the optical signals generated at the microparticles with the corresponding signals in other steps), ***and determines a longer nucleotide sequence by assembling smaller sequences together***.

*Id.* ¶ 29 (A768) (emphases added).[25]  Thus, the Gelles Declaration identified and explained the relevant passages from the '445 Patent's specification, and Dr. Gelles's resulting conclusion.

While Life Tech dismisses the Gelles Declaration for failing to "mention whether the optical signals are generated at <u>each</u> microparticle, or whether the optical signals generated at <u>each</u> microparticle are correlated with the corresponding signals in <u>each</u> digital image," Life Tech Br. at 46, that objection again assumes the correctness of Life Tech's (unavailing, *see supra* pp. 33–38) claim construction argument.[26]  Life Tech's parallel claim argument, that Gelles "answers the wrong question" by referring to assembly of nucleotide words in Paragraph 28, *see* Life Tech Br. at 44, likewise misses the mark.  What the Gelles Declaration makes clear is that correlation of individual images is necessary to "assembl[e]" a sequence of nucleotides, *see* Gelles Declaration ¶¶ 28, 29 (A768),

---

[25]    Dr. Gelles's expression of his opinion to identify "what someone of ordinary skill in the art would have known does not transform the factual statements contained in the declaration into opinion testimony." *In re Alton*, 76 F.3d at 1175. Nor is it improper for an examiner to consider "opinion evidence relating to a fact issue," *id*. at 1175 n.10, particularly where, as here with the written description requirement, the inquiry turns on the understanding of the skilled artisan. *See supra* pp. 38–39.

[26]    Moreover, here again, Life Tech premises its argument on selective and uncited paraphrasing of the '505 Patent's correlating step rather than on the claim language itself.  *See* Life Tech Br. at 46; *id*. at 27 ("paraphras[ing]" step).  Life Tech's gloss on the correlating step, however, is not reconcilable with the claim language, which does not require correlation of "optical signals" across all digital images.  *See* '505 Patent, claim 10 (A322–23); *see also supra* pp. 35–37.

which is true regardless of the scale—nucleotides into words, or words into longer strings—of the assembly.  For that reason, the PTAB rejected Life Tech's challenge as overly focused on Dr. Gelles's use of "non-technical language to explain the claim."  *See* A21.  *See also Hyatt*, 146 F.3d at 1353 (recognizing that "minutiae of descriptions or procedures perfectly obvious to one of ordinary skill in the art yet unfamiliar to laymen need not be set forth").

The Gelles Declaration paragraphs referenced by the PTAB, among others, also rebut Life Tech's broader assertion that the Gelles Declaration is "obvious[ly] conclusory" and lacking in factual support.  *See* Life Tech Br. at 48.  As the PTAB recognized, Paragraphs 27, 28, and 30 of the Gelles Declaration identify the portions of the '445 specification on which Gelles—an ordinarily skilled artisan— relied in forming his opinions.  *See* A19; Gelles Declaration, ¶¶ 27, 28, 30 (A767– 68).  That Dr. Gelles analyzed the controlling specification—not whether he has used the exact methods disclosed therein, *see* Life Tech Br. at 48—is a sufficient factual basis for his expert opinion.  *Compare In re Wright*, 999 F.2d 1557, 1563 (Fed. Cir. 1993) (discounting as conclusory affidavits in which affiants did "not even indicate in their affidavits that they actually reviewed the specification").[27]

---

[27]   Indeed, Life Tech's off-hand challenge to the Gelles Declaration's foundation, *see* Life Tech Br. at 48, similarly strains credulity because (1) "[t]he technical rules of evidence do not apply to Board proceedings," *Schoemakers v. Office of Personal Mgmt.*, 180 F.3d 1377, 1381 (Fed. Cir. 1999) (rejecting challenge to affidavit foundation), and (2) Life Tech itself asserted an article

Life Tech's related reliance on the PTAB's brief admission that the Gelles Declaration is "sparse," *see* Life Tech Br. at 10, 17; A19, fares no better. Instead, Life Tech's citation selectively ignores the balance of the PTAB's assessment of the Gelles Declaration, and its relation to the '445 Patent's specification. In full, the PTAB explained,

> While Dr. Gelles's explanation is admittedly sparse, **we find it difficult to ignore the disclosure in the '445 Patent** of 1) assembling data from three different tag complements successively collected at the same microparticle as shown in Figure 4 to produce a sequence of positions 5-12 of the target polynucleotide; and 2) creating an electronic image of the fluorescence. Since each tag is successively removed during the process, the electronic image would necessarily be taken at each cycle prior to tag removal.

A19 (citing PTAB Findings of Fact 8–9, 12–14) (emphasis added). The PTAB accordingly found that Dr. Gelles's testimony on the correlating step flowed "logical[ly]" from the need to assemble a sequence of nucleotides, A19, and was therefore "entirely consistent and supported by the written description of the '445 Patent," A20.

To the extent the PTAB accorded "weight," *see* Life Tech Br. at 48, to the Gelles Declaration, it was because the PTAB found the Gelles Declaration "entirely consistent," A20, with its own "independent findings on the '445 Patent." A22. In this way, the PTAB employed the mutually reinforcing language of the

---

authored by Gelles as anticipatory prior art to the '505 Patent, *see*, *e.g.*, A83, A86–88, A112–14, A116–20, A125–27, A138, A145–47, A158–60. Here, moreover, the PTAB itself specifically reviewed Dr. Gelles's qualifications. *See* A18.

specification and opinion of an ordinarily skilled artisan to "find that the written description of the '445 Patent conveys to one of ordinary skill in the art that inventors had possession of the claimed [correlating] step." A22.

Taken as a whole, Life Tech's arguments fall well short of demonstrating that the '445 Patent and the Gelles Declaration provide no more "than a mere scintilla of evidence," *In re Pond*, 466 F. App'x at 879, in support of the PTAB's conclusion that the '445 Patent offers adequate written description support to the correlating step.

### D. Life Tech's Challenge to the USPTO's Decision to Consider the Gelles Declaration is Not Properly Before this Court, and Otherwise Lacks Merit.

In a final attempt to undercut the PTAB's written description determination, Life Tech argues that the PTAB erred in considering the Gelles Declaration in the first instance. *See* Life Tech Br. at 52–54. In Life Tech's view, the Gelles Declaration was untimely submitted after the Examiner's Action Closing Prosecution without the requisite showing of "good and sufficient reasons" for the delay. *See id.* at 52 (quoting 37 C.F.R. § 1.116(e)). Thus, Life Tech complains to this Court, "[t]he PTAB should have declined to consider the Gelles Declaration . . . ." *Id*.

As this Court has explained, however,

There are a host of various kinds of decisions an examiner makes in the examination proceeding—mostly matters of discretionary,

51

procedural or nonsubstantive nature—which have not been and are not now appealable to the board or this court when they are not directly connected with the merits of issues involving rejections of claims, but traditionally have been settled by petition to the Commissioner.

*In re Meyer Mfg. Corp.*, 411 F. App'x 316, 320 (Fed. Cir. 2010) (quoting *In re Berger*, 279 F.3d 975, 984 (Fed. Cir. 2002)). Similarly, review of the Examiner's decision to enter an affidavit alleged to be untimely is by petition, and not appeal, within the USPTO. *See In re Meyer Mfg. Corp.*, 411 F. App'x at 320 (holding that examiner's refusal to enter an affidavit as untimely was not subject to appeal to the Board or the Court).

Nor is Life Tech's challenge substantively availing. First, Life Tech's argument rests on unsupported attorney assertions as to what (and when) Illumina "should" have known about the need for expert testimony. *See* Life Tech Br. at 52–53. This argument, moreover, belies Life Tech's alleged prejudice from the alleged inability to engage (or predict the need to engage) an expert of its own "within 30 days," *see id.* at 53, on a contentious, technical factual issue at the heart of the written description debate. *See supra* pp. 31–32, 38–39; *see also* A822–26, A836–38 (responding to Gelles Declaration).[28]

---

[28] Indeed, Life Tech could have submitted evidence from its own counter-expert. *See* 37 C.F.R. § 1.116(e). Its failure to do so further indicates that the Gelles Declaration reflects the understanding of a skilled artisan.

Second, as detailed above, Illumina provided the Gelles Declaration only after the Examiner (1) winnowed the *inter partes* reexamination down from the seventy-five rejections proposed by Life Tech, and (2) expressly invited Illumina to "point out specifically where in the earlier parent disclosures support for the '505 patent claims may be found." A541. *See also supra* pp. 19–20; *In re Giannelli*, 739 F.3d 1375, 1380 (Fed. Cir. 2014) ("[B]ecause the initial burden [of showing unpatentability] was not met, [the patentee] was not obligated to submit additional evidence to rebut the examiner's findings . . . .").

Finally, that neither the Examiner—who received the Gelles Declaration— nor the PTAB expressly addressed Life Tech's challenge to the Gelles Declaration's timeliness, does not establish that the USPTO did not find "good and sufficient reasons," 37 C.F.R. § 1.116(e), to accept the document. Rather, a reviewing court "assume[s] agencies follow their own regulations." *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006). *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (explaining that agencies are "entitled to a presumption of regularity").

## II. The PTAB Correctly Reversed the Examiner's Patentability Rejections of Claims 10-30 Based on Brenner.

As set forth above, (1) the '505 Patent claims priority from a chain of applications running through the '445 Patent to an application first filed on December 19, 1994, *see supra* p. 12, (2)  the '445 Patent adequately discloses the

correlating step from claims 10-30 of the '505 Patent, *see supra* pp. 38–44, (3) Life Tech challenges no other application in the chain back to December 19, 1994, *see supra* n.14, and (4) the only prior art reference raised on appeal is a 1996 publication by Brenner, *see supra* n.13. Because the 1996 Brenner reference is not prior art to claims 10-30, with a priority date of December 19, 1994, the PTAB correctly held that Brenner does not anticipate claims 10-30 (and the Examiner erred in holding otherwise). *See* A39.

## III. The PTAB Erred in Finding that Claims 1-9 Lack Adequate Written Description Support in the '505 Patent's Predecessor Patents.

Although independent claims 1 and 10 of the '505 Patent are largely identical, *see supra* pp. 16–17, the PTAB nevertheless determined that the '445 Patent provides adequate written description for claim 10, but not claim 1,[29] *see* A15–16. The PTAB reasoned that, while "the disclosure of the '445 Patent is restricted to DNA sequencing methods," "[n]one of the claimed steps [in claims 1-9 of the '505 Patent] are limited to DNA sequencing." A15. Because it believed claims 1-9 lacked this additional "limit[ation]," A15, the PTAB concluded that the '445 Patent does not adequately describe claims 1-9.

The PTAB likewise determined that claims 1-9 lack an adequate written description in additional patents in the chain of continuing patent applications. *See*

---

[29] Claims 2-9 are dependent upon claim 1, and share its scope. *See* '505 Patent, claims 1–9 (A74, 322). For ease of reference, claim 1 is discussed as representative.

A16.  Although conceding the '097 Patent[30] and the '719 Patent[31] "have a broader disclosure than the '445 Patent," the PTAB nevertheless concluded that claims 1-9 of the '505 Patent lacked additional "limi[ations]" of the '097 and '719 Patents. A16.

Taken together, the PTAB concluded that claims 1-9 of the '505 Patent could not claim priority to earlier-filed applications that antedate Brenner.  *See* A33–37 (affirming the Examiner's rejections of claims 1-9 as anticipated and/or obvious in light of Brenner).  As set forth below, however, the PTAB's decision misapplies the written description requirement, and misreads the '445, '097, and '719 Patents.  Accordingly, the PTAB's decision with respect to claims 1-9 lacks the support of substantial evidence.

### A. The PTAB Erred in Finding No Adequate Written Description of Claim 1 in the '445 Patent's Specification that Discloses Each and Every Limitation of Those Claims.

As demonstrated above, (1) the limitations of claims 1 and 10 of the '505 Patent are nearly identical, (2) the only question raised to the adequacy of the '445 Patent's disclosure of claim 10 relates to the correlating step, and (3) the '445

---

[30]    The '097 Patent issued on February 18, 1997 from an application filed December 19, 1994.  The sole named inventor of the '097 Patent is Sydney Brenner.  *See* A1284.

[31]    The '719 Patent issued on December 8, 1998 from an application filed June 6, 1996.  The named inventors of the '719 Patent are Sydney Brenner, Glenn Albrecht, and Stephen C. Macevicz.  *See* A1310.

Patent adequately describes the challenged correlating step. *See supra* pp. 38–44. In the PTAB's view, however, claim 10 of the '505 Patent and the '445 Patent share an additional limitation that is not present in claim 1: an alleged "restrict[ion] to DNA sequencing methods." A15.

In other words, the '445 Patent's specification includes each and every limitation of the '505 Patent's claim 1. The written description requirement is thus satisfied for claim 1 through "a written description that supports **all the limitations** of" the disputed claim. *Tech. Licensing Corp.*, 545 F.3d at 1327. *See also In re Jones*, 10 F. App'x at 827 ("An applicant complies with the written description requirement by describing the invention with all its claimed limitations." (quotation omitted)); *Tronzo*, 156 F.3d at 1158 (explaining "the disclosure must describe the claimed invention with all its limitations"); *Hyatt*, 146 F.3d at 1355 (same). Thus, the PTAB's determination conflicts with the underlying purpose of the written description requirement to ensure that, "as of the filing date sought, [the inventor] was in possession *of the invention*." *In re Alton*, 76 F.3d at 1172 (quotation omitted) (emphasis original).

The sole authority recited by the PTAB in reaching the opposite conclusion—*Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998), *see* A15—is not to the contrary. First, *Gentry Gallery* involved an infringement action before a district court, *see Gentry Gallery*, 134 F.3d at 1474,

56

and thus did not consider the written description in the context of the "broadest reasonable interpretation" employed by the USPTO, *see supra* pp. 33–34.

Moreover, *Gentry Gallery* involved an invention that "solved" a problem in designing parallel recliners in a sectional sofa by building a console between the recliners to "accommodate[] the controls for both reclining seats . . . ." *Gentry Gallery*, 134 F.3d at 1475. The Court accordingly found claims in the patent permitting the console to be placed elsewhere than between the recliners to be unsupported in the patent's written description because "*the invention*" included controls only in a central console. *See id.* at 1479 (quotation omitted) (emphasis original).

Here, by contrast, the basis of the PTAB's decision—DNA sequencing—is not an aspect of the invention needed to solve any problem defined by the '445 Patent's specification. Rather, the '445 Patent solves problems in existing detection methods and apparatus that may be used in DNA sequencing, *see*, *e.g.*, '445 Patent, 1:19 through 2:13 (A381), and "*the invention*" itself is within those detection methods and apparatus. *See Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1333 (Fed. Cir. 2003) (distinguishing *Gentry Gallery* because, *inter alia*, "[i]n *Gentry* the invention *was* the" disputed term (emphasis original)).

Because the PTAB's decision "relied on its misreading" of the '445 Patent as relating solely to DNA sequencing, *see also infra* pp. 58–60, "and nothing

more," its rejection of claim 1 for lack of an adequate written description in the '445 Patent is not supported by substantial evidence. *See Institut Pasteur*, 738 F.3d at 1345 (holding that Board's obviousness decision lacked substantial evidence where Board misread prior art references).

### B. The '445 Patent's Specification is Otherwise Commensurate With Claim 1.

While the '445 Patent's disclosure of each and every limitation of claim 1 settles the inquiry and requires reversal of the PTAB's contrary conclusion, *see supra*, additional review of the '445 Patent and the '505 Patent bolsters the former's disclosure of claim 1. As demonstrated above, *see supra* pp. 39–40, the specifications of the '445 Patent and '505 Patent share an underlying symmetry. That symmetry culminates in the patents' respective descriptions and illustrations of the same "schematic representation," '445 Patent, Figure 5 (A380); *see also id.*, 3:65–67 (A382); 38:30–66 (A399); '505 Patent, Figure 1*a* (A51), of a device for collecting fluorescent images and creating an electronic image for processing and analysis of loaded microparticles, *compare, e.g.*, '445 Patent, 38:50–66 (A399) *with, e.g.*, '505 Patent, 4:65 through 5:6 (A62–63). *See also supra* pp. 8–15 (Statement of Facts describing the '445 Patent and the '505 Patent).

The patents' identical drawings, and similar descriptions of image capture, are particularly telling with respect to claim 1, which is directed to "[a] device-readable medium embodying a program of instructions for execution by said

device to perform a method of generating images of a planar array of microparticles . . . ." '505 Patent, claim 1 (A74). Indeed, "drawings alone may provide a written description of an invention . . . if they describe what is claimed and convey to those of skill in the art that the patentee actually invented what is claimed." *Cooper Cameron Corp. v. Kvarner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322 (Fed. Cir. 2002) (quotation omitted).

That is precisely the case here in Figure 5 of the '445 Patent. *See* Gelles Declaration ¶¶ 20–22 (A767) (noting system and process described by the '445 Patent). As Dr. Gelles explained, "Figure 5 of the '445 patent contains functional elements of the system of claim 1 of the '505 patent." *Id.* ¶ 30 (A768). That the '445 Patent largely directs the similarly described apparatus and process to DNA sequencing does not diminish the fundamental overlap between the patents. *See Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1478 (Fed. Cir. 2003) (explaining that "an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention" (quotation omitted)); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1371 (Fed. Cir. 2009) (recognizing that claim does not lack written description simply "because it is broader than the specific examples disclosed" (citing cases)).

Confirming the symmetry between the '445 specification and '505 Patent, the prior art references relied upon by the Examiner to invalidate the '505 Patent,

*see*, *e.g.*, A872–77 (Brenner and Gelles), A879–81 (Schmidt), A884–86) (Dow),

reach beyond DNA sequencing to methods and apparatus for analyzing a range of

molecules and biological cells, *see* A184–292. Brenner, for example, makes clear

that its method using oligonucleotide tags—although "especially" apt for use with

polynucleotides—applies to "molecules" more "generally." A234, lines 5–6. *See*

*also*, *e.g.*, A236, lines 6–11. Thus, an artisan of ordinary skill would understand

the '445 Patent's specification to disclose use of its system beyond DNA

sequencing. *See* Gelles Decl. ¶¶ 11–31 (A765–768) (explaining understanding that

the '445 Patent discloses claim 1 of the '505 Patent).

Viewed in this full context, by ignoring the complementary nature of the

'445 specification and the '505 Patent, the PTAB's restrictive reading conflicts

with its duty to consider the perspective of an ordinarily skilled artisan. As read by

an artisan of ordinary skill, the '445 Patent's broader ***specification*** does not require

such a limitation that exists, if at all, only in the '445 Patent's narrower ***claims***.

*See supra*.[32]

---

[32] In essence, the PTAB ignores that the '445 Patent's specification is, and may properly be, broader than the patent's claims. Regardless of its propriety, moreover, the PTAB's interpretation importing limitations into the '505 Patent is not controlling of the scope of the '505 Patent's construction in future infringement litigation. The USPTO and a district court perform fundamentally different functions. *See In re Morris*, 127 F.3d at 1053–54. And the rules governing a district court's claim construction caution against, as the PTAB does here, reading an at most arguably, narrower disclosure in the '445 Patent to limit claims in the '505 Patent. *See*, *e.g.*, *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328,

## C. The PTAB Erred in Finding No Adequate Written Description of Claim 1 in the Specifications of the '097 and '719 Patents.

For the same reasons, the PTAB erred in concluding that the '097 and '719 Patents do not disclose claim 1 of the '505 Patent. As with the '445 Patent, the PTAB found that the specifications of the '097 and '719 Patents adequately disclose claim 10 of the '505 Patent, *see* A22, which is nearly identical to claim 1 (except for the former's inclusion of DNA terminology), *see supra* pp. 16–17. Moreover, as the PTAB recognized, the '097 and '719 Patents "have a broader disclosure than the '445 Patent." A16.[33] Because the '445 Patent adequately discloses claim 1 of the '505 Patent, *see supra* pp. 55–60, the "broader" '097 and '719 Patents likewise must adequately disclose claim 1.

To the extent the PTAB further concluded that the '097 and '719 Patents include an additional "limit[ation]" not found the in claim 1 of the '505 Patent, *see* A16, that conclusion lacks substantial evidence for the same reasons as the PTAB's determination with respect to the '445 Patent. The PTAB determined that, unlike the '097 and '719 Patents, representative claim 1 is "not limited to methods

---

1335 (Fed. Cir. 2007) ("[A] narrow disclosure in the specification does not necessarily limit broader claim language."); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1375 (Fed. Cir. 2012) ("[I]t is not proper to impose from the patent's written description limitations that are not found in the claims themselves.").

[33] Indeed, the '097 and '719 Patents relate more generally to methods involving "molecules." *See*, *e.g.*, '097 Patent, 3:12–15 (A1292); '719 Patent, 3:17–20 (A1315).

of using oligonucleotide tags." A16.  As before, however, the PTAB's conclusion ignores that (1) the '097 and '719 Patent specifications disclose each and every limitation of the '505 Patent's claim 1, *see supra* p. 56; A22 (concluding that the '097 and '719 Patents disclose claim 10 of the '505 Patent), and (2) the '097 and '719 specifications are commensurate with the '505 Patent.

Indeed, like the '445 and '505 Patents, *see supra* pp. 8–15, the '097 and '719 specifications disclose "an apparatus for carrying out parallel operations, such as polynucleotide sequencing, in accordance with the invention."  *See* '097 Patent, 5:1–3 (A1293) (describing '097 Patent, Figure 5 (A1290)); '719 Patent, 5:55–57 (A1316) (describing '719 Patent, Figure 2 (A1312)).  Again, such apparatus is controlled by a digital computer to collect and store fluorescence generated through a sequence of steps—which may include ligation—by microparticles arrayed in a flow cell.  *See* '097 Patent, 19:49 through 21:44 (A1300–01); '719 Patent, 25:23 through 27:30 (A1326–27); *supra* pp. 39–40, 58–59 (describing '505 and '445 Patent symmetries).  In all, both patents provide "a method and materials for tracking, identifying, and/or sorting," in other words processing or analyzing, molecules with oligonucleotide tags.  *See* '097 Patent, 3:12–15 (A1292); '719 Patent, 3:17–20 (A1315).

In addition, Dr. Gelles again confirmed that an ordinarily skilled artisan would understand the '097 and '719 specifications to disclose the elements of

claim 1. *See* Gelles Dec. ¶ 11 (A765); *id.* ¶¶ 13–17 (A765–66) (explaining that the '097 and '719 specifications disclose a computer apparatus for gathering images of microparticles, use of a flow cell, identification of microparticle position, computer software to control data collection, and combination of computer and microscope). *See Hyatt*, 146 F.3d at 1353 (recognizing that "minutiae of descriptions or procedures perfectly obvious to one of ordinary skill in the art yet unfamiliar to laymen need not be set forth").[34]

Taken as a whole, the '097 and '719 specifications both disclose claim 1 and demonstrate the PTAB's failure to employ the perspective of an ordinary skilled artisan. Because the '097 and '719 adequately support claim 1, the PTAB erred in denying claims 1-9 priority through the '097, '719, '445 Patents to the '097 Patent's December 19, 1994 filing date.

## IV. The PTAB Erred in Determining that Claims 1-9 of the '505 Patent Are Invalid.

Because the PTAB erred in failing to find that the '445 Patent adequately discloses claim 1 of the '505 Patent, *see supra*, its attendant conclusion that the 1996 Brenner reference invalidates claims 1-9, *see* A33–37, is likewise erroneous. As demonstrated above, claims 1-9 are entitled to claim a priority date of

---

[34] Indeed, the disclosures are commensurate with the 1996 publication by Brenner, *see* Gelles Decl. ¶¶ 13–17 (A765–66), who was also an inventor of the '097, '719, '445, and '505 Patents.

December 19, 2004 through the '445 Patent, thereby antedating Brenner. Accordingly, the PTAB's invalidity determination must be reversed.

## CONCLUSION

The Court should affirm the PTAB's rulings with respect to claims 10-30 of the '505 Patent. The Court should reverse the PTAB's rulings with respect to claims 1-9 of the '505 Patent.

*/s/  Christopher N. Sipes*
CHRISTOPHER N. SIPES
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, D.C. 20004
202.662.6000 phone
202.662.6291 facsimile

*Counsel for Cross-Appellant Illumina, Inc.*

Dated: May 27, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2014, a true and correct copy of the foregoing Principal and Response Brief of Cross-Appellant was filed and served via the Court's CM/ECF system. I further certify that I caused a copy to be served by electronic mail, and will cause two paper copies to be served by Federal Express next-day delivery upon acceptance, upon the following:

Kevin R. Casey               kcasey@stradley.com
Brian Cocca                 bcocca@stradley.com
Michelle C. Orloski        morloski@stradley.com
STRADLEY RONON STEVENS & YOUNG, LLP
30 Valley Stream Parkway
Malvern, PA 19355
(610) 640-5813 (Telephone)
(610) 640-1965 (Facsimile)

*Counsel for Appellant Life Technologies Corporation*

Dated: May 27, 2014

*/s/ Christopher N. Sipes*
Christopher N. Sipes

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App.

P. 28.1(e)(2)(B)(i) because this brief contains 15,335 words, excluding the parts of

the brief exempted by Fed. R. App. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

using 14-point Times New Roman font.


Dated: May 27, 2014


*/s/ Christopher N. Sipes*
Christopher N. Sipes